**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SMILEDIRECTCLUB, INC., *et al.*,[1] | ) Case No. 23-90786 (CML) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re: Docket Nos. 463, 464, and 555** |

**DEBTORS' (A) OMNIBUS REPLY
IN SUPPORT OF THE DEBTORS' SALE MOTION AND
THE DEBTORS' DISMISSAL MOTION AND (B) OBJECTION
TO ALIGN TECHNOLOGY, INC.'S CROSS MOTION FOR CONVERSION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this reply (this "Reply") in support of (a) the *Debtors' Motion for Entry of an Order (I) Authorizing*

*(A) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances,*

*(B) the Debtors' Entry Into and Performance Under the Asset Purchase Agreement, and*

*(C) the Rejection of Certain Executory Contracts and (II) Granting Related Relief*

[Docket No. 463] (the "Sale Motion"); and (b) the *Debtors' Motion for Entry of an Order*

*(I) Dismissing the Debtors' Chapter 11 Cases, (II) Approving Procedures for Dismissal and*

*Distribution of the Debtors' Remaining Assets, and (III) Granting Related Relief* [Docket No. 464]

(the "Dismissal Motion," and together with the Sale Motion, the "Motions"),[2] in response to the

objections listed on **Schedule 1** attached hereto (collectively, the "Objections," and the objecting

parties, the "Objectors"), and in objection to the cross motion of Align Technologies, Inc.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SmileDirectClub. The location of Debtor SmileDirectClub, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 1530 Antioch Pike, Antioch, Tennessee 37013.

[2] Capitalized terms used but not defined in this Reply have the meanings ascribed to them in the Sale Motion or the Dismissal Motion, as applicable.

("Align") to convert these chapter 11 cases [Docket No. 555].  The Debtors have worked with many of the Objectors to consensually resolve their Objections with certain modifications to the proposed orders approving the Sale Motion and the Dismissal Motion (respectively, the "Sale Order" and the "Dismissal Order"), as applicable, which will be filed in advance of the hearing on the Motions (the "Hearing").  The Debtors submit this Reply in response to the remaining outstanding Objections and in support of the Motions:

**Preliminary Statement**

1.      The Court should approve the Asset Sale because it is by far the highest and best alternative available to the Debtors after a robust prepetition and postpetition marketing process. If consummated, the Asset Sale would transfer substantially all the Debtors' assets to the founders, as DIP Lenders, in exchange for a full credit bid of the $28.7 million outstanding under the DIP Facility, $4 million cash, and $3 million deferred cash consideration.  A condition of the Asset Sale is a release of all estate claims and causes of action against the Debtors' officers and directors, other than specified claims against four individuals (the Debtors' co-founder and current Chief Executive Officer, the Debtors' current Chief Financial Officer, the Debtors' former Chief Financial Officer, and the Debtors' current Chief Clinical Officer) up to the value of the applicable insurance policies, which provides $25 million in total coverage.

2.      Section 363(b) of the Bankruptcy Code authorizes asset sales outside of the ordinary course of business when such sales reflect a sound exercise of a debtor's business judgement.[3]  Centerview Partners, LLC ("Centerview"), the Debtors' investment banker, has extensively marketed the Debtors' assets at the direction of the Special Committee of the board of

---

[3]     *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").

directors of Debtor SmileDirectClub, Inc.  Centerview's marketing process included prepetition marketing efforts from June 2023 to September 2023 when the Debtors filed these chapter 11 cases, postpetition marketing efforts from the Petition Date until the shutdown of the Debtors' business on December 8, 2023, and incremental marketing efforts after the filing of the Motions. Through this process, Centerview contacted 162 parties, dozens of which have signed NDAs, obtained data room access, and attended management meetings or conducted on-site visits.

3.      The end result of the marketing process is that not one party has been willing to extend meaningful capital toward the Debtors' assets—as a loan, equity investment, or as an asset purchase, in whole or in part, as a going concern or otherwise—with the exception of the Debtors' founders.  The outcome of this marketing process is the best evidence of the value of the Debtors' assets.[4]  And it demonstrates that the consideration offered by the DIP Lenders is by far the best available alternative for the estates.

4.      One of the many parties that has steadfastly refused to extend any capital toward the Debtors' assets is HPS Investment Partners, LLC ("HPS").  As of the Petition Date, HPS held an approximately $140 million secured loan against SDC U.S. SmilePay SPV, a non-Debtor special purpose vehicle (the "SPV").  The SPV holds approximately $40.1 million in cash and $145.6 million in consumer receivables, plus the SmileDirectClub trademarks and the Debtors' patents and other intellectual property.  HPS's only claim against the Debtors is an unsecured guarantee claim against Debtors SmileDirectClub, LLC and SDC Financial LLC for 10% of the balance of the loan outstanding under the HPS Credit Facility (approximately $14 million as of

---

[4]     *In re Energy Coop., Inc.*, 109 B.R. 822, 830 (N.D. Ill. 1989) ("There is simply no substitute in measuring value than to analyze what informed buyers are willing to [pay], informed sellers are willing to [accept], and with neither group under a compulsion to act . . . [A]ll sophisticated valuation methods must yield to the realities of the marketplace."),

the Petition Date).  Throughout the prepetition and postpetition restructuring process, HPS has

been firm on one point:  it cares little about what happens to the Debtors because its loan is covered

by its collateral in the non-Debtor SPV in all circumstances.

5.     But now HPS comes before the Court purporting to be very concerned about

creditor recoveries and purporting to believe the Debtors' assets may be worth hundreds of

millions of dollars in a liquidation.  These assertions are false.  The $381 million in aggregate asset

value that HPS points to in its pleading is an accounting book value.[5]  This amount includes a

$233 million gross book value (as of September 30, 2023) of purchased and internally developed

software assets that consists entirely of capitalized labor costs.  The market value of that asset is

zero.  It includes $10 million of "cash" that actually consists of a variety of non-cash assets like

credit card reserves and collateral securing surety bonds.[6]  After paying applicable winddown

costs, the Debtors will have essentially zero cash.  It includes $39.3 million in foreign customer

receivables held by non-Debtor subsidiaries—receivables that the payment processor is currently

refusing to process, against which massive chargeback reserves have been taken, and which will

likely never be collected in a manner that results in any value whatsoever to the Debtors.  In short,

HPS's inflated view of the value of the Debtors' assets is belied by a closer examination of the

Debtors' books and records, by the outcome of the Debtors' extensive marketing process, and by

HPS's own consistent course of conduct.

6.     As to the release of estate claims, Bankruptcy Rule 9019 authorizes compromises

of estate claims and causes of action when such compromises are fair and equitable and in the best

---

[5]     HPS Obj. ¶ 20.

[6]     HPS Obj. ¶ 20, n. 33.

interest of the estate.[7]  Kirkland & Ellis LLP ("Kirkland"), acting at the direction of the Special Committee, conducted an investigation of estate claims and causes of action against the Debtors' insiders (the "Investigation").  In connection with the Investigation, Kirkland (a) interviewed nine individuals and the Debtors' prepetition litigation counsel, (b) supervised the review of approximately 56,000 documents, (c) engaged in months of formal and informal discussions with numerous parties in interest and advisors, and (d) met repeatedly with the Special Committee.  The Debtors then negotiated the Global Settlement with the Creditors Committee, who conducted their own diligence of the estate claims through their own advisors, and the founders.  The outcome of this process demonstrates that the compromise embodied in the releases contained in the Sale Order is fair, equitable, and in the best interests of the Debtors' estates.

7.    Align's assertion that there are potentially hundreds of millions of dollars of estate causes of action is demonstrably false.  Align, of course, was a principal competitor of the Debtors before the shutdown.  Align has been engaged in a long-standing litigation vendetta against the Debtors ever since an arbitrator forced Align to sell its minority ownership stake in the Debtors after violating non-compete and confidentiality provisions by attempting to replicate the Debtors' business model.  The estate claims that Align asserts are each premised on basic falsehoods:

- **Payments to Insiders.**  Referencing the Debtors' schedules and statements, Align points to $105 million of payments to insiders in the one year prepetition and seeks to imply that these payments were made to the Debtors' founders or other individual insiders.  These payments were merely ordinary course intercompany transfers among the Debtors and their subsidiaries.  The $3.7 million disbursed to Troy Crawford (the CFO), David Katzman (the CEO), and Steven Katzman (the COO) reflect ordinary course compensation.  ***The Debtors have never made any dividends or other equity distributions to insiders or otherwise.***

- **Tax Reimbursements.**  Align points to a tax receivable agreement that the Debtors entered into with the founders in connection with the Debtors' initial public offering

---

7    *In re Cajun Elec. Power Coop.*, 119 F.3d 349, 355 (5th Cir. 1997) (citing *In re Jackson Brewing Co.*, 624 F.2d at 602) (noting courts may approve settlements where "fair and equitable and in the best interest of the estate").

5

in 2019 (the "IPO").  **But the Debtors have never made any distributions or other payments under the tax receivable agreement.**

- **Sale of Stock.**  Align points to the fact that the founders sold $494 million of stock in connection with the IPO.  **But these were secondary sales of stock by the founders to the equity capital market—no Debtor cash was involved.**

- **Breach of Fiduciary Duties.**  This leaves Align's assertions that the estates hold valuable breach of fiduciary duty claims against the founders.  These fiduciary duty claims are, in essence, claims that the Debtors had a flawed business model. No such claims were pending as of the Petition Date, and any such claims would be subject to the high hurdle of the business judgment rule.  Recognizing this, Align seeks to recharacterize its longstanding fraud claims against the Debtors—which have never been proven or found valid by any court or tribunal—as derivative claims held by the Debtors.  The Debtors would have little likelihood of success if they brought any such claims.  **Nonetheless, as Align concedes, the proposed compromise embodied in the Motions preserves breach of fiduciary duty claims up to the value of insurance.**

8.    In addition to the Investigation conducted by Kirkland, FTI Consulting, Inc. ("FTI"), the Debtors' restructuring advisor, also analyzed potential non-insider preference claims related to approximately $82 million of applicable transfers in the 90 days prepetition, of which approximately $59 million related to antecedent debt.  Of those, the vast majority were ordinary course transactions or otherwise subject to likely defenses.  Taking into account these factors, collectability, and litigation costs, FTI estimated the mid-point range for the total value of non-insider preference claims to be approximately $4.7 million.

