# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| SMILEDIRECTCLUB, INC., *et al.*, | ) Chapter 7 |
| | ) (Previously Chapter 11) |
| Debtors. | ) |
| | ) Case No. 23-90786 (CML) |
| | ) |
| | ) (Jointly Administered) |
| | ) |

## CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING LITIGATION ARRANGEMENT, (II) GRANTING PRIMING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY STATUS, (III) APPROVING THE PAYMENT OF CERTAIN RELATED FEES AND EXPENSES, AND (IV) GRANTING RELATED RELIEF

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 14 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

RELIEF REQUESTED ....................................................................................................... 6

STATEMENT PURSUANT TO BANKRUPTCY RULE 4001 ................................... 7

BACKGROUND ................................................................................................................ 12

    A.    Commencement of the Chapter 11 Cases ..................................................... 12

    B.    The Insider DIP Facility ................................................................................. 13

    C.    Conversion to Chapter 7 ................................................................................. 14

    D.    Engagement of Special Litigation Counsel and the Contingency Fee
          Arrangement ..................................................................................................... 15

    E.    The Trustee's Search for Litigation Financing and the Funding
          Arrangement ..................................................................................................... 17

    F.    Recent Agreements by the Insider DIP Lenders ....................................... 21

BASIS FOR RELIEF ........................................................................................................ 22

    A.    The Court Should Authorize and Approve the Litigation Arrangement
          Under Section 364 of the Bankruptcy Code. ............................................. 22

          1.    Entering the Litigation Arrangement is an Exercise of the Trustee's
                Sound Business Judgment. ................................................................. 22

          2.    The Litigation Liens and Litigation Superpriority Claims Should
                be Granted. ............................................................................................ 26

    B.    The Break-Up Fee and Expense Reimbursement Should be Approved. ............. 32

    C.    The Funder and Special Litigation Counsel Should be Afforded Good
          Faith Protection Under Section 364(e) of the Bankruptcy Code. ........................ 32

WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H) ............................................. 33

NOTICE ............................................................................................................................. 33

CONCLUSION .................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 495 Central Park Avenue Corp.*,
  136 B.R. 626 (Bankr. S.D.N.Y. 1992) ...................................................................30

*In re Ames Dep't Stores*,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ..............................................................23, 27

*In re Ampel-American Israel Corp.*,
  534 B.R. 569 (Bankr. S.D.N.Y. 2015) ...................................................................25

*Assocs. Commer. Corp. v. Rash*,
  520 U.S. 953 (1997) ................................................................................................29

*In re Beker Indus. Corp.*,
  58 B.R. 725 (Bankr. S.D.N.Y. 1986) .....................................................................29

*In re Bronson Masonry, LLC*,
  Case No. 15-34713-sgj7 [Dkt. Nos. 43-44] (Bankr. N.D. Tex. Apr. 21, 2016) ....25

*Dean v. Seidel*,
  Case No. 20-CV-01834, 2021 WL 1541550 (N.D. Tex. Apr. 20, 2021)................24

*In re Ellingsen McLean Oil Co., Inc.*,
  65 B.R. 358 (W.D. Mich. 1986) .............................................................................23

*In re Farmland Indus., Inc.*,
  294 B.R. 855 (Bankr. W.D. Mo. 2003).................................................................23

*In re First S. Sav. Ass'n,*,
  820 F.2d 700 (5th Cir. 1987) .................................................................................29

*In re Hubbard Power & Light*,
  202 B.R. 680 (Bankr. E.D.N.Y. 1996)...................................................................30

*In re Islet Scis., Inc.*,
  Case No. 19-13366-mkn [Dkt. No. 160] (Bankr. D. Nev. Oct. 17, 2019).............24

*In re L.A. Dodgers LLC*,
  457 B.R. 308 (Bankr. D. Del. 2011) ................................................................23, 27

*In re LATAM Airlines Grp. S.A.*,
  C620 B.R. 722 (Bankr. S.D.N.Y. 2020) .................................................................27

*In re MLCJR LLC*,
    Case No. 23-90324 (CML) [Dkt. No. 1862] (Banrk. S.D. Tex. April 30, 2024) ...................25

*In re Mountain Express Oil Co.*,
    Case No. 23-90147-H2-7 [Dkt. No. 2278] (Bankr. S.D. Tex. June 13, 2024) .......................25

*In re Plabell Rubber Products, Inc.*,
    137 B.R. 897 (Bankr. N.D. Ohio 1992) ...................................................................................29

*In re Sky Valley, Inc.*,
    100 B.R. 107 (Bankr. N.D. Ga. 1988) .....................................................................................29

*In re The Colonial Bancgroup, Inc.*,
    Case No. 09-32303 [Dkt. No. 1933] (Bankr. M.D. Ala. Sep. 13, 2012) ................................25

*In re The Great Atlantic & Pacific Tea Co., Inc.*,
    Case No. 15-23007-lgb [Dkt. No. 5156] (Bankr. S.D.N.Y. July 26, 2022) ...........................24

*In re Trans World Airlines, Inc.*,
    163 B.R. 964 (Bankr. D. Del. 1994) ........................................................................................23

*In re Tropicana Entertainment, LLC*,
    Case No. 08-10856-MFW [Dkt. No. 4131] (Bankr. D. Del. Jan. 23, 2017)............................24

*In re Tuesday Morning Corp.*,
    Case No. 23-90001-ELM [Dkt. No. 1684] (Bankr. N.D. Tex. May 24, 2024) .......................25

*In re Welded Construction, L.P.*,
    Case No. 18-12378 (KG) [Dkt. No. 745] (Bankr. D. Del. May 22, 2019) .............................24

*In re Westport Holdings Tampa, Ltd. P'ship*,
    Case No. 8:16-bk-8167-mgw [Dkt. No. 1827] (Bankr. M.D. Fla. July 17,
    2020) ........................................................................................................................................24

*In re Yellowstone Mountain Club, LLC*,
    Case No. 08-61571-11, 2008 Bankr. LEXIS 4062 (Bankr. D. Mont. Dec. 17,
    2008) ........................................................................................................................................29

**Statutes and Rules**

11 U.S.C. § 105.............................................................................................................................6, 25

11 U.S.C. § 361.................................................................................................................................29

11 U.S.C. § 363...................................................................................................................6, 24, 25, 32

11 U.S.C. § 364.........................................................6, 20, 22, 23, 24, 25, 26, 27, 28, 32, 33

11 U.S.C. § 503.............................................................................................................................6, 26

11 U.S.C. § 507 ..................................................................................................................6

11 U.S.C. § 547 ................................................................................................................21

11 U.S.C. § 550 ................................................................................................................21

11 U.S.C. § 726 ..................................................................................................................6

11 U.S.C. § 1107 ..............................................................................................................12

11 U.S.C. § 1108 ..............................................................................................................12

11 U.S.C. § 1142 ..............................................................................................................25

28 U.S.C. § 157 ..................................................................................................................6

28 U.S.C. § 1334 ................................................................................................................6

28 U.S.C. § 1408 ................................................................................................................6

28 U.S.C. § 1409 ................................................................................................................6

Fed. R. Bankr. P. 1015 ....................................................................................................12

Fed. R. Bankr. P. 2002 ................................................................................................6, 33

Fed. R. Bankr. P. 4001 ............................................................................................6, 7, 22

Fed. R. Bankr. P. 6004 ................................................................................................6, 33

Fed. R. Bankr. P. 9014 ..............................................................................................6, 25

Local Bankruptcy Rules for the Southern District of Texas 2002-1 ................................6

Local Bankruptcy Rules for the Southern District of Texas 4001-1 ................................6

Local Bankruptcy Rules for the Southern District of Texas 9013-1 ................................6

**Other Authorities**

Leslie Picker & Angelica Peebles, *SmileDirectClub prices IPO at $23 per share,
    valuating the company at $8.9 billion*, CNBC (Sept. 11, 2019, 5:32 PM),
    https://www.cnbc.com/2019/09/11/smiledirectclub-prices-ipo-at-23-per-share-
    valuing-the-company-at-8point9-billion.html. ..........................................................2

SmileDirectClub, Inc. (SDCCQ), Yahoo Finance,
    https://finance.yahoo.com/quote/SDCCQ/ (last visited May 15, 2024) ...................2

iv

Babin et al., *SmileDirectClub Letter to the F.D.A. and the F.T.C.*, dated January 6, 2020, available at https://mma.prnewswire.com/media/1082153/Smile_Direct_Club_Letter_to_t he_FDA_and_FTC.pdf .............................................................................................................3