9.    Based on the foregoing, the Court can and should approve the Asset Sale and the Debtor Release included therein under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  The Asset Sale forgives $28.7 million of DIP claims, contributes $7 million in upfront cash and deferred cash consideration, and preserves up to $25 million in insider claims.  The Asset Sale is supported by a robust marketing process and an independent investigation and was negotiated between two estate fiduciaries:  the Debtors, acting at the direction of the Special Committee, and the Creditors Committee.  Simply put, the Asset Sale and the Debtor Release

6

contained in the Sale Order reflects the highest and best alternative available to the Debtors' estates and is fair and equitable under the circumstances.

10.     To the extent the Court approves the Asset Sale and the Debtor Release, the Court can approve the Structured Dismissal under section 1112 of the Bankruptcy Code because it is in the best interest of creditors and the estates.[8]  After effectuating the Asset Sale and Debtor Release, all that will remain in the bankruptcy estates is $4 million in cash, $3 million in deferred cash consideration, and the Specified Claims up to $25 million of insurance coverage.  Even assuming a full recovery on the Specified Claims, including after taking into account a customary contingency fee, distributable value will likely not exceed $24 million.[9]  In advance of the Hearing, the Debtors expect to file a revised proposed Dismissal Order reflecting the amount of agreed or uncontested Administrative Claims.  Accordingly, the available distributable value will not conceivably exceed the amount of the Administrative Claims.

11.     The Structured Dismissal is the most efficient means of distributing the remaining estate value to the holders of Administrative Claims.  This structure has been agreed between the Debtors, the Creditors Committee, and various holders of Administrative Claims as a means of swiftly distributing cash to holders of Administrative Claims and efficiently litigating the Specified Claims.  Appointing a chapter 7 trustee to do the same job will merely delay distribution of the cash consideration being provided in connection with the Asset Sale and increase the cost of prosecuting the Specified Claims.  Non-administrative unsecured creditors will receive no

---

[8]     *See, e.g.*, *In re Buffet Partners, L.P.*, 2014 WL 3735804, at *2 Bankr. N.D. Tex. Jul. 23, 2014) (citing *In re OptInRealBig.com, LLC*, 345 B.R. 277, 290 (Bankr. D. Colo. 2006)).

[9]     This assumes a $16.75 million recovery on $25 million of insurance proceeds (equal to $25 million minus a 33% contingency fee), plus $4 million of cash and $3 million of deferred cash consideration.

recovery in any conceivable scenario.  Accordingly, the Structured Dismissal is in the best interests of the Debtors' estates and their creditors.

12.     Finally, the U.S. Trustee and several other Objectors, citing the Fifth Circuit's decision in *In re Braniff Airways, Inc.*,[10] assert that the Court should not approve either Motion because they together constitute a *sub rosa* plan.  But *Braniff* involved a transaction that sought to dictate the terms of a future chapter 11 plan without complying with the terms of section 1129 of the Bankruptcy Code.  Since *Braniff*, courts have repeatedly found that the case does not preclude all-asset sales under section 363 of the Bankruptcy Code,[11] and Bankruptcy Rule 9019 expressly authorizes compromises of estate causes of action like those included in the release in the Sale Order.[12]  With respect to the Structured Dismissal, no party disputes that the Debtors are unable to confirm a chapter 11 plan under section 1129 of the Bankruptcy Code.  This renders *Braniff* inapposite.  After giving effect to the Asset Sale and the Debtor Release, the Structured Dismissal is merely the most efficient means of distributing assets to administrative creditors without incurring unnecessary costs.

13.     In advance of the Hearing, the Debtors have worked—and continue to work—to resolve the vast majority of the Objections, many of which are limited objections regarding the schedule of Administrative Claims.  The Objections and their status as of the filing of this Reply are reflected on **Schedule 1** hereto.  The remaining objecting stakeholders are all out-of-the-money general unsecured creditors:  HPS with a 10% general unsecured guarantee claim, Align and other

---

[10]    700 F.2d 935 (5th Cir. 1983).

[11]    *See*, *e.g.*, *In re 9 Houston LLC*, 578 B.R. 600, 620 (Bankr. S.D. Tex. 2017); *see also In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009)

[12]    *See In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ("The bankruptcy court's power to approve a proposed settlement or 'compromise' of the estate's claims arises under rule 9019 of the Federal Rules of Bankruptcy Procedures.").

prepetition litigation parties with disputed unsecured litigation claims, and a 22% ad hoc group of unsecured noteholders whose first and only pleading in these cases is its three-page joinder. Because these holders of general unsecured claims will receive no recovery from the transactions contemplated by the Motions, they have no incentive but to roll the dice on a chapter 7 conversion. But this approach also has no chance of resulting in a recovery to unsecured creditors. Rather, a chapter 7 conversion only sacrifices $7 million in cash proceeds that would otherwise be distributed to holders of Administrative Claims and the potential for recovery from the Specified Claims. For these and the reasons set forth below, the Court should approve both Motions and deny Align's cross motion to convert.

## Argument

### I.     The Asset Sale Is the Best Alternative Available to the Debtors, and the Terms of the Asset Purchase Agreement Should Be Approved.

#### A.     Entry into the Asset Purchase Agreement Is a Sound Exercise of the Debtors' Business Judgment and Is in the Best Interest of the Debtors' Estates.

14.     Section 363(b)(1) of the Bankruptcy Code allows a debtor to "use, sell, or lease, other than in the ordinary course of action, property of the estate."[13]   The Fifth Circuit has established that a debtor may sell estate property under this provision if there is a good business reason to do so.[14]   A debtor's business judgment is entitled to substantial deference from the

---

[13]   11 U.S.C. § 363(b)(1).

[14]   *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re TM Vill., Ltd.*, No. 18-32770-BJH, 2019 WL 1004571, at *10 (Bankr. N.D. Tex. Feb. 28, 2019) ("court approval of a debtor-in-possession's decision to [sell] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code") (internal citations omitted); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988) (citing *Continental* and stating "there need be no showing of special or timely circumstances other than those which would support a sound business reason for the transaction").

Case 23-90786   Document 580   Filed in TXSB on 01/16/24   Page 10 of 48

Court.[15]  Having articulated a good business reason for a section 363 transaction, the debtor is presumed to have made such decision "on an informed basis, in good faith and in the honest belief that the [transaction] was in the best interests of the [debtor] company."[16]  Although certain of the Objectors assert that a heightened scrutiny applies when the transaction is with an insider, this is not the case where the transaction was reviewed and approved by independent fiduciaries.[17]

15.     Here, entry into the Asset Purchase Agreement represents a sound exercise of the Debtors' business judgment.  The business justification for the Asset Sale is clear:  consummation of the Asset Sale will forgive $28.7 million of super-priority DIP claims, provide $4 million of upfront cash and $3 million of deferred cash consideration to holders of Administrative Claims, and leave behind the Specified Claims for potential prosecution, which, if successful, could result in up to $25 million of insurance value.  The Debtors entered into the Asset Purchase Agreement after the Special Committee—consisting entirely of independent and disinterested directors—determined that the Sale Consideration represented the highest and best price for the Debtors' assets and that no alternative would provide a greater recovery to the Debtors' estates.

16.     The multi-phase marketing process conducted by the Debtors, with the assistance of Centerview, provides the best evidence that the Sale Consideration offers the highest value return for the Debtors' assets.  Following its engagement in June 2023 and prior to the Petition

---

[15]   *See In re State Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) ("Great judicial deference is given to the [debtor's] exercise of business judgment.").

[16]   *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990); s*ee also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as [the sale of estate property] appears to enhance [the] debtor's estate, court approval of a debtor in possession's decision to [sell the property] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (internal quotation marks and citation omitted).

[17]   *See In re Tribute Co. Fraudulent Conveyance Litig.*, 10 F. 4th 147 (2d Cir. 2021) (holding that, absent specific allegations to the contrary, an insider's intent cannot be imputed to an independent special committee); *In re Adelphia Comms. Corp.*, 323 B.R. 345 (Bankr. S.D.N.Y. 2005) (holding that, under Delaware law, the entire fairness doctrine only applies to insider transactions which have "not been approved by disinterested directors").

Date, Centerview contacted 61 prospective third-party lenders and investors to evaluate a potential investment in the Debtors, 25 of which executed non-disclosure agreements.  Although these substantial efforts did not result in an out-of-court financing, partnership, or strategic acquisition, the Debtors obtained the DIP financing proposal from the DIP Lenders, conditioned on the continued postpetition marketing of the Debtors' assets so as to provide more runway for the solicitation of an actionable go-forward proposal.

17.     Pursuant to the terms of the DIP Facility, the Debtors launched a 65-day postpetition marketing process with the assistance of Centerview and the oversight of the Special Committee to solicit a going-concern sale transaction or sale of individual assets to be consummated pursuant to a chapter 11 plan or under section 363 of the Bankruptcy Code. Throughout this process, Centerview engaged 104 parties, 30 of which executed non-disclosure agreements, seven of which held meetings with the Debtors' management team, and five of which submitted formal non-binding letters of intent.  Yet, despite these efforts, no actionable third-party sale or other restructuring transaction materialized, prompting the Debtors to initiate a wind-down of their business and ultimately seek the relief sought in the Motions.

18.     Finally, after filing the Motions, the Debtors and their advisors continued soliciting interest in individual asset sales as alternatives to, and overbids of, the Sale Considerations.  As will be demonstrated at the Hearing, the Debtors did not obtain any substantive offers that would provide greater value to the Debtors' estates than the Sale Consideration.

19.     It is well settled that an asset is worth what the market is willing to pay for it.[18] Throughout the extensive three-part marketing process conducted prepetition and postpetition by

---

[18]     *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007), 369 B.R. at 140, 143 ("[T]he best evidence of value is what a third party is willing to pay in an arm's length transaction . . . [p]eople who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument."); *In re Energy Coop., Inc.*, 109 B.R. 822, 830 (N.D. Ill. 1989) ("There is

Centerview, the Debtors have solicited 162 potential counterparties and have provided additional data room access and other diligence to over 55 of these parties that signed non-disclosure agreements.  Despite the Debtors' best efforts, *none* of these parties submitted an actionable, binding bid for any of the Debtors' assets greater than the consideration offered by the Asset Sale. If, as the Objectors claim, the Sale Consideration were undervaluing the Debtors' Assets, another bidder would have come forward with a higher bid.  But not a single party has come forward—not even during the incremental marketing efforts conducted by Centerview when a potential purchaser would simply have had to outbid the supposedly deficient Sale Consideration.