Allison D. Byman, in her capacity as the Chapter 7 Trustee (the "Trustee") of the jointly-administered bankruptcy estates (the "Estates") of SmileDirectClub Inc. and the affiliated debtors (collectively, the "Debtors") in the above-captioned chapter 7 cases, by and through her undersigned proposed counsel, files this motion (this "Motion") for entry of an order, substantially in the form attached hereto (the "Proposed Order"), (i) authorizing and approving the Funding Arrangement with the Funder and the Contingency Fee Arrangement with Special Litigation Counsel (each as defined herein) (together with the Funding Arrangement, the "Litigation Arrangement") (including the Litigation Funding Agreement (as defined herein) with Omni Bridgeway Management (USA) LLC (together with its affiliates, "Omni" or the "Funder") and the Contingency Fee Agreement (as defined herein) with Orrick, Herrington & Sutcliffe LLP ("Special Litigation Counsel" or "Orrick")), (ii) granting the Litigation Liens and the Litigation Superpriority Claims (each as defined herein), (iii) approving payment of the Break-Up Fee and the Expense Reimbursement (each as defined herein), and (iv) granting related relief. In support of the Motion, the Trustee submits the Declaration of Allison D. Byman (the "Byman Declaration") attached hereto as **Exhibit A**, and respectfully states as follows:

## INTRODUCTION

1. The Debtors own legal claims against directors and officers and their affiliates that could be worth well into the hundreds of millions of dollars—making them by far the most valuable assets in the Estates. But the insiders, through their control of the insider DIP lenders, have hamstrung the Trustee in her attempts to monetize those claims for the benefit of creditors, by refusing to fund any litigation against themselves. After canvassing a broad range of law firms, special situation and other financiers, and litigation funders, the Trustee was able to find one funder and one law firm willing to take on the risk of an extended legal battle with well-funded adversaries while still allowing substantial value to flow to the Estates. Unsurprisingly, however, these

professionals do not want to put their resources at risk in waging this battle if recoveries will go first and foremost to the very insiders they are pursuing, whose mismanagement drove the Debtors into insolvency. The Trustee therefore seeks the Court's approval to enter into a financing arrangement by which Omni and Orrick would receive priming liens solely on the proceeds of the claims against the insiders, as provided in the Litigation Funding Agreement and Contingency Fee Agreement. Because the insider DIP lenders' existing lien on the proceeds of these claims has zero value absent financing to pursue them, the Litigation Arrangement adequately protects—indeed, enhances—the value of their collateral. The Trustee respectfully requests that the Court approve the Litigation Arrangement because, in the exercise of her business judgment, she believes it to be the best, and potentially the only, way to extract value for the Estates from the claims against the insiders.

2.     The Trustee believes that the claims against the insiders are compelling, and for good reason. After using almost $700 million of the $1.29 billion in proceeds from the company's IPO to cash out their own pre-IPO holdings, the insiders drove a business once valued at $8.9 billion[1] to ruin. Following the IPO, the company lost over fifty percent of its market capitalization within one month.[2] Within two years, the company lost over seventy-five percent of its IPO market capitalization and, by year three, the company's stock price struggled to stay above one dollar.[3] The dramatic drop in revenue is attributable to accusations of false advertising, fraud, and violations of various state consumer protection lawsuits. The scores of complaints led to

---

[1] *See* Leslie Picker & Angelica Peebles, *SmileDirectClub prices IPO at $23 per share, valuating the company at $8.9 billion*, CNBC (Sept. 11, 2019, 5:32 PM), https://www.cnbc.com/2019/09/11/smiledirectclub-prices-ipo-at-23-per-share-valuing-the-company-at-8point9-billion.html.

[2] SmileDirectClub, Inc. (SDCCQ), Yahoo Finance, https://finance.yahoo.com/quote/SDCCQ/ (last visited May 15, 2024).

[3] SmileDirectClub, Inc. (SDCCQ), Yahoo Finance, https://finance.yahoo.com/quote/SDCCQ/ (last visited May 15, 2024).

investigations by the news media, multiple lawsuits, and even sparked concern among members of Congress, who wrote a letter asking the Food and Drug Administration and the Federal Trade Commission to look into the Debtors' "questionable advertising practices" and potential to harm patients.[4]

3.      Following a $63 million arbitration award against the Debtors in favor of Align Technologies, Inc., and with numerous additional lawsuits against the Debtors alleging millions of dollars in damages hanging over their heads, the Debtors filed for chapter 11 protection in September 2023. The Debtors' chapter 11 cases were defined by the insiders' repeated attempts to use the process to buy their way out of personal liability for looting and mismanaging the company.

4.      At the outset of the chapter 11 cases, the Debtors' insiders tried to use their insider DIP facility to escape liability in exchange for only $20 million of new money, proposing to give the insider DIP lenders liens over Estate claims against the insiders that, if approved, would have allowed the insider DIP lenders to foreclose on those claims. Fortunately, the Debtors' organized creditor constituencies were able to keep the claims against the insiders alive by limiting the collateral package such that only the proceeds of the claims were pledged in favor of the insider DIP lenders, not the claims themselves.

5.      Then, after the Debtors' marketing process failed to generate any third-party bidders, the insider DIP lenders sought to implement a structured dismissal under which the insiders would have received a release from liability for any uninsured claims (and liability for insured claims would have been limited in recourse to the Debtors' directors' and officers' insurance policies) in exchange for just $7.65 million in cash and a $28 million credit bid of their

---

[4] Babin et al., *SmileDirectClub Letter to the F.D.A. and the F.T.C.*, dated January 6, 2020, available at https://mma.prnewswire.com/media/1082153/Smile_Direct_Club_Letter_to_the_FDA_and_FTC.pdf.

DIP facility claims. This time the Court stepped in to protect the claims by rejecting the insiders' gambit, refusing to allow the Debtors to sell the company back to the insiders and release them from personal liability, and instead converted the Debtors' bankruptcy cases to chapter 7 to allow (among other things) the Trustee to investigate potential claims against the Debtors' insiders.

6.      Post-conversion, the Trustee and her advisors have worked diligently to chart a path forward that will maximize the value of the Estates' assets for the benefit of all creditors. The most valuable of those assets—and the only potentially significant source of creditor recoveries—are the claims against the Katzmans and the Debtors' other insiders. The Trustee's ability to prosecute these claims against the insiders is essential to providing any meaningful recovery to non-insider stakeholders.

7.      But litigating the claims effectively against numerous well-heeled defendants will require substantial resources, and the only cash to which the Trustee has access is encumbered by $25 million or more of claims by the insider DIP lenders arising under the DIP financing facility they caused the Debtors to incur. The insider DIP lenders have flatly refused to allow the Trustee to use any cash collateral to investigate or prosecute claims against them. As a result, the Trustee began exploring other options and engaged in discussions with potential funding sources seeking financing for the litigation, as well as law firms willing to consider prosecuting the claims against the insiders under alternative fee arrangements.

8.      Following extensive negotiations with several prospective law firms and litigation funders, the Trustee selected Orrick as special litigation counsel to pursue the claims against the insiders under a contingency fee agreement. Under the terms of the contingency fee agreement, Special Litigation Counsel is entitled to receive either (i) 35% of the proceeds of the insider claims (net of Special Litigation Counsel's expenses) as a full contingency fee option or, (ii) if the Trustee

succeeded in obtaining litigation financing, 20% of the proceeds of the insider claims, with Special Litigation Counsel's hourly fees to be paid from the financing based on its then-current hourly billing rates discounted by 40%. Under both scenarios, the Trustee agreed to grant Special Litigation Counsel an assignment of the contingency fee portion of the proceeds of the insider claims and, absent the Court's approval of the assignment, Special Litigation Counsel is not obligated to represent the Trustee or bring claims against the insiders. In addition, the Trustee agreed to a commitment letter and term sheet with Omni, subject to the Court's approval, that contemplates up to an aggregate $██████ in non-recourse funding on a senior secured, superpriority basis to pay litigation fees and expenses. Together, the contingency fee arrangement and funding arrangement will allow the Trustee to prosecute the claims against the insiders and maximize their value for the benefit of the Estates and creditors.

9.      The Trustee respectfully requests that the Court approve the Litigation Arrangement, as well as the granting of priming liens and superpriority administrative expense claims with priority over outstanding administrative, priority, and secured claims with respect to the proceeds of claims against the insiders, among other related relief. The Trustee submits that granting non-consensual priming liens to secure a proposed litigation financing in a converted chapter 7 case with priority ahead of the claims of pre-conversion chapter 11 DIP lenders is appropriate in the narrow circumstances present here where (i) the chapter 11 DIP lenders or their affiliates are insiders, (ii) causes of action against those insiders represent the only potentially significant source of recovery for creditors, (iii) the proposed priming collateral package is limited solely to the proceeds of those causes of action, and (iv) the interests of the chapter 11 DIP lenders are adequately protected.

10. The Court need not conduct a mini-trial to value the claims because those claims do not have *any* value to the Estates unless the Trustee is able to assert and prosecute them. As such, the Litigation Arrangement is in the best interests of the Estates and consistent with the goal of maximizing value for creditors. Armed with the requested funding, the Trustee will have the means to advance the prosecution of the claims against the insiders and work towards achieving the best possible outcome for the Estates and creditors.