20.     Moreover, the Debtors will demonstrate at the Hearing that the purported values HPS assigns the Debtors' assets are simply inaccurate.[19]  ***First***, HPS overestimates the Debtors' ability to collect on its customer receivables.  These receivables reflect amounts owed by consumers for the purchase of aligners, which the consumers chose to pay in installments over an 18-month period.  These installment payments are charged to consumer credit cards.  In addition to upfront receipt of their aligners at the time of purchase, the consumers also received a lifetime guarantee and the ability to receive touchups and adjustments.  Because the Debtors have shut down operations, consumers can and will cancel their credit card charges.  For this reason, the credit card processers have all ceased processing these receivables and have taken massive reserves against the receivables.

21.     The evidence will show that recoveries on these receivables are likely to be severely impaired such that the Debtors will never receive any meaningful proceeds from them.  The U.S.

---

simply no substitute in measuring value than to analyze what informed buyers are willing to [pay], informed sellers are willing to [accept], and with neither group under a compulsion to act . . . [A]ll sophisticated valuation methods must yield to the realities of the marketplace.").

[19]  *See* HPS Obj. ¶ 20.  The Dentist & Orthodontist Plaintiffs assert similar claims.  *See* Dentist & Orthodontist Obj. ¶ 10.

consumer receivables are all housed at the SPV. As of the Petition Date, there were approximately $145.6 million of receivables in the SPV against a $140 million net first lien loan balance in favor of HPS. No value is likely to ever flow up from the SPV to the Debtors given the probable collection rate on these receivables.

22.     Moreover, the $39.3 million of foreign consumer receivables are all housed at non-Debtor subsidiaries with their own liabilities. Additionally, there is an approximately $4.1 million reserve maintained against these receivables in favor of the processor, and the processor is refusing to process these receivables. It is unlikely that any value is ever to flow to the Debtors from these receivables under these circumstances.

23.     ***Second***, HPS overestimates the value of the Debtors assets other than receivables. These assets consist primarily of toothbrushes and other dental supplies branded with the SmileDirectClub trademark, 3D printers and other equipment, and certain raw materials and finished goods. HPS claims that the Debtors have a total asset value of over $330 million, based solely on the reported book values attributable to such assets as of March 31, 2023. The book values for these assets, however, do not reflect the market's valuation of the same (as borne out during the marketing process), and are based on months-old data that does not reflect the current non-operational state of the Debtors' business.[20] Furthermore, the Debtors believe any valuation of certain of the Debtors' hard assets are, at best, overly optimistic, since these assets rely on certain licenses to operate and HPS, as stated in its Objection, will not consent to the use of such licenses upon disposition of the applicable property.[21] In general, HPS's assertions regarding the Debtors' valuation relies on outdated reports and HPS ignores the reality of the Debtors' current

---

[20]   For example, the Debtors' assets no longer include the plane sold by Debtor SDC Plane, LLC during these chapter 11 proceedings. *See* Docket No. 160.

[21]   HPS Obj. ¶ 26.

13

status.  The assertions raised in HPS's Objection do not reflect the best estimates for a potential return that the Debtors could receive for the Assets.

24.     As demonstrated by the months-long marketing process conducted by the Debtors, there is no higher value alternative for the Debtors than the Asset Sale.  A chapter 7 conversion would be value-destructive, failing to clear the outstanding DIP claims.[22]  The Creditors Committee supports the Asset Sale for these same reasons—to maximize potential recoveries for the Debtors' creditor constituency.  Accordingly, Align's cross motion to convert should be denied and the terms of the Asset Purchase Agreement and the Asset Sale, which reflect a reasonable exercise of the Debtors' business judgment, should be approved.

**B.     The Debtor Release of Estate Claims and Causes of Action Is Appropriate Under Bankruptcy Rule 9019 and Supported by the Investigation.**

25.     "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy."[23]  Settlements are considered "a normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly."[24]  Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court.[25]

---

[22]   The Consumer Class argues that the DIP credit bid is "illusory."  *See* Consumer Class Sale Obj. ¶ 13.  This claim is demonstrably false, since the credit bid extinguishes all DIP obligations and provides for excess recovery to flow to the Debtors' other creditors.

[23]   *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).

[24]   *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

[25]   *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984); *see also Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

26.     Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court "may approve a compromise or settlement" upon a motion by a debtor and after notice and a hearing.[26]  In determining whether to approve a compromise or settlement under Bankruptcy Rule 9019(a), courts in the Fifth Circuit consider whether the settlement is "fair and equitable and in the best interest of the estate."[27]  As set forth in more detail below, this analysis requires the consideration of the probability of success in litigation, the complexity, duration, expense, and delay of any litigation, and other "factors bearing on the wisdom of the compromise."[28]

27.     Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement.[29]  Instead, the court should determine whether the settlement as a whole is fair and equitable.[30]  "Great judicial deference is given to the [debtor's] exercise of business judgment."[31]  "As long as [the decision] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision . . . should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code."[32]

28.     In determining whether a compromise is "fair, equitable, and in the best interest of the estate," courts in the Fifth Circuit consider:

> (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law;

---

[26]   Fed. R. Bankr. P. 9019(a).

[27]   *In re Cajun Elec. Power Coop.*, 119 F.3d 349, 355 (5th Cir. 1997) (citing *In re Jackson Brewing Co.*, 624 F.2d at 602).

[28]   *Id.*

[29]   *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).

[30]   *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

[31]   *In re State Park Bldg. Grp., Ltd.*, 331 B.R. at 254.

[32]   *In re Richmond Leasing Co.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

(2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and

(3) all other factors bearing on the wisdom of the compromise.[33]

29.     With respect to the third factor, the Fifth Circuit has specified two additional factors that weigh on the decision to approve a proposed settlement.  First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views."[34]  "While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'"[35]  Second, the court should consider "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."[36]

### 1.     The Special Committee Conducted a Thorough Investigation of Potential Estate Claims and Causes of Action.

30.     During the pendency of these chapter 11 cases, the Special Committee, with the assistance of Kirkland, conducted a thorough Investigation into potential estate claims and causes of action.  At the direction of the Special Committee, Kirkland oversaw the review of more than 56,000 documents and conducted formal interviews with nine directors, officers, and employees of the Debtors, as well as the Debtors' counsel in certain prepetition litigations.  Additionally, Kirkland held informal meetings and discussions with the Debtors' in-house counsel, operational teams, and other professional advisors in relation to the potential claims and causes of action.

31.     Prior to the filing of the Motions, the Special Committee reviewed and analyzed the results of the Investigation with Kirkalnd.  The Special Committee considered corporate

---

[33]   *In re Jackson Brewing Co.*, 624 F.2d at 602 (citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424425 (1968)).

[34]   *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995); *see also Age Ref. Inc.*, 801 F.3d at 540 (noting the *Foster Mortgage* factors).

[35]   *Foster Mortg. Corp.*, 68 F.3d at 917 (quoting *In re Transcon. Energy Corp.*, 764 F.2d 1296, 1299 (9th Cir. 1985)).

[36]   *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

governance claims such as breach of fiduciary duty claims, fraudulent transfer claims, preference claims, and additional claims and theories of recovery, including in connection with the Debtors' initial public offering.  After analysis and deliberation on the results of the Investigation, the Special Committee concluded that the value provided by the Sale Consideration outweighed the likely potential recovery from the claims included in the Debtor Release.

32.     In parallel with the Special Committee's Investigation, the Creditors Committee conducted its own diligence into estate claims and causes of action.  The Debtors cooperated with the Creditors Committee's diligence efforts, producing approximately 400,000 documents.  After independently evaluating the estate claims and causes of actions, and reaching an arms'-length settlement with the Debtors and the DIP Lenders to retain the Specified Claims for the benefit of their creditor constituency, the Creditors Committee agreed to the terms of the Global Settlement, including the Debtor Release.

> **2.     The Debtor Release is Fair, Equitable, and in the Best Interests of the Debtors' Estates.**
>
>> **a.     The Debtors Are Unlikely to Successfully Prosecute the Released Claims.**

33.     Based on the results of the Investigation, and as will be further demonstrated at the Hearing, the Debtors are unlikely to succeed on the merits of any potential estate claims and causes of action released pursuant to the Debtor Release.

>> **i.     Payments to Insiders and Fraudulent Transfers**

34.     Pursuant to section 548 of the Bankruptcy Code, a debtor may avoid actual or constructive fraudulent transfers.[37]  Intentional fraudulent transfer claims are not easily susceptible to direct proof of intent, so courts look to certain "badges of fraud," which can establish an

---

[37]   11 U.S.C. § 548(a) (emphasis added).

intentional fraudulent transfer, including (a) the lack or inadequacy of consideration; (b) the family, friendship, or close associate relationship between the parties; (c) the retention of possession, benefit, or use of the property in question; (d) the financial condition of the party sought to be charged both before and after the transaction in question; (e) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (f) the general chronology of events and transactions under inquiry.[38]

35.     The Investigation analyzed potential actual or constructive fraudulent transfer claims related to prepetition insider transactions with the Debtors.  During the Investigation, through interviews and in consultation with professionals, the Special Committee reviewed and evaluated potential benefits to insiders that, if identified, may have given rise to potential claims against insiders.

36.     The Investigation did not reveal any insider transactions that would likely be susceptible to valuable constructive or actual fraudulent transfer claims.  There have been no dividends, equity distributions, management fees, or other similar transfers that would typically be subject to potential challenge.  Despite the lack of such transactions for evaluation, the Investigation did include a review of bonus payments and use of a corporate airplane.[39]  This review did not yield evidence of valuable claims.  In short, there is simply no evidence of valuable avoidance actions.

37.     No party seriously asserts otherwise.  Align alleges two specific potential bases for avoidance actions in its Objection:  (a) payments to insiders listed on the Debtors' schedules and

---

[38]   *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008).

[39]   *See* Ex. 43, *December 18, 2023 Update & Recommendations Presentation to Special the Committee* at 33; Ex. 44, *January 3, 2024 Company Plane Usage Presentation to the Special Committee* at 2-3.

statements and (b) tax reimbursements made under that certain Tax Receivable Agreement entered into by the Debtors in connection with the IPO.[40]  These assertions are based on simple misunderstandings.