11. In view of the foregoing, the Trustee respectfully submits that the Litigation Arrangement (including the Litigation Funding Agreement and the Contingency Fee Agreement) and the related relief requested by this Motion should be approved.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

13. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14. The basis for the relief requested herein are sections 105, 363, 364(c), 364(d), 503, 507, and 726 of the title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

## RELIEF REQUESTED

15. By this Motion, the Trustee seeks entry of an order, substantially in the form of the Proposed Order attached hereto, (i) authorizing and approving the Litigation Arrangement (including the Litigation Funding Agreement and the Contingency Fee Agreement), (ii) granting

the Litigation Liens and the Litigation Superpriority Claims, (iii) approving payment of the Break-

Up Fee and the Expense Reimbursement, and (iv) granting related relief.

## STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

16.     The following chart contains a summary of the material terms of the proposed

Litigation Arrangement, including information required pursuant to Bankruptcy Rule 4001:[5]

| Summary of Material Terms | | |
|---|---|---|
| **Terms** | **Summary** | **Source** |
| **Parties** | **Trustee**: Allison D. Byman, the Chapter 7 Trustee of the jointly administered cases of SmileDirectClub Inc., et al.<br><br>**Funder**: Omni Bridgeway Management (USA) LLC or any of its affiliates.<br><br>**Law Firm**: Orrick, Herrington & Sutcliffe LLP. | Term Sheet p. 1 |
| **Liens and Priorities** | Fully perfected first-priority liens on and security interests in the Insider Claims Proceeds granted in favor of the Funder and Special Litigation Counsel. | Term Sheet p. 3; Contingency Fee Agreement p. 3-4; Proposed Order ¶¶ 5-6 |
| **Term/Maturity** | None. | N/A |
| **Funding Amount/Milestones** | Up to $███████ in legal fees and costs to be disbursed as follows (the amount actually disbursed, the "<u>Funding Amount</u>"):<br><br><u>Fees</u>:<br><br>Funder will pay up to $███████ of the Trustee-approved legal fees subject to the following milestones (the "<u>Legal Fees</u>"):<br><br>a)  Prior to ███████████████████████████ such period, "<u>Phase 1</u>"), Funder will pay all Trustee-approved monthly Discounted Fees,[6] up to a cap of $███████, incurred by the Law Firm for the scope of work under its engagement letter with the Trustee and subject to a budget reasonably acceptable to the Funder;<br><br>b)  From and after ████████████████████████████████████████ such period, "<u>Phase 2</u>"), the Funder will pay all Trustee-approved monthly Discounted Fees, up to a cap of $████ | Term Sheet p. 1-3 |

---

[5] The summary set forth in this Motion of the terms of the Litigation Arrangement is qualified in its entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used but not defined in this summary have the meanings given to them elsewhere in the Motion unless otherwise indicated.

[6] "<u>Discounted Fees</u>" is defined in the Term Sheet as "[t]he Law Firm's fees based on its then-current hourly billing rates discounted by 40%."

| Summary of Material Terms | | |
|---|---|---|
| **Terms** | **Summary** | **Source** |
| | ▮▮▮, incurred by the Law Firm for the scope of work under its engagement letter with the Trustee and subject to a budget reasonably acceptable to the Funder; | |
| | c) From and after ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ such period, "<u>Phase 3</u>"), the Funder will pay all Trustee-approved monthly Discounted Fees, up to a cap of $▮▮▮▮, incurred by the Law Firm for the scope of work under its engagement letter with the Trustee and subject to a budget reasonably acceptable to the Funder; and | |
| | d) From and after ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ such period, "<u>Phase 4</u>" and, together with Phase 1, Phase 2 and Phase 3, the "<u>Phases</u>" and, each of the Phases, a "<u>Phase</u>"), the Funder will pay all Trustee-approved monthly Discounted Fees, up to a cap of $▮▮▮▮, incurred by the Law Firm through appeal and subject to a budget reasonably acceptable to the Funder. | |
| | <u>Costs</u>: | |
| | The Funder will pay up to $▮▮▮▮ in Trustee-approved, monthly invoiced, capped Costs (as defined in the Term Sheet) incurred by the Law Firm and/or the Trustee in connection with the Litigation (invoiced at 100% of actual Costs). | |
| | **Excess Law Firm Fees**: | |
| | The Funder will not be responsible for paying any fees or costs in excess of the caps set out above. To the extent the Trustee approves Law Firm fees in excess of the caps set out above and which shall accrue at the same rate as the Discounted Fees (i.e., at a 40% discount to the Law Firm's then-current rates) ("<u>Excess Law Firm Fees</u>"), and the Funder chooses not to exercise the Call Option (defined herein), such Excess Law Firm Fees shall be subject to the payment waterfall set forth below. | |
| | All Excess Law Firm Fees, whether or not paid in priority steps (b) and (c) of the payment waterfall, shall be owed to the Law Firm by the Estates and such amounts shall be in addition and incremental to the up to 20% of Insider Claims Proceeds owed to the Law Firm pursuant to priority step (d) of the payment waterfall. | |
| | **Reallocation of Budgeted Amounts**: | |
| | Any unused Legal Fees available to pay any Discounted Fees incurred in any Phase (any such Phase, an "<u>Under-Budget Phase</u>") following the completion of such Under-Budget Phase, may be used, at the Trustee's and | |

| Summary of Material Terms | | |
|---|---|---|
| **Terms** | **Summary** | **Source** |
| | Law Firm's discretion, to pay any Discounted Fees incurred in any other Phase (any such Phase, an "<u>Over-Budget Phase</u>") in excess of the funding available to pay any such Discounted Fees during such Over-Budget Phase.<br><br>For the avoidance of doubt, any such Discounted Fees incurred during an Over-Budget Phase and paid with funding available from any Under-Budget Phase shall not constitute Excess Law Firm Fees. | |
| **Conditions to Commitment** | The Commitment of the Funder is subject to the satisfaction of each of the following conditions precedent:<br><br>a.      the results of the Funder's due diligence with respect to the litigation described in the "Litigation" section of the Term Sheet shall be reasonably satisfactory to the Funder, which the Funder shall determine no later than 30 days following entry of the Order (defined herein);<br><br>b.      the Court shall have issued a final order approving the Commitment Letter, including the Term Sheet and authorizing the Trustee to enter into and perform (and cause the Debtors' estates to perform) the obligations under the Commitment Letter and under the Litigation Funding Agreement (the "<u>Order</u>"); and<br><br>c.      the execution and delivery of the Litigation Funding Agreement for the Litigation Funding Facility (as defined in the Commitment Letter) that is mutually acceptable to the Funder and the Trustee. | Commitment Letter § 2 |
| **Funder's Return** | The Funder's return will be due solely from the Insider Claims Proceeds, whether such proceeds are obtained by final award, non-appealable judgment, settlement, or otherwise and without deduction, set-off, or counterclaim. The Funder otherwise has no recourse to the assets of the Debtors, the Estates, or the Trustee. As used herein, "<u>Funder's Return</u>" means its deployed Funding Amount *times* the multiple *plus* the percentages set out in the following table: | Term Sheet p. 3 |

| Time[7] | Multiple of deployed Funding Amount | % of Gross Litigation Proceeds to Omni |
|---|---|---|
| ████ | | ██ |
| ████ | ██ | ██ |
| ████ | ██ | ██ |

---

[7] Indicates time from the date of the definitive agreement to be documented providing for the litigation funding as contemplated by this term sheet (i.e., the Litigation Funding Agreement).

| Summary of Material Terms | | |
|---|---|---|
| **Terms** | **Summary** | **Source** |
| | ███ █████ ███ | |
| | ███ █████ ███ | |
| | ███ █████ ███ | |
| **Interest** | ███ compound annual interest, but only if the Insider Claims Proceeds are received more than ███████ after execution of the Litigation Funding Agreement. | Term Sheet p. 3 |
| **Payment Waterfall** | Total amounts distributable to the Funder and the Law Firm from the Insider Claims Proceeds collectively will not exceed 34% in all scenarios and shall be paid in the priority contemplated by the following payment waterfall:<br><br>a. **First**, the Funder is entitled to priority recovery of ███████ the deployed Funding Amount *plus* the Transaction Fee (defined herein);<br><br>b. **Second**, *pro rata* to (i) the Law Firm, an amount equal to one-third (1/3) of the Discounted Fees *plus* up to $200,000 of the Excess Law Firm Fees, and (ii) to the Trustee, up to 3% for her commission;<br><br>c. **Third**, *pro rata* to (i) the Law Firm, an amount equal to one-third (1/3) of the Discounted Fees *plus* up to $200,000 of the Excess Law Firm Fees, and (ii) the Funder, up to the full amount of the Funder's Return; and<br><br>d. **Fourth**, to the Law Firm, up to 20% of Insider Claims Proceeds (less the sum of Discounted Fees paid pursuant to the foregoing priority steps (b) and (c)) *plus* any Excess Law Firm Fees incurred by the Law Firm but not paid pursuant to the foregoing priority steps (b) and (c). | Term Sheet p. 3 |
| **Fees** | "Transaction Fee": As noted above, the Litigation Funder shall receive a one-time transaction fee of $50,000 payable from the Insider Claims Proceeds consistent with the payment waterfall set forth above.<br><br>"Expense Reimbursement": In the event the Funder incurs costs associated with its diligence process, including professional fees, and the deal is not consummated due to no fault of the Funder, Trustee shall reimburse the Funder its reasonable and documented out-of-pocket costs, not to exceed $100,000.<br><br>"Break-Up Fee": In consideration of the costs and efforts to be expended by the Funder in negotiating the transaction described in the Term Sheet, if, after executing the Commitment Letter, the transaction is not consummated due to no fault of the Funder, including by the Trustee's acceptance of an Alternative Proposal, the Funder shall receive a break-up fee of $300,000; provided, however, that the Break-Up Fee will be payable only from Insider Claims Proceeds or the proceeds from any Alternative Lender (in the event the Trustee enters into an agreement related | Term Sheet p. 3-4; Commitment Letter § 4; Proposed Order ¶ 7 |