38.    ***First***, Align's concerns with respect to the $105 million payments identified on the schedules and statements are unfounded and misleading.  The unredacted schedules and statements clearly identify these payments as the aggregate ordinary course intercompany transactions between the Debtors and their non-Debtor subsidiaries during the year prior to the Petition Date and not payments to the Debtors' founders or equityholders.[41]  The $3.7 million paid to Troy Crawford, David Katzman, and Steven Katzman reflect ordinary course compensation for the Debtors' officers.

39.    ***Second***, no distributions have ever been made under the Tax Receivable Agreement.  In fact, distributions under the Tax Receivable Agreement could only occur if the Debtors' met certain profitability markers, which never occurred.  Moreover, even if any distributions had been made, the repeated public disclosures of the Tax Receivable Agreement indicate that there was no intent to hinder, delay, or defraud any creditors of the Debtors.

40.    ***Third***, the Investigation concluded that the sale of stock by the founders during the IPO were sales to the open market and not back to the Debtors.  Additionally, these sales were all publicly disclosed, weighing against a finding of fraud.  In short, there is simply no evidence of colorable avoidance actions against insiders, and no party raises a credible claim to the contrary.

### ii.    Preferential Transfers

---

[40]    Align Obj. ¶ 23.

[41]    The unredacted schedules and statements have been provided the Court, the U.S. Trustee, and the Creditors Committee.

41.     The six elements of a preference action under section 547(b) of the Bankruptcy Code are:  (a) a transfer of an interest of the debtor in property; (b) to or for the benefit of a creditor; (c) for or on account of an antecedent debt owed by the debtor before such a transfer was made; (d) made while the debtor was insolvent; (e) made on or within 90 days before the date of the filing of the petition, or one year before the date of the filing of the petition if made to an insider of the debtor; and (f) that enables such creditor to receive more than such creditor would have received if the debtor filed under chapter 7 or the transfer had not been made.[42]

42.     Kirkland uncovered no evidence to support any potentially viable preference claims against insiders.[43]  While the Debtors did make certain retention payments to Troy Crawford and to Susan Greenspon Rammelt (the Debtors' Chief Legal Officer) during the preference window, these payments were made by contract and subject to clawback rights.  Additionally, these payments were not made "for or on account of" an antecedent debt owed to either officer, since the payments were forward-looking, rather than in exchange for pre-existing obligations.

43.     In parallel, FTI performed a sperate preference analysis with respect to non-insider preference claims.[44]  In the 90 days prior to the Petition Date, the Debtors made approximately $81.6 million in payments, approximately $59.3 million of which relate to antecedent debt.  Based on FTI's review of such payments, the Debtors believe that potential exposure of viable preference claims results in a net recovery, after anticipated settlements and collection fees (and in consideration of a customary contingency fee), between approximately $3.7 million and $5.8 million, with a midpoint of approximately $4.7 million.  Even the high end of the estimated

---

[42]   *Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 459 (5th Cir. 2006).

[43]   *See* Ex. 43, *December 18, 2023 Update & Recommendations Presentation to the Special Committee* at 34.

[44]   *Id.*

net recovery from the pursuit of viable preference claims is dwarfed by the flow of funds to the estates and their creditors—including unsecured creditors—provided by the Asset Sale. The Creditors Committee agreed to the Global Settlement in partial consideration that such preference claims against their constituency would not be pursued.

### iii.      Breach of Fiduciary Duties

44.     Finally, Align and other Objectors generally assert that the Debtors hold viable breach of fiduciary duty claims against the insiders related to, among other things, the Debtors' business model.[45]  Claims for breach of fiduciary duty are analyzed under the business judgment rule, which presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."[46]  "A court will not substitute its judgment for that of the board if the . . . decision can be 'attributed to any rational business purpose.'"[47]

45.     The results of the Investigation do not support any fiduciary duty claims against the Debtors' insiders. Align has argued that the prepetition litigation against the Debtors—including the cases brought by Align itself—is somehow evidence of a flawed business model. Information revealed during the Investigation, however, does not support Align's theory. **First**, there is no pending derivative litigation against the Debtors' insiders. In fact, three such suits stemming from the IPO were dismissed by the Delaware Chancery Court for lack of standing.[48]

---

[45]     *See* Align Obj. ¶ 23; HPS Obj. ¶ 20; Dentist & Orthodontist Obj. ¶ 4.

[46]     *Gantler v. Stephens*, 965 A.2d 695, 705–06 (Del. 2009).

[47]     *Id*.

[48]     *See* Ex. 43, *December 18, 2023 Update & Recommendations Presentation to the Special Committee* at 27.  The cases were consolidated under *In Re SmileDirectClub, Inc. Derivative Litigation*, C.A. No. 2019-0940-MTZ.

46.     **Second**, Align alleged that the Debtors had a practice of seeking second opinions until the patient was approved for treatment.[49]  Interviews with Susan Greenspon Rammelt and Dr. Sulitzer indicated that, in reality, second opinions are rarely sought.[50]

47.     **Third**, Align has asserted that the Debtors' product is ineffective, and pointed to false advertising claims, including a consumer class action lawsuit.[51]  Consumers, though, were ordered to arbitrate and have not proceeded.[52]  Only the class of providers has moved forward, and that provider class has not yet obtained class certification as of the date hereof.[53]

48.     **Fourth**, Align has pointed to a pending bellwether mass arbitration related to consumer dissatisfaction with the Debtors' products.  Interviews with the Debtors revealed that the cases generally lack merit; as disclosed in their public filings, the Debtors estimated its potential exposure at merely $300k in aggregate.[54]

49.     **Finally**, Align points to shareholder securities class actions brought against the Debtors in connection with the IPO,[55] alleging that that these cases are somehow evidence that the Debtors have misrepresented its business model to the market.[56]  The Special Committee's Investigation, however, including interviews with Susan Greenspon Rammelt and the Debtors'

---

[49]  *See Objection of Align Technology, Inc. to the Debtors' Motion for Conditional Approval of Disclosure Statement and Approval of Solicitation and Notice Procedures* [Docket No. 407] ("Align DS Objection"), at ¶ 9.

[50]  *See* Ex. 43, *December 18, 2023 Update & Recommendations Presentation to the Special Committee* at 28.

[51]  *See* Align DS Obj. ¶ 14 (citing *Ciccio, et al. v. SmileDirectClub, LLC, et al.*, No. 3:19-cv-00845 (M.D. Tenn.)).

[52]  *See* Ex. 43, *December 18, 2023 Update & Recommendations Presentation to the Special Committee* at 29.

[53]  Briefing on class certification concluded just prior to the Petition Date.

[54]  *See id.* at 30.

[55]  *Franchi v. SmileDirectClub, Inc., et al.*, 19-cv-12883 (E.D. Mich. filed 10/2/19); *Ginsberg v. SmileDirectClub, Inc., et al.*, 19-cv-09794 (S.D.N.Y. filed 10/23/19); *Franchi v. SmileDirectClub, Inc.*, 19-cv-962 (M.D. Tenn. filed 10/29/19); and related actions.

[56]  *See Objection of Align Technology, Inc. to Final Approval of the Debtors' Proposed DIP Financing* [Docket No. 261], at ¶ 19.

prepetition litigation counsel handling these shareholder class actions, revealed that the Debtors expected to prevail in the litigation, further evidenced by the Debtors' rejection of settlement demands in 2022.[57]   The Investigation indicated that the Debtors did not, in fact, make any misrepresentations in connection with the IPO.   The existence of these cases is not evidence of any wrongdoing by any director or officer for which the Debtors could recover against such directors or officers.

50.     At the direction of the Special Committee, Kirkland interviewed not only the Debtors' employees, officers, and directors, but also the Debtors' prepetition litigation counsel to inform the Special Committee's analysis of the risks associated with the litigation and deepen the understanding of the allegations and likelihood of success of the plaintiffs who have brought suit against the Debtors.[58]  There has been no evidence discovered that would overcome the business judgment rule such that a court would determine the Debtors' directors and officers to have acted without a "rational business purpose."

51.     Despite Align's allegations that the Debtors' business model was flawed and rose to the level of a breach of fiduciary duty, such allegations are very unlikely to satisfy the high burden of proof required to show that there was no legitimate business reason to pursue such a model.  The Debtors believe that Align's allegations are without merit, as indicated by Align's course of action in transacting with the Debtors.  Notwithstanding Align's purported issues with the Debtors' business model, Align chose to invest in the Debtors' equity in 2016, loan the Debtors tens of millions in funds, and negotiate an agreement to become the Debtors' exclusive supplier.

---

[57]     *See* Ex. 43, *December 18, 2023 Update & Recommendations Presentation to the Special Committee* at 28, 31.

[58]     *See id.* at 21.

52.     Notwithstanding the results of the Investigation, the Debtors have agreed with the Creditors Committee through the Global Settlement to retain the Specified Claims, which include certain breach of fiduciary duty claims, for the Creditor Trust to pursue up to the value of insurance.[59]   To the extent Align, or any other Objector, believes there is value in pursuing the potential breach of fiduciary duty causes of action, Align (and such other Objectors) cannot object to Asset Sale on the basis that the Debtors are not pursuing the value of these claims.

> ### b.      Potential Litigation Would Be Complex, Expensive, and Time Consuming.

53.     Setting aside that the Debtors are unlikely to succeed on the potential claims subject to the Debtor release, pursuing them could impose substantial costs on the Debtors and their estates.  As with most settlements of potential litigation claims, the proposed settlement would avoid time-consuming and costly litigation.  If the prepetition litigation with Align and the other litigation classes that filed an Objection is any indication, the costs and delay would be substantial. The settlement is especially reasonable in this case, since the *contingent* net recovery from the potential claims to be released must exceed the *guaranteed* cash consideration provided pursuant to the Asset Sale.

> ### c.      The Debtor Release Is in the Best Interests of Creditors.

54.     The Debtors negotiated the Debtor Release in good-faith and at arms-length with the Creditors Committee, representing the interests of the Debtors' unsecured creditor class as a whole.  Through these negotiations, the Debtors and Creditors Committee agreed to the retention of the Specified Claims so that additional recoveries may flow to the Debtors' unsecured creditors. The Creditors Committee's support of the Global Settlement generally, and the Debtor Release

---

[59]   *See id.* at 34.

specifically, demonstrates that the Debtor Release is in the best interests of the Debtors' creditors. Furthermore, because the Debtor Release is a key condition to closing the Asset Sale, failure to secure its approval will place the Global Settlement in serious jeopardy.  Absent the Debtor Release, the Debtors will be unable to consummate the Asset Sale and realize the only meaningful value that has been offered for their assets, to the detriment of their estates and their stakeholders. In light of these facts, the Special Committee determined that granting the Debtor Release is reasonable in exchange for the Sale Consideration.