| Summary of Material Terms | | |
|---|---|---|
| **Terms** | **Summary** | **Source** |
| | to an Alternative Proposal and the Funder does not substantively match the terms of the Alternative Proposal) to the Trustee. <br><br> Under no circumstance (i) shall the Law Firm be responsible for either the Expense Reimbursement or Break-Up Fee due to the Funder or (ii) shall the Break-Up Fee be payable if (a) the Court declines to approve the Order following the Trustee's good faith submission of a motion seeking approval of the same or (b) the Funder fails to execute and deliver the LFA on commercially reasonable terms following completion of its due diligence as provided in the Term Sheet and the Commitment Letter. For the avoidance of doubt, if, following execution of the Commitment Letter, the Trustee reaches a settlement with the Defendants prior to the Court approving or denying the Order, the Funder shall be entitled to the Break-Up Fee (to be paid from the Insider Claims Proceeds). | |
| **Exclusivity; Alternative Proposals** | The Trustee agrees that it will not solicit, consider, discuss or negotiate a transaction with another funding or investing party starting the date the Commitment Letter is signed and continuing until the date that is 30 days following the Court's entry of the Order, to permit the Funder to perform due diligence to its reasonable satisfaction to enable it to determine whether to enter into a binding funding agreement to fund the Litigation and to obtain approval from its investment committee. <br><br> If the Trustee deems necessary in the exercise of her fiduciary duties, notwithstanding any provision of this term sheet to the contrary, the Trustee may consider, discuss, and negotiate any Alternative Proposal and the Trustee may determine in good faith, after consulting with outside counsel, to enter into an agreement related to an Alternative Proposal; provided that the Trustee provides written notice to the Funder within 5 business days of such determination and the Funder will then have 15 business days after such notice to substantively match the terms of the Alternative Proposal. Should the Funder substantively match the terms of the Alternative Proposal, the Trustee will cease discussions on the Alternative Proposal and work in good faith to finalize a funding agreement with the Funder. For the avoidance of doubt, the Break-Up Fee and the Expense Reimbursement will be payable to the Funder if the Trustee enters into an agreement related to an Alternative Proposal and the Funder does not substantively match the terms of the Alternative Proposal. | Term Sheet p. 4; Commitment Letter § 4 |
| **Call Option** | The Funder shall have the right (such right, the "Call Option"), but not the obligation, to fund on the terms set forth in the Term Sheet any Excess Law Firm Fees. | Term Sheet p. 5 |
| **Right of First Refusal** | As will be definitively provided in the LFA, the Funder shall have a right of first refusal to provide additional funding to Trustee in respect of any additional litigation other than the Litigation. | Term Sheet p. 5 |

| Summary of Material Terms | | |
|---|---|---|
| **Terms** | **Summary** | **Source** |
| **Litigation Conduct and Settlement** | The Trustee shall have the sole and exclusive right to direct the conduct of the Litigation, including any settlement and the terms of such settlement. | Term Sheet p. 5; Proposed Order ¶ 9 |
| **Indemnification** | The Trustee agrees that it shall cause the Debtors' estates to indemnify, defend and hold the Funder and the Funder's Related Parties (as defined in the Commitment Letter) harmless from any Losses (as defined in the Commitment Letter) that are incurred as a result of the Funder providing the Commitment and/or consummating (or not consummating) the transaction contemplated under the Commitment Letter; *provided* that the Trustee shall not be required to cause the Debtors' estates to indemnify the Funder and its Related Parties under the Commitment Letter if (i) the Funder and/or any of its Related Parties have not otherwise suffered any uncured Losses or (ii) the Losses arose from the gross negligence, willful misconduct, fraud, bad faith, or collusion by the Funder and/or any of its Related Parties, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. For the avoidance of doubt, the Trustee shall not be obligated to satisfy the indemnity set forth in the Commitment Letter from its own assets and shall not have any personal liability and instead, any such indemnification shall be from the assets of the Debtors' estate, if any, and payable only to the extent that value is available to satisfy the claim in accordance with its applicable priority under the Bankruptcy Code. | Commitment Letter § 6 |
| **Releases** | The Proposed Order contains certain releases set forth therein. | Proposed Order ¶ 8 |
| **Events of Default** | None. | N/A |
| **Adequate Protection** | The interests of the Insider DIP Secured Parties are adequately protected by the Trustee's prosecution of the Litigation, which is necessary for the Insider Claims to have any value for the Estates. | Proposed Order ¶ 4 |
| **Waiver of Automatic Stay** | None. | N/A |

## **BACKGROUND**

### A.    **Commencement of the Chapter 11 Cases**

17.    On September 29, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases were jointly administered and procedurally consolidated pursuant to Bankruptcy Rule 1015(b).

18.     The Debtors operated their businesses and managed their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code until the Conversion Date.

**B.     The Insider DIP Facility**

19.     On the Petition Date, the Debtors filed a motion [Dkt. No. 16] (the "Insider DIP Motion") seeking interim and final approval of a senior secured superpriority new money delayed-draw DIP Facility (the "Insider DIP Facility") in the aggregate principal amount of up to $80 million (all amounts extended under the Insider DIP Facility, the "Insider DIP Loans") provided by Cluster Holdco LLC and other entities owned and controlled by the Insiders (defined herein) (the "Insider DIP Lenders"),[8] pursuant to the terms of that certain Debtor-in-Possession Credit Agreement, dated as of September 29, 2023 (as subsequently modified in accordance with the terms therewith, the "Insider DIP Credit Agreement" and, together with that certain Collateral Agreement (as defined in the Insider DIP Credit Agreement) and such other related documents, the "Insider DIP Documents"), and related orders.

20.     On November 7, 2023, the Court approved the Insider DIP Motion on a final basis [Dkt. No. 296] (the "Insider DIP Order").

21.     Pursuant to the Insider DIP Order and the Insider DIP Documents, Cluster Holdco LLC, in its capacity as administrative agent and collateral agent (the "Insider DIP Agent", and together with the Insider DIP Lenders, the "Insider DIP Secured Parties"), for the benefit of itself and the other Insider DIP Lenders, was granted a lien on substantially all of the Debtors' assets to secure the obligations under the Insider DIP Facility. The lien included the proceeds of claims (the "Insider

---

[8] The $80 million available under the DIP Facility included a $25 million accordion feature allocated to holders of the Debtors' convertible notes, none of whom elected to subscribe.

Claims", and the proceeds thereof, the "<u>Insider Claims Proceeds</u>") against certain of the Debtors'
insiders, including the Debtors' founders Jordan Katzman and Alexander Fenkell, Jordan's father
and company CEO David Katzman, Jordan's uncle and company COO Steven Katzman, and
individuals and entities affiliated with them (together, the "<u>Insiders</u>"). The Insider Secured Parties
had originally sought liens over the Insider Claims themselves, but after facing stiff opposition from
the Debtors' organized creditor constituencies, the Insider DIP Facility collateral package was
modified to carve out liens over the Insider Claims. All obligations under the Insider DIP Facility
were given superpriority status.

22.     As of the date hereof, the Insider DIP Lenders assert that not less than $30 million
is outstanding under the Insider DIP Loans, inclusive of interest and fees. Byman Decl. ¶ 6.

**C.      Conversion to Chapter 7**

23.     On December 20, 2023, following a failed marketing process for a going concern
sale of the business, the Debtors filed a sale motion [Dkt. No. 463] (the "<u>Sale Motion</u>") seeking
approval for a sale of the company to the Insider DIP Lenders accompanied by a structured
dismissal motion [Dkt. No. 464] (the "<u>Dismissal Motion</u>"). Under the Insiders' proposed structured
dismissal, the Insider DIP Lenders would provide the Debtors with approximately $35.65 million
in aggregate consideration (up to $7.65 million in cash and a $28 million credit bid of their Insider
DIP Facility claims) and a creditor trust would be established to pursue certain claims and make
distributions. The dismissal motion also sought to release the Insiders from liability for any
uninsured claims and to limit their liability in respect of insured claims solely to the value of the
Debtors' directors' and officers' insurance policies (the "<u>D&O Policies</u>"). Several parties objected
to the structured dismissal and sale motions and requested that the Court convert the cases to
chapter 7, including the United States Trustee (the "<u>U.S. Trustee</u>"), Align Technologies, Inc. (the
maker of Invisalign), the agent under the Debtors' off-balance sheet secured credit facility (the

"HPS Credit Facility"), and an ad hoc group of convertible noteholders. [*See* Dkt. Nos. 513, 555, 541, and 547].