## II.   Dismissal of the Cases Is Permissible Under the Circumstances and Is in the Best Interest of Creditors.

55.    The Objectors do not dispute that the outcome of the marketing process for a going-concern transaction demonstrates that there is no viable business to reorganize, which is grounds for dismissal under section 1112(b) of the Bankruptcy Code.[60]  Additionally, structured dismissals are warranted under section 105 of the Bankruptcy Code where, as is the present case, they do not contravene the Bankruptcy Code's provisions.[61]   Thus, when cause exists to dismiss a chapter 11 case and the court has the authority to do so under the terms proposed by the debtor, a court must determine, in its discretion whether to dismiss the case or convert it to a case under chapter 7 of the Bankruptcy Code.[62]

---

[60]   *See, e.g.*, *In re Buffet Partners, L.P.*, No. 14-30699-HDH-11, 2014 WL 3735804, at *2 (Bankr. N.D. Tex. Jul. 23, 2014); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982).

[61]   *See, e.g.*, 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."); *Buffet Partners, L.P.*, 2014 WL 3735804, at *4 ("11 U.S.C. §§ 1112(b) and 105(a) provide this court with the requisite authority to fashion the dismissal order that the parties seek."); *In re Olympic 1401 Elm Assocs., LLC*, 2016 WL 4530602, at *2 (Bankr. N.D. Tex. Aug. 29, 2016) ("The Court has the authority to grant a Chapter 11 structured dismissal pursuant to sections 105(a), 305(a) and 1112(b) of the Bankruptcy Code.").

[62]   *See, e.g.*, 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."); *Buffet Partners, L.P.*, 2014 WL 3735804, at *4 ("11 U.S.C. §§ 1112(b) and 105(a) provide this court with the requisite authority to fashion the dismissal order that the parties seek."); *In re Olympic 1401 Elm Assocs., LLC*, 2016 WL 4530602, at *2 (Bankr. N.D. Tex. Aug.

56.     When a court is charged with the task of determining whether to dismiss a chapter 11 case or convert it to a case under chapter 7, it must determine whether a conversion or dismissal is in the best interests of the creditors and the debtor's estate.  While there is no clear test delineating which path is preferable, courts in the Fifth Circuit and elsewhere have followed the same general guideline:

> Section 1112(b)'s requirement that a court must examine the best interests of the estate, as well as the best interests of the creditors, strikes that balance. The best interests of the creditors test addresses the interests of the creditor body as a whole.  It is inevitable that different creditors, even if similarly situated, will fare differently outside of bankruptcy.  Therefore, the best interests of creditors test focuses on the interest of the entire creditor body; it does not focus on individual creditor interests.  The interests of individual creditors are protected by the requirement that a court examine the best interests of the estate.  The focus of that test is upon the economic value of the debtor; it compares the economic value of the debtor in a converted case to its value after dismissal.  *In re Staff Inv. Co.*, 146 B.R. 256 (Bankr. E.D. Cal. 1992) ("The element of the best interest of the estate focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy.  The estate is defined in terms of interests in property.").  A bankruptcy court cannot insure that all creditors will make a pro-rata recovery of their debts after dismissal of a bankruptcy case.  But, when a court determines that a debtor's economic value is likely to be greater by dismissing the case rather than converting it, the court maximizes the opportunity of individual creditors to recover their claims.[63]

Here, despite the Objectors' misguided statements to the contrary, when compared to a chapter 7 conversion, the Structured Dismissal is clearly in the best interests of creditors.

57.     Upon the closing of the Asset Sale, the Debtors' only remaining assets will include $4 million in cash, $3 million in deferred cash consideration, and the Specified Claims up to $25 million of insurance coverage.  The only creditors who can conceivably recover on account of

---

29, 2016) ("The Court has the authority to grant a Chapter 11 structured dismissal pursuant to sections 105(a), 305(a) and 1112(b) of the Bankruptcy Code.").

[63]     *Buffet Partners, L.P.*, 2014 WL 3735804, at *2 (quoting *In re OptInRealBig.com, LLC*, 345 B.R. 277, 290 (Bankr. D. Colo. 2006)).

distributions through the Creditor Trust are the Administrative Claimants, each of whom had the opportunity to review the schedule of Administrative Claims and object if their claim was excluded or if otherwise incorrectly listed.  Indeed, many of the Objectors include such Administrative Claimants, and the Debtors have resolved or are working to resolve their Objections prior to filing the revised Dismissal Order.  Thus, by virtue of the Global Settlement and the procedures set forth in the Dismissal Order, the Debtors and the Administrative Claimants are working to reach consensus on an efficient, value-maximizing, and equitable method to distribute estate value to creditors following the Asset Sale.  Further, as explained in greater detail below, such distributions comply in all respects with the Bankruptcy Code's priority scheme.  It is under these circumstances, where dismissal is in the best interest of creditors and complies with the statutory requirements of the Bankruptcy Code, that courts should, and do, approve structured dismissals.

58.     Not only would conversion to chapter 7 significantly delay the process and add another layer of administrative expenses in the form of professional fees and trustee commissions without any clear corresponding benefit, but absent the structured dismissal path, creditors would not receive the benefit of the approximately $60 million in aggregate Sale Consideration from the DIP Lenders through the Asset Sale. The Objectors do not, and cannot, convincingly argue that such inefficiency and willingness to leave valuable consideration on the table is in the best interests of creditors.

59.     If the Court does not grant the Dismissal Motion or the Sale Motion, the Debtors' creditors will forgo significant settlement recovery that they would not have access to if these cases are converted to cases under chapter 7 of the Bankruptcy Code.  Without the benefit of the Sale Consideration and Global Settlement, any recovery for creditors in chapter 7 would be highly

speculative and would likely result in materially lower recoveries for creditors, if any.[64]  In short, the Structured Dismissal is the most efficient and value-maximizing means to distribute value to the Debtors' stakeholders.

60.     The Consumer Class argues that a structured dismissal is not permitted when a party objects.[65]  While the Objector cannot point to a single authority that supports such an assertion,[66] courts *have* found that dismissal is in the best interests of creditors where an interested party, other than the debtor, supports the dismissal, and objections to dismissal or lack thereof are not outcome determinative.[67]  Moreover, any unsecured creditors who object to the Structured Dismissal will not receive a recovery on their claims under any conceivable  scenario—whether it be through a chapter 7 liquidation, the Global Settlement, or otherwise.  Thus, it is the support of the Creditors Committee and Administrative Claimants that is most consequential when evaluating whether conversion or dismissal is in the best interests of creditors.

## III.     The Other Objections Have No Merit and Should Be Overruled.

### A.     The Terms of the Global Settlement Do Not Constitute an Impermissible *Sub Rosa* Plan.

61.     The main impetus for the Debtors' filing of the Dismissal Motion is that they are not in a position to propose a confirmable chapter 11 plan.  As such, the requirements of plan

---

[64]   Contrary to the assertions of Align and HPS, the Debtors do not believe that the Sale Consideration being offered by the Purchaser in connection with the proposed Asset Sale will remain unchanged to the extent the relief requested in the Sale Motion is denied and these cases are converted to cases under chapter 7 of the Bankruptcy Code.  *See* Align Obj. ¶ 24; HPS Obj. ¶ 5.

[65]   *See* Consumer Class Dismissal Obj. ¶ 1.

[66]   The Consumer Class states that the Supreme Court rejected the applicability of *Buffet* when a party objects and cites a portion of the *Jevic* opinion distinguishing the *Buffet* facts from those in *Jevic* where the impaired class objected to a structured dismissal's "priority violating distributions."  *See Jevic*, 137 S. Ct. at 975.

[67]   *See, e.g.*, *Buffet Partners, L.P.*, 2014 WL 3735804, at *4 (emphasizing in its reasoning that structured dismissal was in the best interest of creditors that "[a]ll of the following parties affirmatively assent to the proposed dismissal:  the Debtor, the Lender, and the Committee, which represents a large portion of unsecured debt").

confirmation are inapplicable, and certain Objectors' reliance on *In re Braniff Airways, Inc.* is inapposite.  As the Fifth Circuit has stated, *Braniff* stands for the proposition that "[w]hen a proposed transaction specifies terms for adopting a reorganization plan, the parties and the district court must scale the hurdles erected in Chapter 11."[68]  The Global Settlement does not dictate the terms of a future chapter 11 plan, and, in fact, does not contemplate any such plan being proposed.[69]

62.     Additionally, the Objectors' arguments that the terms of the Asset Sale constitute a *sub rosa* plan are similarly misguided.[70]  Courts in this Circuit, since *Braniff* and *Continental* were decided over 30 years ago, have repeatedly rejected the assertion that a sale for substantially all of a debtor's assets equates to a *sub rosa* plan.[71]  Here, the circumstances surrounding the proposed dismissal do not resemble an attempt to impose a *sub rosa* plan.  Rather, the Debtors are seeking an expeditious and equitable resolution to these chapter 11 cases, under terms that are in the best interests of creditors under the circumstances.

---

[68]   *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also In re Babcock & Wilcox Co.*, 250 F.3d 955, 960 n.10 (5th Cir. 2001) ("Notably, *Braniff* mentioned the absolute priority rule only when referring to the requirements the parties must meet in any future attempts to specify the terms whereby a reorganization plan is to be adopted.") (citations omitted).

[69]   The Consumer Class boldly asserts, with no supporting authority, that "litigation trusts may only be created through a plan process."  *See* Consumer Class Dismissal Obj. ¶ 22.  Courts regularly enter orders authorizing the creation of creditor trusts outside the context of a chapter 11 plan.  *See, e.g.*, *Buffet Partners, L.P.*, 2014 WL 3735804 (approving a structured dismissal following approval of a settlement that included the creation of a creditor trust), at *1; *In re Noranda Aluminim, Inc.*, No. 16-10083 (Bankr. E.D. Mo. Nov. 9, 2016) (approving a settlement providing for the creation of a creditor trust).

[70]   *See, e.g.*, U.S. Trustee Obj. ¶ 21; Consumer Class Sale Obj. ¶¶ 17–18.