24.     On January 24, 2024, the Court announced that it would deny the Sale Motion and Dismissal Motion and convert the Debtors' cases to chapter 7. [*See* Dkt. No. 619 (the "Jan. 24 Hr'g Tr.")]. The Court found, among other things, that the Debtors' requested relief incorporated too many elements of a chapter 11 plan without the protections of the section 1129 plan approval process, contained overly broad releases, and that the Debtors failed to demonstrate that the requested relief was in the best interest of creditors. *See* Jan. 24 Hr'g Tr. at 202:18-19; 203:4-5; 204: 21-24.

25.     On January 26, 2024 (the "Conversion Date"), the Court entered its *Order Denying Debtors' Motions and Converting Cases to Chapter 7* [Dkt. No. 617]. On the Conversion Date, the U.S. Trustee appointed Allison D. Byman as the Chapter 7 Trustee in these bankruptcy cases.

**D.     Engagement of Special Litigation Counsel and the Contingency Fee Arrangement**

26.     Following conversion of the cases, the Trustee engaged in a multi-week effort to solicit law firms to prosecute the Insider Claims. Byman Decl. ¶ 11. While the Trustee spoke with a half-dozen law firms during that time and received numerous expressions of interest, most firms—unable to get comfortable with the Insider DIP Facility—did not provide proposed fee arrangements. *Id.* Of the few firms that presented potential fee structures, they were both vague and involved existing litigation, and contemplated an assignment of the Insider Claims to the law firm, which would have transferred control and settlement authority to the law firm. In the Trustee's judgment, these structures did not present a good opportunity to bring value to the Estates. *Id.* The Trustee eventually selected Orrick as Special Litigation Counsel because it was willing to pursue the Insider Claims on a full contingency or hybrid contingency basis, without an assignment of the Insider Claims, subject to the terms in the Contingency Fee Agreement dated

April 1, 2024 (the "Contingency Fee Agreement" and the arrangement contemplated thereunder (as modified with respect to the hybrid contingency fee structure under the Funding Arrangement), the "Contingency Fee Arrangement"), a copy of which is annexed as Exhibit 1 to the proposed order attached to the Orrick Retention Application (defined herein). *Id.* The terms of Special Litigation Counsel's engagement are described in greater detail in the Orrick Retention Application.

27.     Pursuant to the full contingency fee option, Special Litigation Counsel would receive 35% of the Insider Claims Proceeds (net of Special Litigation Counsel's expenses). Alternatively, under the hybrid arrangement, if the Trustee successfully obtained litigation financing Special Litigation Counsel's contingency fee would be reduced to 20% of the Insider Claims Proceeds, with Special Litigation Counsel's hourly fees to be paid from the financing based on its then-current hourly billing rates discounted by 40%. The Contingency Fee Agreement requires the Trustee to "use best efforts" to obtain such litigation financing. The Trustee also agreed to assign to Special Litigation Counsel the contingency fee portion of the net Insider Claims Proceeds. The proposed assignment to Special Litigation Counsel would have priority over the Insider DIP Secured Parties' liens solely with respect to the Insider Claims Proceeds and no other asset of the Estates. The assignment provision is a material term of the Contingency Fee Agreement, and without it Special Litigation Counsel is not obligated to represent the Trustee or to bring the Insider Claims.

28.     As described herein, in connection with the Funding Arrangement, Special Litigation Counsel agreed to certain modifications to the Contingency Fee Arrangement in respect of the hybrid contingency fee structure, including (i) adding a limitation on distributions such that the total amount payable to the Funder and Special Litigation Counsel collectively from the Insider

Claims Proceeds must not exceed 34% in all cases and (ii) providing for the application of a payment waterfall that describes the distribution of Insider Claims Proceeds among the Funder, Special Litigation Counsel, and the Trustee.

29.     Contemporaneously with this Motion, the Trustee is filing the *Application for Entry of an Order Authorizing the Retention and Employment of Orrick, Herrington & Sutcliffe LLP as Special Litigation Counsel to the Chapter 7 Trustee* (the "Orrick Retention Application") and has asked the Court to consider the Orrick Retention Application and this Motion together. By this Motion, the Trustee requests entry of an order approving, among other things, the grant of security interests and liens and superpriority administrative claims to Special Litigation Counsel in respect of the Contingency Fee Arrangement, as well as the modifications to the hybrid fee structure under the Funding Agreement. However, the employment terms for Special Litigation Counsel remain subject to this Court's approval of the Orrick Retention Application.

**E.     The Trustee's Search for Litigation Financing and the Funding Arrangement**

30.     Prior to soliciting interest from potential financiers, the Trustee and Special Litigation Counsel developed an initial budget for prosecuting the Insider Claims, covering the anticipated costs of preparing a complaint, defending motions to dismiss, fact discovery, expert discovery, summary judgment, and trial, with both high end and low end scenarios to guide expectations. Byman Decl. ¶ 12. The initial budget estimated total fees and expenses of up to $█████ . *Id.*

31.     Following preparation of the initial budget, the Trustee and Special Litigation Counsel contacted fourteen institutions regarding the opportunity to fund the prosecution of the Insider Claims. Byman Decl. ¶ 13. These institutions included both litigation funders and investment managers. *Id.* Of the parties solicited, nine signed non-disclosure agreements. *Id.* Upon

executing the non-disclosure agreements, each party received key documents and information necessary to assess the value of the Insider Claims, including access to the initial budget. *Id.*

32.     Special Litigation Counsel and the Trustee engaged in several rounds of meetings and follow-up communications with the parties subject to confidentiality agreements regarding the funding opportunity. Byman Decl. ¶ 14. For any meetings where the Trustee did not personally participate, Special Litigation Counsel updated her promptly following each meeting. *Id.* During the course of these negotiations, it became clear that none of the prospective lenders were willing to provide litigation financing that would repay the Insider DIP Loans. *Id.* Further, all of the prospective lenders indicated that they were unwilling to provide financing on an unsecured basis or on a junior or *pari passu* basis to the Insider DIP Secured Parties. *Id.*

33.     Overall, negotiations with the potential funders and evaluation of various funding frameworks focused on obtaining sufficient funding to prosecute the Insider Claims to completion while improving potential recoveries to the Estates and all creditors. Byman Decl. ¶ 15. In addition, the Trustee focused on ensuring that any litigation funding selected would be superior from the perspective of the Estates to Special Litigation Counsel's full contingency fee arrangement in all scenarios. *Id.* As such, a key consideration in negotiating and assessing the different funding frameworks was ensuring that the return to the financier (whether through an interest rate and/or a multiple) was favorable to the Estates *overall*. *Id.* These negotiations were informed by an understanding that the Insider Claims Proceeds would be used in part to satisfy certain administrative, priority, and secured claims and, therefore, that any "priming" of such claims by a funder should be limited to the extent feasible, while still safeguarding recoveries for as many creditors as possible in accordance with their applicable priority under the Bankruptcy Code. *Id.* Substantial progress was made in that regard, with Omni agreeing that any proposal must limit

Omni's recourse solely to the Insider Claims Proceeds and that the total amount distributable to Omni and Special Litigation Counsel collectively from the Insider Claims Proceeds must not exceed 34% in all cases. *Id.*

34.     Ultimately, although four other prospective lenders expressed initial interest in providing a priming loan, no party other than Omni submitted a term sheet. Byman Decl. ¶ 16. Upon receipt of Omni's initial term sheet, the Trustee and Special Litigation Counsel engaged in extensive negotiations and exchanged numerous draft proposals with Omni. *Id.* The Trustee and her counsel also had several meetings with Omni to discuss the structure and economics of the proposed financing. *Id.* Through these discussions, the Trustee and Omni determined that the amount of litigation funding should be set at up to $██████, which is slightly above the high end of the Trustee's initial budget.[9] *Id.*

35.     On July 31, 2024, Omni and the Trustee agreed to a Commitment Letter (together with the term sheet (the "Term Sheet") attached as Annex A thereto, the "Commitment Letter", and together with any other documents that may be reasonably required to implement or give effect to the Commitment Letter, the "Funding Arrangement") attached hereto as **Exhibit B**. Byman Decl. ¶ 17. The material terms of the Funding Arrangement were memorialized in the Term Sheet attached to the Commitment Letter. *Id.* After careful consideration, the Trustee believes that the Funding Arrangement represents the best terms available—indeed, the only terms—and is in the best interests of the Estates and creditors. *Id.*