[71]   *See, e.g.*, *In re 9 Houston LLC*, 578 B.R. 600, 620 (Bankr. S.D. Tex. 2017) (holding that "to the extent that [the *sub rosa* objector] suggests that the [sale] Motion should be denied on the grounds that the *Braniff* holding bars the sale of the Property because it represents a sale of substantially all of the Debtor's assets, this argument is also off the mark"); *see also In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) ("[T]he Fifth Circuit also expressly declined to hold that the sale of all property of the estate was *per se* improper [as a purported *sub rosa* plan]" (citing to *Braniff*), and "The court [in *Continental*] recognized that it is implicit in § 363(b) that the sale must be justified by the debtor in possession or trustee, and that the debtor in possession or trustee has a fiduciary duty to parties in interest.").

**B.      The Asset Sale Complies with Section 363 of the Bankruptcy Code.**

63.      The Consumer Class makes a number of incorrect assertions with respect to the Asset Sale.  ***First***, the Consumer Class argues that the Debtors' Assets cannot be sold free and clear of certain successor liability claims.[72]  To the contrary, courts have repeatedly held that a debtor may sell assets free and clear of successor liability under section 363(f).[73]  Specifically, under section 364(f)(4), the Consumer Class's unliquidated and contingent litigation claims are "in bona fide dispute," satisfying one of the disjunctive factors under section 363(f).[74]  The Consumer Class's citation to *Stern* is inapposite.[75]  *Stern* only speaks to whether a bankruptcy court can enter a final order on the merits of a claim beyond the scope of a bankruptcy court's core jurisdiction.  However, authorizing a sale of the Debtors' Assets free and clear of the claim will still retain the plaintiffs' claim against the Debtors estates.

64.      ***Second***, the Consumer Class argues that the Asset Sale should be rejected because there is no overbid process.[76]  Pursuant to Bankruptcy Rule 6004(f)(1), there is no requirement for the Debtors to engage in a public auction for a sale of the debtor's assets.[77]  Nevertheless, the incremental marketing efforts conducted by Centerview, in conjunction with the the months-long

---

[72]   Consumer Class Sale Obj. ¶¶ 4–5.

[73]   *See, e.g.*, *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996) (holding that the debtor could sell operating coal assets free and clear of successor liability for actions to collect Coal Act premium payments brought by two employer-sponsored benefit plans); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "the Court will permit [the debtor's] assets to pass to the purchaser free and clear of successor liability claims").

[74]   11 U.S.C. § 365(f)(4).

[75]   *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).

[76]   *See* Consumer Class Sale Obj. ¶¶ 19–20.

[77]   Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be *by private sale* or by public auction.") (emphasis added).

marketing process prior to the filing of the Sale Motion, provided ample opportunity for another party to outbid the Sale Consideration.

65.     **Third**, the Consumer Class raises concerns that the Debtors will improperly assign to the Purchaser certain personal service medical contracts.[78]  As set forth in the Motions, the Debtors are rejecting all executory contracts and unexpired leases.  Accordingly, the Debtors do not intend to assign any personal service medical contracts to the Purchaser and any related objection is therefore irrelevant.

66.     **Finally**, the Consumer Class's assertion that notice of the Motions was deficient because the Debtors did not provide notice of the Motions to its customers is unsupported and incorrect.[79]  The Debtors provided notice of the Motions to all parties on the Debtors' creditor matrix, totaling over 1.3 million parties, which includes all current and former customers from the past two years.[80]  This service was completed primarily by email, the primary form of communication used between the Debtors and their customers, and thus was the most effective form of service on the Debtors' customer list.  The Debtors provided service by mail for parties without valid email addresses on file with the Debtors.

**C.     The Debtors May Sell the iTero Scanners to the Purchaser.**

67.     Align objects to the Debtors' sale of certain iTero Scanners owned by the Debtors on the basis that (a) the sale of the iTero Scanners violates the Align Transfer Policy (as defined in the Align Objection) and (b) the Debtors cannot assign the license covering the software used

---

[78]   *See* Consumer Class Sale Obj. ¶ 27–29.

[79]   *Id*. ¶ 30.

[80]   *Affidavits of Service for Mailings for the Period from December 16, 2023 through December 22, 2023* [Docket No. 494].

in connection with the iTero Scanners.[81]  Align argues in its Objection that the Debtors are prohibited from selling the iTero Scanners to the Purchaser in light of sale restrictions set forth in the Align Transfer Policy.  Align argues that the Align Transfer Policy "requires that iTero Scanners may only be sold by Align or its approved distributors."[82]

68.    The Align Transfer Policy provides that these sale restrictions are in place "to ensure that all iTero scanners are sold in compliance with applicable laws and regulations and with Align's highest standards …"[83]  Notwithstanding reference to this restriction, Align has not identified any applicable laws and regulations that would prohibit the sale of the iTero Scanners to the Purchaser.  Further, the Purchaser currently holds an interest in the iTero Scanners pursuant to the DIP liens granted under the Final DIP Order.  All they are seeking to do is take possession of those assets (*i.e.*, the iTero Scanners).  Prior to the filing of the Align Objection, Align never asserted that the DIP Lenders were prohibited from obtaining an interest in the iTero Scanners.

69.    Additionally, contrary to Align's assertions regarding the restrictions imposed on the Debtors pursuant to the Align Transfer Policy, the iTero Purchase Agreement attached to the Align Objection as <u>Exhibit A</u> provides that "[t]he parties agree to utilize the form of PO attached hereto for submission of all orders under this Agreement *with no additional terms unless mutually agreed in writing by authorized representatives*."[84]  Accordingly, as the parties to the iTero Purchase Agreement have not agreed in writing to the terms of the Align Transfer Policy, the Debtors are not bound by any purported limitations set forth in the Align Transfer Policy.

---

[81]   Align Obj. ¶¶ 36–37.

[82]   *See* Align Obj. ¶ 36.

[83]   *See* Align Transfer Policy.

[84]   *See* Align Obj., <u>Exhibit A</u>.

70.     Finally, Align argues that the Debtors cannot assign to the Purchaser the license covering the software used in connection with the iTero Scanners.[85]   As set forth in the Sale Motion, the Debtors are seeking to reject all executory contracts and unexpired leases, including the iTero Software License.   Align's objection to the sale of the iTero Scanners based on the Debtors' inability to assign the iTero Software License appears to be premised on the false assumption that the license is the asset to be purchased through the Asset Sale, rather than the iTero Scanner itself.  While Align may restrict the granting of a license to utilize the software used to active and operate the iTero Scanners, or may require consent to assign the iTero Software License, the Debtors are not seeking to assign any interest in the iTero Software License, and regardless, the ability to assign any interest in the iTero Software License is irrelevant to whether the iTero Scanners can be sold to the Purchaser.[86]   Accordingly, while Align seeks to challenge the Asset Sale at every turn, Align does not have the authority, contractually or otherwise, to restrict the sale of the iTero Scanners to the Purchaser.

### D.     The Global Settlement Complies with the Absolute Priority Rule.

71.     The proposed distributions to creditors through the Creditor Trust will strictly comply with the absolute priority rule and sections 507 and 726 of the Bankruptcy Code, in accordance with *Czyzewski v. Jevic Holding Corp.*[87]

---

[85]   *See* Align Obj. ¶¶ 37–39.

[86]   For similar reasons, the Debtors disagree with HPS's insinuation that the Debtors may not sell certain hard assets to the Purchaser without granting a license from the SPV.  *See* HPS Obj. ¶ 26.  The Debtors reserve all rights with respect to the Debtors' ability to sell such assets to the Purchaser.

[87]   137 S. Ct. 973 (2017).  The Debtors take this opportunity to respond to Align's assertion that *Jevic* does not support the relief sought in the Dismissal Motion because the Supreme Court did not find any affirmative indication from Congress on an intent to allow structured dismissals to violate the absolute priority rule.  *See* Align Objection, ¶ 14.  The Debtors in fact agree with Align's read of *Jevic*—structured dismissals cannot violate the absolute priority rule.  This is precisely why the procedures contemplated in the Dismissal Motion and the distribution scheme to be implemented through the Creditor Trust, strictly comport with the absolute priority rule, as explained herein.

72.     *First*, the DIP Lenders' claims, which are entitled to superpriority administrative expense status pursuant to the Final DIP Order, will be satisfied in full through the credit bid for the Assets.

73.     *Second*, the Retained Professionals' claims are satisfied in full through the Funded Reserve Account.  The Retained Professionals will receive distributions from the funds reserved in connection with the Carve Out in the Funded Reserve Account (such funds, the "Funded Reserves"), as approved in the Final DIP Order.  Pursuant to the DIP Order, the Funded Reserves are to be paid to estate professionals prior to any and all other claims.

74.     *Third*, the Administrative Claimants will receive *pro rata* distributions through the Creditor Trust before any unsecured creditors.

75.     *Finally*, only then will unsecured creditors be entitled to any distributions under the Bankruptcy Code's priority scheme.  Ultimately, unsecured creditors cannot conceivably expect any recovery through the Creditor Trust.  But the same would be true in cases brought under chapter 7 of the Bankruptcy Code.  A chapter 7 trustee would be required to distribute any liquidation proceeds first to the secured creditors, including the DIP Lenders, then to the Administrative Claimants, and finally to the unsecured creditors.  As explained above, the Debtors' Assets are worth less in a liquidation scenario than under the Global Settlement Terms.  Thus, in both scenarios, nonpriority unsecured creditors will not realistically receive any distributions.[88]

---

[88]     As such, any Objections that are based in part on the assertion that rejection damages should receive priority over other unsecured claims and the claims reconciliation process outlined in the Dismissal Order should also provide for filed proofs of claim are irrelevant.

### E. The Exculpation Provision is Appropriate Under the Circumstances and in Line with Exculpation Provisions Approved in this Jurisdiction.

76.    Contrary to the assertion of the U.S. Trustee, which is presented without argument or analysis in a footnote to its Objection,[89] the exculpation provision set forth in the Dismissal Order complies with applicable law—namely the Fifth Circuit's decision in *In re Highland Cap. Mgmt., L.P.*[90]  *Highland* requires that exculpation be limited to (a) the debtor (including any independent directors), (b) any official creditors' committee and its members for conduct within the scope of their duty, and (c) any trustees within the scope of their duties.[91]

77.    Here, the Exculpated Parties only include (x) the Debtors, (y) the Debtors' independent directors and managers, and (z) the Creditors Committee and its members, all appropriate parties under *Highland*.[92]  Furthermore, the exculpation provision applies to the Creditors Committee and its members within the scope of their duties, since the exculpation provision only applies to Causes of Action that arise with respect to or during these chapter 11 cases.[93]

78.    Courts in this jurisdiction have specifically approved exculpation provision in the context of a structured dismissal and a global settlement's "case resolution procedures."[94]

---

89    *See* U.S. Trustee Obj. § 13(f), n.11.  *See also* AHG Obj. ¶ 1, Consumer Cass Obj. ¶¶ 24–25.