36.     As described in greater detail above, the Funding Arrangement contemplates that the Funder will commit up to $██████ in critical, non-recourse litigation financing on a senior

---

[9] As described herein, the Funding will be available based on satisfaction of certain milestones, as needed. As such, substantially less than $██████ may be deployed depending on how the Litigation develops.

secured, superpriority basis (the "Funding") for the Trustee that will be used to cover the Trustee's fees and expenses incurred in connection with pursuing the Insider Claims for the benefit of the Estates. Byman Decl. ¶ 18. The obligations of the Estates to the Funder under the Funding Arrangement and to Special Litigation Counsel under the Contingency Fee Arrangement will be secured by a first priority priming lien on the Insider Claims Proceeds and the Funder and Special Litigation Counsel will receive superpriority claims pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. *Id.* The Funding will be provided on an incremental basis as the proceedings against the Insiders to prosecute the Insider Claims (the "Litigation") progress. *Id.* The Term Sheet contains a payment waterfall provision that describes the sharing of the Insider Claims Proceeds among the Funder, Special Litigation Counsel, and the Trustee. *Id.* In exchange for providing the Funding, the Funder will receive priority recovery of ██████████████ the deployed Funding Amount plus a one-time Transaction Fee of $50,000 at step a of the payment waterfall, plus the remainder of the Funder's return (consisting of a multiple of its deployed Funding Amount plus a percentage, both depending on the duration of the Litigation) at step c of the payment waterfall.[10] *Id.* Importantly, the Trustee negotiated a structure that ensures the total amount payable to the Funder and Special Litigation Counsel collectively from the Insider Claims Proceeds under any scenario will not exceed 34% of the Insider Claims Proceeds. *Id.* The structure also provides a source of payment for experts and consultants, which the Trustee expects to need to prosecute the Litigation, but which Special Litigation Counsel is not obligated to fund under its Contingency Fee Arrangement. *Id.*

---

[10] In addition to these amounts, an additional ██% compound annual interest will be added to the Funder's return if the Insider Claims Proceeds are received more than ████████ from the date of the LFA.

37.     Among other things, the Commitment Letter provides that the Trustee and Omni will work in good faith to execute and deliver a definitive agreement evidencing the Funding contemplated by the Term Sheet (the "Litigation Funding Agreement" or "LFA") within 30 days following this Court's entry of an order granting the Motion. Notably, however, the Commitment Letter preserves the right of the Trustee, in the exercise of her fiduciary duties, to consider, discuss, and negotiate an alternative transaction (an "Alternative Proposal") made by another funding or investing party (an "Alternative Lender").[11]

38.     The Term Sheet reflects the best, and at this time the only, financing terms available to the Trustee. Byman Decl. ¶ 20. The Trustee believes that the terms are fair to the Estates and that the Litigation Arrangement will enable the Trustee to maximize the value of the Insider Claims, which will have zero value to the Estates if the Trustee is unable to pursue them. *Id.* Accordingly, the Trustee believes that the Litigation Arrangement is in the best interests of the Estates and creditors. *Id.*

## F.     Recent Agreements by the Insider DIP Lenders

39.     After the Conversion Date, on May 24, 2024, the DIP Agent and the Trustee jointly filed an emergency motion [Dkt. No. 796] (the "May 24 Joint Motion") seeking, among other things, approval of the Trustee's assignment of all estate claims and causes of action other than the Insider Claims and claims to avoid preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code against non-Insiders of the Debtors (the "Non-Insider Preference Claims") to the

---

[11] If the Trustee determines in good faith, after consultation with outside counsel, to enter into an agreement related to an Alternative Proposal, then the Trustee will provide written notice to Omni of her determination within 5 business days. Omni's receipt of such notice triggers a period of 15 business days during which Omni will have the right to substantively match the terms of the Alternative Proposal. In the event the Trustee enters into an agreement for an Alternative Proposal and Omni chooses not to match or beat the terms of such Alternative Proposal, then the Alternative Lender will replace Omni as the "Funder" and the "Funding Arrangement" and related terms used herein will instead refer to the Alternative Proposal, and the Trustee will be required to pay certain fees and expenses to Omni, namely the Break-Up Fee and Expense Reimbursement.

DIP Agent (the "<u>Assigned Claims and Causes of Action</u>"). *See* May 24 Joint Motion ¶¶ 18-20. The DIP Agent acknowledged that "the chapter 7 estate lacks resources to fund the prosecution of the Assigned Claims and Causes of Action." *Id.* ¶ 29.

40.     In addition, the DIP Agent also consented to the Court's entry of orders [Dkt. Nos. 798, 821] approving a contingency fee arrangement that the Trustee negotiated with Porter Hedges LLP ("<u>PH</u>") for the prosecution of the Non-Insider Preference Claims, pursuant to which PH's compensation would equal 17.5% of any recoveries obtained prior to filing suit and 27.5% of any recoveries obtained after filing suit, net of costs and expenses, if any, incurred in prosecution of the Non-Insider Preference Claims. Among other things, the DIP Agent agreed to the payment of PH's contingency fees "out of the net proceeds (if any) from the [Non-Insider] Preference Claims." [Dkt. No. 798]. In seeking this relief, the DIP Agent acknowledged that because the Estates did "not have cash available to fund the prosecution of the [Non-Insider] Preference Claims on an hourly basis", the DIP Agent and the Trustee "need[ed] an agreed funding arrangement" to "monetize the [Non-Insider] Preference Claims". May 24 Joint Motion ¶ 31.

41.     In connection with the Trustee's post-conversion requests to the Insider DIP Lenders to use cash collateral during these chapter 7 cases, the Insider DIP Lenders have repeatedly and clearly articulated that the Trustee is prohibited from using cash collateral to investigate and prosecute the Insider Claims. Byman Decl. ¶ 10.

## **BASIS FOR RELIEF**

**A.    The Court Should Authorize and Approve the Litigation Arrangement Under Section 364 of the Bankruptcy Code.**

**1.    Entering the Litigation Arrangement is an Exercise of the Trustee's Sound Business Judgment.**

42.     The Trustee requests authority, pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, to obtain loans, advances, and other accommodations on behalf of the

Estates under the Litigation Arrangement on the terms set forth therein, as an exercise of her sound business judgment.

43.     Courts give considerable deference to the business judgment exercised by a trustee or debtor in possession in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgement of a debtor in the selection of the lender."); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

44.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the trustee or debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (approving terms that "might appear to be extreme or even unreasonable" if "[v]iewed in isolation" because the terms were not unreasonable when "taken in context, and considering the relative circumstances of the parties"); *In re Ellingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

45.     As evidenced by the extensive negotiation process undertaken with numerous potential funders, credit is unavailable on any better basis than the Litigation Arrangement, including credit under Bankruptcy Code sections 364(a) and 364(b). Specifically, none of the parties contacted to consider providing litigation financing were willing to do so on an unsecured basis, and the terms contemplated by the Litigation Arrangement are the result of extensive, arm's-length negotiations. Moreover, the Trustee has negotiated for the right to accept an Alternative Proposal to the extent that she receives a superior offer from an Alternative Lender, which provides an additional market-test for the Funding Arrangement contemplated by the Term Sheet.

46.     Bankruptcy courts are not strangers to litigation funding agreements and have approved such agreements sought by debtors and trustees when circumstances warrant. *See, e.g.*, *In re The Great Atlantic & Pacific Tea Co., Inc.*, Case No. 15-23007-lgb [Dkt. No. 5156] (Bankr. S.D.N.Y. July 26, 2022) (approving chapter 11 debtor's litigation funding motion pursuant to sections 363 and 364 of the Bankruptcy Code); *In re Islet Scis., Inc.*, Case No. 19-13366-mkn [Dkt. No. 160] (Bankr. D. Nev. Oct. 17, 2019) (granting debtor's request to approve post-petition litigation funding agreement); *In re Westport Holdings Tampa, Ltd. P'ship*, Case No. 8:16-bk-8167-mgw [Dkt. No. 1827] (Bankr. M.D. Fla. July 17, 2020) (approving liquidating trustee's request to approve litigation funding agreement under 11 U.S.C. §§ 364(c)(1), (c)(2), and (d)(1)); *Dean v. Seidel*, Case No. 20-CV-01834, 2021 WL 1541550, at *2 (N.D. Tex. Apr. 20, 2021) (affirming bankruptcy court decision to approve litigation funding agreement); *In re Welded Construction, L.P.*, Case No. 18-12378 (KG) [Dkt. No. 745] (Bankr. D. Del. May 22, 2019) (approving chapter 11 debtor's litigation funding motion pursuant to sections 363 and 364 of the Bankruptcy Code); *In re Tropicana Entertainment, LLC*, Case No. 08-10856-MFW [Dkt. No. 4131] (Bankr. D. Del. Jan. 23, 2017) (approving chapter 11 litigation trust's motion to obtain

litigation funding pursuant to sections 1142 and 105 of the Bankruptcy Code); *In re Ampel-American Israel Corp.*, 534 B.R. 569, 574 (Bankr. S.D.N.Y. 2015) (approving chapter 7 trustee's request for litigation funding under section 364(b)); *In re Bronson Masonry, LLC*, Case No. 15-34713-sgj7 [Dkt. Nos. 43-44] (Bankr. N.D. Tex. Apr. 21, 2016) (approving chapter 7 trustee's request to obtain financing under a litigation funding agreement on a secured and superpriority basis pursuant to sections 363 and 364, and approving the retention of special litigation counsel subject to the terms of the litigation funding agreement); *In re The Colonial Bancgroup, Inc.*, Case No. 09-32303 [Dkt. No. 1933] (Bankr. M.D. Ala. Sep. 13, 2012) (authorizing litigation funding for post-confirmation debtor under authority of section 105(a) and the debtor's confirmed plan).