90    48 F.4th 419 (5th Cir. 2022).

91    *Id.* at 438 ("Consistent with §524(e), we strike all exculpated parties from the Plan except [the debtor], the Committee and its members, and the Independent Directors.").

92    *See* Sale Mot. ¶ 14(f).

93    *Id.*  For the avoidance of doubt, the restriction that the exculpation provision relate to "conduct within the scope of their duty" applies only to creditors committees and their members and to trustees, not to debtors or their independent directors.  *See In re Highland*, 38 F.4th at 438.

94    *See In re CBL & Associates Properties, Inc.*, No. 20-35226 (Bankr. S.D. Tex. Aug. 19, 2021) [Docket No. 1417] (granting an exculpation in a structured dismissal order for (a) the debtor, (b) the ad hoc noteholder group, (c) U.S. Bank, (d) the creditors' committee, (e) each member of the creditors' committee, and (f) with respect to each of the foregoing persons or entities, their directors and officers, financial advisors, attorneys, and other professionals); *see also In re Basic Energy Services, Inc.*, No. 21-90002 (Bankr. S.D. Tex. Nov. 6, 2021)

Accordingly, the exculpation provision is warranted and appropriate under the circumstances and in light of relevant precedent.

### F.     Objections to the Administrative Claims Schedule Are Either Moot or Will Be Reconciled.

79.     Many Objectors have limited their Objections solely to the issue of either being excluded from the list of Administrative Claims attached to the Dismissal Order at Exhibit 1 or contesting the amount listed on the schedule.  Many of these Objections have been reconciled by the Debtors following verification of the correct Administrative Claims amounts pursuant to the Debtors' books and records,[95] and the Debtors are working to resolve the rest prior to the Hearing.[96]  A revised version of the list of Administrative Claims reflecting the Debtors' verification and reconciliation will be attached to the revised proposed Dismissal Order.

80.     The Debtors received two formal Objections and one informal Objection by Objectors whose claims patently do not satisfy the criteria of an "administrative claim" under sections 503(b), 507(a)(2), or 1114(e)(2) of the Bankruptcy Code.  In order to be scheduled on the list of Administrative Claims receiving distributions pursuant to the Creditor Trust, a creditor's claim must satisfy the criteria of an "administrative claim" under sections 503(b), 507(a)(2), or 1114(e)(2).  In order to establish a *prima facie* case in the Fifth Circuit for administrative expense priority, a creditor must show that "(1) the claim arises from a transaction with the

---

[Docket No. 678] (granting an exculpation in the context of a settlement providing for resolution of the debtors' chapter 11 cases for (a) the debtors; (b) the ad hoc group; (c) the prepetition secured notes trustee; (d) the creditors' committee and each of its members; (e) the prepetition ABL agent and the prepetition ABL secured parties, (f) and each of debtors' officers, directors, or employees or served in such capacity immediately prior to the closing of certain sale transactions during the course of the chapter 11 cases).

[95]    As stated in the Dismissal Motion, the Administrative Claims listed on Exhibit 1 to the Dismissal Order are based on the Debtors' books and records.

[96]    The Debtors reserve all rights to address any outstanding Objections to the Administrative Claims listed on Exhibit 1 to the Dismissal Order.

debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern."[97]  Thus, any claims that arose prepetition and/or arose out of actions or services that did not benefit the Debtors' estates during these chapter 11 cases are not entitled to administrative priority status and any related Objections should be overruled.

81.    Here, the Debtors received two formal Objections, one filed by Teresa Welch [Docket No. 548] (the "Welch Objection") and another filed by Teresa Vogel [Docket No. 552] (the "Vogel Objection"), each based on unfulfilled retainer orders.  The Welch Objection asserts that the Court should mandate payment of damages for an unfulfilled retainer order purchased on July 14, 2023 (nearly two-and-a-half months prior to the Petition Date).[98]  Given that this claim for a refund (a) arises out of prepetition activity and (b) does not arise out of goods or services that enhanced the Debtors' ability to administer their bankruptcy estates, such claim constitutes a general unsecured claim not entitled to priority treatment.[99]  The Vogel Objection similarly objects to the relief sought in the Sale Motion on the basis that the Debtors "owe [her] retainers or a $249 refund."[100]  The Vogel Objection does not disclose when the Objector placed their order with the Debtors.  In any event, the claim for a refund does not amount to claim on account of goods or

---

[97]    *Matter of TransAmerican Natural Gas Corp.*, 978 F.2d at 1416; see also *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001) ("In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefitted the estate.").

[98]    *See* Welch Obj. ¶ 8, 15.

[99]    Additionally, the Welch Objection argues, with no supporting authority, that the Court should find the unsecured debt not dischargeable.  *See* Welch Obj. ¶ 14.  Given that the general unsecured claim asserted in the Welch Objection does not fall under any exception to discharge under 11 U.S.C. § 523, the objection on this basis should also be overruled.

[100]    *See* Vogel Obj.

services that enhanced the Debtors' ability to administer their bankruptcy estates.  The Welch Objection and Vogel Objection should thus be overruled.

82.     The Debtors also received an informal Objection from claimant Yuxin Ai (the "Ai Objection), objecting to the Dismissal Motion on the basis that their claim is excluded from the Administrative Claims schedule.  Here, the Objector has a claim against the Company arising from a judgment entered against the Debtors in the Essex County Small Claims Court on August 21, 2023 (more than a month prior to the Petition Date).  Not only is the Objector's claim not on account of goods or services supplied to the Debtors that enhanced the Debtors' ability to function as a business, the claim arose prior to the Petition Date.  Accordingly, the Ai Objection should be overruled.

## **Conclusion**

83.     For the reasons set forth herein, the Debtors request that the Objections be overruled, Align's cross motion be denied, and the Motions be granted.

Houston, Texas
Dated:  January 16, 2024

/s/  *Spencer A. Winters*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL**
**LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com

-and-

Spencer A. Winters (admitted *pro hac vice*)
Rachael M. Bentley (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:            spencer.winters@kirkland.com
                    rachael.bentley@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## <u>Certificate of Service</u>

I certify that on January 16, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Spencer A. Winters*
Spencer A. Winters

**<u>Schedule 1</u>**

**Objections Summary**

| Party | Docket No(s). | Objection | Debtors' Response |
|---|---|---|---|
| **Securities Litigation Class Action Members (Filed by Brittany Vang, Matthew G. Mancour)** | 558 | The Sale Order will improperly release "direct" claims of pending securities litigation, which could be construed as a non-consensual third-party release. | The Debtor Release does not provide for the release of third-party claims. |
| | | The Sale Order and Dismissal Order should include a provision requiring the preservation of debtors' books and records after the sale for discovery evidence purposes (as relates to the parallel securities litigation involving the class members). | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **Align Technology, Inc.** | 555, 544 | Neither *Jevic* nor section 105(a) of the Bankruptcy Code support the relief the Debtors seek in the Dismissal Order. | *See* Reply ¶¶ 55, 71–75. |
| | | The Structured Dismissal constitutes an impermissible *sub rosa* plan under *Braniff*. | *See* Reply ¶¶ 12, 61–62. |
| | | Courts in the Southern District of Texas have never approved structured dismissals over an objection. | Courts in the Fifth Circuit have found that dismissal is in the best interests of creditors where an interested party, other than the debtor, supports dismissal.  *See* Reply ¶ 60. |
| | | The Special Committee concluded, without any evidence, that the debtor releases being given in exchange for cash consideration are "reasonable," when further details illustrating the claims' values and the costs of pursuing such claims are necessary. | *See* Reply ¶¶ 6, 31–32. |
| | | Breach of fiduciary duty, preference, and fraudulent transfer claims could bring potentially hundreds of millions of dollars into the estates. | *See* Reply ¶¶ 7, 25–52. |
| | | Conversion to chapter 7 is in the best interest of creditors. | *See* Reply ¶¶ 11, 56–59. |
| | | The Debtor Release's cap at coverage under the D&O Policies limits further value available to unsecured creditors. | The Debtor Release as a whole is in the best interest of creditors and the Global Settlement was negotiated at arms-length with the Creditors Committee.  *See* Reply ¶ 54. |
| | | Debtors must provide evidence of remaining insurance coverage and disclose whether any pending claims against the Debtors' D&O Policies arising from third-party claims might erode creditor recoveries.  Failing to disclose the remaining insurance coverage creates a risk that insurers may attempt to deny coverage. | *See Debtors' Witness and Exhibit List for Hearing Scheduled for January 18, 2024, at 2:00 P.M (Prevailing Central Time)* [Docket No. 568], Exs. 64–68. |

| | | | |
|---|---|---|---|
| | | Without a demonstration that the D&O Policies would actually be accessible, the Debtor Release creates a risk that insurers may attempt to deny coverage. | The D&O Policies will be submitted into evidence prior to the Hearing. |
| | | Align holds an administrative claim for outstanding iTero service fees that is not listed. | Resolved via revised schedule of Administrative Claims. |
| | | The Debtors cannot contribute cash collateral securing the Australian letter of credit to the Creditor Trust. | The Dismissal Motion provides that the Debtors shall contribute proceeds from the collection of *any* of the Select Assets. *See* Dismissal Motion, Ex. A. Accordingly, a contribution to the Creditor Trust on account of cash collateral securing the Australian letter of credit shall occur to the extent proceeds from the collection of such asset is available. |
| | | The iTero scanners cannot be sold because the scanners themselves are subject to an Align transfer policy that requires a sale to be conducted by Align or an Align-approved distributor and the iTero software license cannot be sold without the relevant license agreement being assumed and assigned by the Debtor to a buyer. | *See* Reply ¶¶ 67–70. |
| **Teresa Vogel** | 552 | The claimant, a consumer or customer, is owed a refund. | *See* Reply ¶¶ 79–81. |
| **Teresa Welch** | 548 | The claimant, a consumer or customer, is owed a refund and the debt is not dischargeable. | *See* Reply ¶¶ 79–81. |
| **Ad Hoc Group of Convertible Noteholders** | 547 | The relief sought under the Sale Order and Dismissal Order constitute an impermissible *sub rosa* plan under *Braniff*. | *See* Reply ¶¶ 12, 61–62. |
| | | The transactions contemplated by the Motions do not have broad creditor support. | *See* Reply ¶¶ 24, 52, 57, 60. |
| **Dentist & Orthodontist Class Action Claimants** | 542, 540 | Debtors did not specify which claims and causes of actions will be bought by the Purchaser. | The schedule of claims and causes of action will be appended to the amended Asset Purchase Agreement to be filed prior to the Hearing. |
| | | The claims that would be released are likely valuable and should be pursued, and the current consideration will be insufficient, given book valuations of the assets. | *See* Reply ¶¶ 7, 25–52. |
| | | The Debtor Release's cap at coverage under the D&O Policies limits further value available to unsecured creditors. | The Debtor Release as a whole is in the best interest of creditors and the Global Settlement was negotiated at arms-length with the Creditors Committeee.  *See* Reply ¶ 54. |