47.     In respect of the Contingency Fee Arrangement, the Trustee spoke to a half-dozen law firms about potentially representing her to bring the Insider Claims. Of those law firms, Special Litigation Counsel's proposal was superior because it did not contemplate an assignment of the Insider Claims to the law firm, which would have transferred control and settlement authority in respect of the Insider Claims away from the Estates to a third party that would not owe a fiduciary duty to maximize recoveries for stakeholders of the Estates. Byman Decl. ¶ 11.

48.     The Trustee submits that the proposed contingency fee is reasonable and commensurate with contingency fees approved by Courts in this and other jurisdictions. *See, e.g.*, *In re MLCJR LLC*, Case No. 23-90324 (CML) [Dkt. No. 1862] (Banrk. S.D. Tex. April 30, 2024) (approving 35% contingency fee); *In re Mountain Express Oil Co.*, Case No. 23-90147-H2-7 [Dkt. No. 2278] (Bankr. S.D. Tex. June 13, 2024) (approving 30% contingency fee); *In re Tuesday Morning Corp.*, Case No. 23-90001-ELM [Dkt. No. 1684] (Bankr. N.D. Tex. May 24, 2024) (approving 35% contingency fee). If the Litigation Arrangement is approved in its entirety, Special

Litigation Counsel's contingency fee will be further reduced to 20% of the Insider Claims Proceeds, with its hourly billing rates discounted by 40%.

49.     Accordingly, after considering all available alternatives and an extensive diligence and negotiation period, the Trustee, as a sound exercise of her business judgment, has concluded that the Litigation Arrangement represents the best financing available and is in the best interests of the Estates and creditors.

### 2.     The Litigation Liens and Litigation Superpriority Claims Should be Granted.

50.     The Litigation Arrangement will provide the Funder and Special Litigation Counsel with security interests and liens (including priming liens) (the "Litigation Liens") and superpriority claims (the "Litigation Superpriority Claims") pursuant to Bankruptcy Code sections 364(c) and 364(d). The Litigation Liens and Litigation Superpriority Claims are a necessary feature of the Litigation Arrangement, and such provisions are appropriate under the circumstances present here.

### a.     The Requirements Under Section 364(c) of the Bankruptcy Code are Satisfied.

51.     In the event that a trustee or debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court may authorize the debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. *See* 11 U.S.C. § 364(c).

52.     Courts have articulated a three-part test to determine whether a trustee or debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically:

     a.   the trustee or debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

     b.   the credit transaction is necessary to preserve the assets of the estate; and

> c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 767 (Bankr. S.D.N.Y. 2020); *In re L.A. Dodgers LLC*, 457 B.R. at 312-13. The Litigation Arrangement satisfies each part of this test.

53.     *First*, as set forth above and in the Byman Declaration, the Trustee has made reasonable, good faith efforts to identify and evaluate financing alternatives, and given the circumstances present in these chapter 7 cases, no lender was willing to provide litigation financing on an unsecured or junior priority basis. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where the debtor approached four lending institutions, was rejected by two, and selected the more favorable financing option from the remaining two lenders). The Trustee has determined that the Funding Arrangement is the best— and right now only—litigation financing available.

54.     *Second*, the Litigation Arrangement is necessary to maximize the value of the Insider Claims and, absent approval of such arrangement, there is no path to monetize these valuable assets. As explained above, the Insider DIP Secured Parties are owned and controlled by the Insiders themselves, who are using that control to block any effort by the Trustee to prosecute the Insider Claims. Unless the Trustee is able to bring the Insider Claims, the value of the Estates will be significantly impaired to the detriment of all stakeholders.

55.     *Third*, the Litigation Arrangement is the result of extensive, arm's-length negotiations with multiple potential funders, which negotiations resulted in material improvements to the terms of such arrangement. The Funder will only receive its return and Special Litigation Counsel will only receive its contingency fee from proceeds of the Litigation. Otherwise, the Funder and Special Litigation Counsel will have no recourse to payment for such amounts. Further,

under the payment waterfall in the Litigation Arrangement, the Funder and Special Litigation Counsel will have priority above allowed administrative expense claims, priority claims, and secured claims only with respect to Insider Claims Proceeds and no other asset of the Estates. Finally, the Funder's return is based on the amount actually deployed. If actual costs are lower than anticipated or proceeds are recovered sooner than expected, the impact to creditors will be lessened accordingly. The terms of the Litigation Arrangement are fair, reasonable, and adequate under the circumstances. *See supra* ¶ 46 (citing cases approving litigation funding arrangements on a senior secured, superpriority basis).

> **b.   Litigation Financing on a Non-Priming Basis is Not Available to the Trustee and the Interests of the Insider DIP Secured Parties are Adequately Protected.**

56.   Section 364(d) of the Bankruptcy Code authorizes a trustee or debtor to obtain credit or incur debt secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, if the trustee or debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

57.   As explained above and in the Byman Declaration, litigation financing is unavailable to the Trustee on a non-priming basis. The Trustee contacted numerous law firms and lenders, and none was willing to prosecute the claims without a priming position. *See* Byman Decl. ¶¶ 11-16.

58.   The Insider DIP Secured Parties will be adequately protected because the value of their interests in the Insider Claims Proceeds will *increase* by the proposed financing. Unless the proposed financing and Special Litigation Counsel's contingency fee are approved, the Insider Claims are valueless. Any increase in their value provided by the financing benefits the Insider DIP Lenders, as well as the Estates.

59.     The purpose of the adequate protection requirement is "protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *See, e.g.*, *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Although the Bankruptcy Code does not define "adequate protection," section 361 provides three non-exclusive examples, including relief that provides the "indubitable equivalent" of an entity's interest in the property. 11 U.S.C. § 361(3).

60.     "The flexible provision of § 361(3) allows for many and varied means of adequate protection." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989). The Fifth Circuit has noted with respect to adequate protection that "[i]ts application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (quoting *In re Becker Indus.*, 58 B.R. at 736). Regarding valuation, the Supreme Court has stated that "the 'proposed disposition or use' of the collateral is of paramount importance[.]" *Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 962 (1997).

61.     Courts have held that adequate protection exists when the proposed use of funds from postpetition financing augments the value of the secured creditor's collateral. *See In re Sky Valley, Inc.*, 100 B.R. at 114 ("[A]n increase in the value of the collateral generated by the improvements resulting from the superpriority financing could constitute adequate protection.") (citing *In re First South Savings Association*, 820 F.2d 700 (5th Cir. 1987)); *In re Plabell Rubber Products, Inc*. 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (same); *see also In re Yellowstone Mountain Club, LLC*, Case No. 08-61571-11, 2008 Bankr. LEXIS 4062, at *28-34 (Bankr. D. Mont. Dec. 17, 2008) (finding adequate protection for primed secured party because debtor's going

concern value was preserved); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631-32 (Bankr. S.D.N.Y. 1992) (finding secured creditor's lien adequately protected based on evidence that improvements to be funded by the DIP loan increased property's value).

62.     While these opinions required fact-intensive inquiries to determine whether the proposed financing increased the value of the collateral, the analysis here is far simpler. The Insider Claims are valueless—and there will be no Insider Claims Proceeds—absent financing because the Trustee cannot otherwise pursue them. *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996), in which the court held that a county's lien on the debtor's property would be adequately protected even if subordinated to a new lender's loan, is squarely on point. The court in *Hubbard* approved the priming loan because much of the loan funds would go to cleaning up environmental damage on the property, without which the county's lien would be worthless. The court explained:

> There is no question in this Court's mind that the property will be improved by the clean-up [funded by the DIP loan] since it is presently either unsaleable or has a nominal value at best . . . . Without this investment and improvement to Debtor's property, the County itself may have to invest the cost of the clean-up if it wishes to have any benefit from its collateral. It is further clear to this Court that the investment made to clean-up the property will result in a benefit not only to the Debtor and its estate, but to all secured creditors and parties-in-interest.

*Hubbard*, 202 B.R. at 685. The same is true of the Insider Claims Proceeds.