| | | Conversion to chapter 7 is in the best interest of creditors. | *See* Reply ¶¶ 11, 56–59. |
|---|---|---|---|
| **HPS Investment Partners, LLC** | 541 | The Debtors have not disclosed with great enough detail the Special Committee's investigation process which resulted in the conclusion that Structured Dismissal was a better alternative to conversion. | *See* Reply ¶¶ 6, 31–32. |
| | | The value of the Debtors' assets may "significantly" exceed the consideration being put up by the DIP Lenders. | *See* Reply ¶¶ 5, 23. |
| | | The Asset Sale does not satisfy the "heightened scrutiny" applicable to sales to insiders. | *See* Reply ¶¶ 14. |
| | | Conversion to chapter 7 is in the best interest of creditors. | *See* Reply ¶¶ 11, 56–59. |
| | | The proposed asset sales require HPS's approval, since they include certain intellectual property licenses that comprise certain of HPS's collateral. | *See* Reply ¶¶ 67–69. |
| **Stripe, Inc.** | 539 | Claimants assert an administrative expense claim of up to $12 million arising from potential credit card chargebacks stemming from customer disputes and refund requests. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **Amazon Web Services, Inc.** | 538 | The Objector's claim is listed incorrectly on the Administrative Claims schedule. | Resolved via revised schedule of Administrative Claims. |
| **RXO Capacity Solutions, LLC and RXO Freigh Forwarding, Inc.** | 537 | The Objector's claim is listed incorrectly on the Administrative Claims schedule. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **Tyco Integrated Security LLC** | 536 | The Administrative Claims schedule excludes the Objector's claim. | Resolved via revised schedule of Administrative Claims. |
| **BRE Mariner Ross Plaza LLC** | 534 | The Debtors cannot retroactively reject the lease because they are still in possession of the leased property. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| | | The Objector's claim is listed incorrectly on the Administrative Claims schedule. | Resolved via revised schedule of Administrative Claims. |
| **Material Handling, Inc.** | 532 | The Debtors still hold certain leased equipment, but neither the Sale Motion nor the Dismissal include lessor protections for the leased equipment. Claimant provides draft provisions to include in amended Dismissal Order and Sale Order. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |

| | | | | |
|---|---|---|---|---|
| | | Distributions should be based on filed proofs of claim, including any rejection damages. | *See* Reply ¶ 75 n.88. |
| **Barrett Distribution Centers, LLC** | 531 | The Debtors cannot sell the Assets free and clear of the Objector's warehouse lien. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| | | The Administrative Claims schedule excludes the Objector's claim. | Resolved via revised schedule of Administrative Claims. |
| **SmileDirectClub LLC Arbitration Claimants (Kibrom Araya et al.)** | 529 | The medical and professional liability insurance policies produced to arbitration claimants are not D&O insurance policies, and thus should be preserved and accessible to the arbitration claimants. | The relief requested in the Motions does not seek to preclude the arbitration claimants from asserting claims against the applicable insurance policies to the extent such coverage exists. |
| | | In the alternative, claimants ask that the court lift the automatic stay in order to access available insurance policies proceeds and liquidate claims arising from the parallel arbitration. | Requests for relief from the automatic stay should be deferred pending resolution of the relief requested in the Motions. |
| **Hewlett-Packard Financial Services Company** | 528 | The Administrative Claims schedule excludes the Objector's claim. | Resolved via revised schedule of Administrative Claims. |
| **Dash BPO, LLC** | 527, 524 | The Objector's claim is listed incorrectly on the Administrative Claims schedule. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **Nashville Hockey Club, Limited Partnership** | 526, 525 | The Administrative Claims schedule excludes the Objector's claim. | Resolved via revised schedule of Administrative Claims. |
| **WARN Act Claimants** | 523 | The WARN Claimants are owed an amount—not specified in their objection—for administrative expenses arising from postpetition back-pay and benefits owed to claimants whose employment was terminated postpetition. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **Coupa Software Inc.** | 522 | Claimant is owed administrative expense claims from unpaid postpetition software services obligations. | Resolved via revised schedule of Administrative Claims. |
| **Consumer Class Plaintiffs (Rene Colorado et al.)** | 519, 518 | The Asset Sale does not satisfy the "heightened scrutiny" applicable to sales to insiders. | *See* Reply ¶ 14. |
| | | The Asset Sale may not take place free and clear of successor liability claims. | *See* Reply ¶ 63. |

| | | | |
|---|---|---|---|
| | | The Sale Order must clarify that the Debtor Release will not apply to direct claims pursued by creditors. | The schedule of claims and causes of action will be appended to the amended Asset Purchase Agreement to be filed prior to the Hearing. |
| | | The Sale Consideration is insufficient and the DIP credit bid should be disallowed. | *See* Reply ¶ 24 n.22. |
| | | The Sale does not contemplate an overbid process that could yield better offers, and instead only contemplates a private process driven by the Debtors, which ultimately limits asset value maximization. | *See* Reply ¶ 64. |
| | | The Creditor Trust is not authorized under applicable law. | *See* Reply ¶ 61 n.69. |
| | | The Purchaser should not be permitted to purchase avoidance-related claims against insiders. | *See* Reply ¶ 36. |
| | | The exculpation provision in the Dismissal Order is overly broad and exculpations are impermissible outside the context of a chapter 11 plan. | *See* Reply ¶¶ 76–78. |
| | | Assignment of the customer service contracts is not permitted. | *See* Reply ¶ 65. |
| | | Notice of the Motions was inadequate. | *See* Reply ¶ 66. |
| | | Conversion to chapter 7 is in the best interests of creditors. | *See* Reply ¶¶ 11, 56–59. |
| | | *Jevic* stands for the proposition that a structured dismissal is impermissible when a party objects to dismissal. | *See* Reply ¶ 60. |
| | | The Consumer Class Plaintiffs are entitled to an administrative claim on account of accrual and discontinuation of medical treatment that occurred postpetition. | *See* Reply ¶¶ 79–82. |
| **LTIMindtree Limited** | 517 | The Objector's claim is listed incorrectly on the Administrative Claims schedule. | Resolved via revised schedule of Administrative Claims. |
| | | Certain software licensing agreements must be assumed and assigned under section 365 of the Bankruptcy Code, if either the Debtors or the potential purchaser intend to use such licenses going forward. Claimants seek to confirm that such licenses will not be assumed. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **Tennessee Department of Revenue** | 515 | The Administrative Claims schedule excludes the Objector's claim. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **United States Trustee** | 513 | The relief sought under the Sale Order and Dismissal Order constitute an impermissible *sub rosa* plan under *Braniff*. | *See* Reply ¶¶ 12, 61–62. |

| | | | |
|---|---|---|---|
| | | The exculpation provision in the Dismissal Order is not permitted under *Highland*. | Reply ¶¶ 76–78. |
| | | The Debtor Release overly broad and will release parties from claims not related to the Asset Sale. | *See* Reply ¶¶ 25–54. |
| | | The Bankruptcy Code does not specifically authorize structured dismissals. | *See* Reply ¶ 55. |
| | | Conversion to chapter 7 is in the best interest of creditors. | *See* Reply ¶¶ 11, 56–59. |
| **Kathlene R. Kelley and Daniel C. Hightower** | 512 | Claimants filed an informal letter to Judge in order to "deny the bankruptcy petition." Claimants expressed a "wish to object to this bankruptcy request" and requested to be "part of any and all proceedings." | See Reply. |
| **Aetna Life Insurance Company** | 510, 508 | The Administrative Claims schedule excludes the Objector's claim. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **Mac Papers, LLC** | 506 | The Objector's claim is listed incorrectly on the Administrative Claims schedule. | Resolved via revised schedule of Administrative Claims. |
| **FR5, LLC** | 502 | Sale Motion did not include appropriate "abandonment" procedures for any personal property left within the leased premises following the Rejection Date. Claimants also provided proposed language to handle the abandonment of personal property. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| | | The Dismissal does not account for missed January rent payments in the administrative claims schedules. | Resolved prior to the Hearing. |
| | | Distributions should be based on filed proofs of claim, including any rejection damages. | *See* Reply ¶ 75 n.88. |
| | | Retroactive rejection is not permissible when a tenant has not yet vacated the property and the court must adjust the lease Rejection Date for some point in the future. | The Debtors continue to engage in discussions with the Objector regarding a potential consensual resolution of this Objection. |
| **NW Met LP** | 489 | Sale Motion did not include appropriate "abandonment" procedures for any personal property left within the leased premises following the Rejection Date. The Objectors also provided proposed language to handle the abandonment of personal property. | Resolved via language in the proposed Sale Order to be filed prior to the Hearing. |
| | | The Objector's claim is listed incorrectly on the Administrative Claims schedule. | Resolved via revised schedule of Administrative Claims. |

| | | Distributions should be based on filed proofs of claim, including any rejection damages. | *See* Reply ¶ 75 n.88. |
|---|---|---|---|
| **Sun Life Assurance Company of Canada and Sun Life Insurance Company** | 474 | Claimants filed an emergency motion seeking allowance and payment of administrative expense claims in the amount of $148,900.79 for monthly premium obligations for postpetition employee benefit policies.  Claimants further request court to (1) direct Debtors to pay amounts; (2) confirm the lapse or termination of employee benefit policies; and (3) authorize claimants to terminate such policies. | Emergency motion withdrawn. |
| **Yuxin Ai** | N/A | Claimant submitted a letter to court clerk, seeking allowance and payment of general unsecured claim. | *See* Reply ¶¶ 79–82. |