63.     Here, the Insider Claims Proceeds are subject only to the postpetition liens of the Insider DIP Secured Parties. Even with the incurrence of superpriority claims and priming liens in connection with the Litigation Arrangement, the Insider DIP Secured Parties will remain more than adequately protected. If the Insider Claims are not prosecuted, they will have zero value to the Estates, leaving the Insider DIP Secured Parties severely undersecured given that the value of the remaining assets in the Estates (excluding the Insider Claims) is less than $10 million. Byman

Decl. ¶¶ 6-8. Indeed, the Insider DIP Secured Parties acknowledge that the Trustee currently lacks the resources to prosecute litigation claims. *See, e.g.*, May 24 Joint Motion ¶ 29 ("[T]he chapter 7 estate lacks resources to fund the prosecution of the Assigned Claims and Causes of Action"); *id.* ¶ 31 (stating that because the Estates did "not have cash available to fund the prosecution of the [Non-Insider] Preference Claims on an hourly basis", the DIP Agent and the Trustee "need[ed] an agreed funding arrangement" to "monetize the [Non-Insider] Preference Claims").

64.     Without the potential recoveries from litigation, the Trustee currently estimates a shortfall of at least $41 million between projected sources of cash and the projected amount of the remaining administrative expense claims and the secured claims asserted by the Insider DIP Secured Parties. Byman Decl. ¶¶ 6-8. While entry into the Litigation Arrangement will increase claims ahead of the Insider DIP Secured Parties, prosecution of the Insider Claims is the only realistic path to provide a meaningful recovery to creditors, including the Insider DIP Secured Parties themselves. *Id.* ¶ 8.

65.     As described in the Byman Declaration, many sources of recovery exist for the anticipated claims against the Insiders, including from (i) the Insiders themselves, most of whom are high net-worth individuals, and who collectively received hundreds of millions of dollars in proceeds from the SmileDirect IPO in 2019, (ii) Camelot Ventures Group, a private investment group owned and operated by certain of the Insiders, and (iii) the D&O Policies. Byman Decl. ¶ 9.

66.     Like the prepetition secured creditor in *Hubbard*, the Insider DIP Secured Parties' interest in the Insider Claims Proceeds is worth *nothing* without financing to prosecute the Insider Claims. And the Insider DIP Secured Parties could not foreclose on and pursue those claims directly (even if they wanted to) because their liens attach only to the *proceeds* of the Insider

Claims, not to the claims themselves. *See* Insider DIP Order ¶ 7. The purpose of granting liens to any lender, including the Insider DIP Lenders, is to protect the lender's ability to be repaid. That cannot happen if the Trustee is unable to bring the Insider Claims.

67.     The Insider DIP Secured Parties will be adequately protected by the Court's approval of the proposed Litigation Arrangement and the Litigation Liens on a priming basis.

**B.     The Break-Up Fee and Expense Reimbursement Should be Approved.**

68.     The Trustee seeks this Court's approval, under section 363 of the Bankruptcy Code, for the payment of the Break-Up Fee and the Expense Reimbursement under the Funding Arrangement. Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

69.     The Break-Up Fee and Expense Reimbursement constitute the best terms on which the Estates could obtain the financing necessary to support the prosecution of the Insider Claims. Paying these fees in order to obtain the Funding is in the best interests of the Estates. Significantly, with respect to the Break-Up Fee, the Funder has agreed to seek payment of such fees, if due, solely from the Insider Claims Proceeds or the proceeds from any financing provided by an Alternative Lender (in the event the Trustee enters into an agreement related to an Alternative Proposal and the Funder does not substantively match the terms of the Alternative Proposal).

**C.     The Funder and Special Litigation Counsel Should be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code.**

70.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a trustee or debtor, and its right in any lien securing those loans, even if the authority of the trustee or debtor to obtain such loans or grant such liens is later reversed or modified on appeal. As explained in detail herein, the Litigation Arrangement is the result of the

Trustee's reasonable and informed determination that such arrangement offered the most favorable terms under the circumstances. All negotiations of the Litigation Arrangement were conducted in good faith and at arm's length. The terms and conditions in the Litigation Arrangement are fair and reasonable, and the Funding will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the Litigation Arrangement. Further, no consideration is being provided to any party to the Litigation Arrangement other than as described herein. Accordingly, the Trustee respectfully submits that the Funder and Special Litigation Counsel are entitled to all the protections afforded by section 364(e) of the Bankruptcy Code.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

71.     The Trustee requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Trustee has established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

72.     The Trustee has provided notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the trustee under the Debtors' convertible notes; (d) the agent under the HPS Credit Facility; (e) counsel to the Insider DIP Secured Parties; (f) the agent under the Insider DIP Facility; (g) the office of the attorney general for each of the states in which the Debtors operate; (h) the Office of the United States Attorney for the Southern District of Texas; (i) the state attorneys general for states in which the Debtors conduct business; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice is required.

## <u>CONCLUSION</u>

WHEREFORE, the Trustee respectfully requests that this Court entered the Proposed Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 16, 2024        Respectfully submitted,


By: _/s/ Ryan C. Wooten_

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Ryan C. Wooten, Texas Bar No. 24075308
609 Main Street, 40th Floor
Houston, TX 77002-3106
Telephone:  (713) 658-6400
Facsimile:  (713) 658-6401
Email:      rwooten@orrick.com

Raniero D'Aversa, Jr. (*pro hac vice* pending)
David Litterine-Kaufman (*pro hac vice* pending)
Nicholas Poli (*pro hac vice* pending)
Mark Franke (*pro hac vice* pending)
51 West 52nd Street
New York, NY 10019-6142
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151
Email:      rdaversa@orrick.com
             dlitterinekaufman@orrick.com
             npoli@orrick.com
             mfranke@orrick.com


*Proposed Special Litigation Counsel for the Chapter 7 Trustee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of August 2024, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties receiving ECF notice and on the parties listed on the attached limited service list by United States first-class mail.

/s/ *Ryan C. Wooten*
Ryan C. Wooten

**LIMITED SERVICE LIST**

**All service made by US First Class Mail, postage prepaid unless otherwise indicated**

**Debtor**
SmileDirectClub, Inc.
1530 Antioch Pike
Antioch, TN 37013

**Debtor's Counsel**
Matthew D. Cavenaugh
Rebecca Blake Chaikin
Genevieve M. Graham
Emily Meraia
Jackson Walker LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010
Via ECF

Joshua A. Sussberg, P.C. (admitted pro hac vice)
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
601 Lexington Avenue
New York, New York 10022
Via ECF

Spencer A. Winters, P.C. (admitted pro hac vice)
Rachael M. Bentley (admitted pro hac vice)
300 North LaSalle Street
Chicago, Illinois 60654
Via ECF

**Chapter 7 Trustee**
Allison D Byman
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
Via ECF

**Office of the U.S. Trustee**
Jayson B. Ruff
Christopher R. Travis
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002
Via ECF

Internal Revenue Services
Centralized Insolvency Operation
1111 Pennsylvania Ave NW
Washington, DC 20004-2541

Internal Revenue Services
Centralized Insolvency Operation
PO Box 7436
Philadelphia, PA 19101-7346

**Counsel for Cluster Holdco LLC**
Benjamin Winger
DLA PIPER
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089

**20 Largest Creditors**
Wilmington Trust,
National Association
Rodney Square North
1100 North Market Street
Wilmington, DE 19890

Align Technology, Inc.
2820 Orchard Parkway San Jose, CA 95134

2987 Horizon Media, Inc.
75 Varick Street
New York, NY 10013

Foley & Lardner LLP
321 N Clark St, Ste 2800
Chicago, IL 60654-5313

Legility, LLC
1828 L St NW Ste 1070
Washington, DC 20036

Salesforce.com
PO Box 203141
Dallas, TX 75320-314

GOOGLE Inc
DEPT 33654
PO BOX 39000
San Francisco, CA 9413
RETURNED MAIL

LTIMindtree Limited
25, Independence Blvd., Suite 401
Warren, NJ 07059

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Heraeus Kulzer, LLC
300 Heraeus Way
South Bend IN 46614- 2517

DASH BPO, LLC
10524 Moss Park Rd Ste 204-349
Orlando, FL 32832

Skadden Arps Slate
Meagher & Flom, LLP
360 Hamilton Ave
White Plains, NY 10601

Ernst & Young U.S. LLP
P.O. Box 773712
Chicago, IL 60677-3712

Merkle Inc.
7001 Columbia Gateway Dr.
Columbia, MD 21046

Globant LLC
875 Howard Street
Suite 320
San Francisco, CA 9410

Troutman Pepper
Hamilton Sanders LLP
PO BOX 933652
Atlanta, GA 31193-3652

PJT Partners LP
280 Park Avenue
17th Floor
New York, NY 10017

Gen.G esports
1615 16th St
Santa Monica, CA 9040

Commission Junction, INC.
P.O. Box 735538
Dallas, TX 75373-5538

Joel R. Daniel
jdaniel@premier-service.com