**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| | (Previously Chapter 11) |
| SMILEDIRECTCLUB, INC., *et al.*,[1] | |
| | Case No. 23-90786 (CML) |
| Debtors. | |
| | (Jointly Administered) |

**DIP AGENT'S OBJECTION TO THE RENEWED APPLICATION FOR ENTRY
OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT
OF ORRICK, HERRINGTON & SUTCLIFFE LLP AS SPECIAL LITIGATION
COUNSEL TO THE CHAPTER 7 TRUSTEE**

Cluster Holdco LLC, in its capacity as administrative agent and collateral agent for the Debtors' DIP facility (the "<u>DIP Agent</u>"), by and through its respective undersigned counsel, hereby files this objection to the *Renewed Application for Entry of an Order Authorizing the Retention and Employment of Orrick, Herrington & Sutcliffe LLP as Special Litigation Counsel to the Chapter 7 Trustee* [Dkt. No. 957] (the "<u>Second Orrick Retention Application</u>");[2] and in support thereof, states as follows.

<u>**PRELIMINARY STATEMENT**</u>

1.      Transparency, process integrity, and timely disclosure are core principles that underpin section 327's "prophylactic statutory rule that approval must be sought in advance of

---

[1] A complete list of each of the Debtors in these chapter 7 cases may be obtained on the website of the Debtors' solicitation agent (as defined herein) at https://restructuring.ra.kroll.com/SmileDirectClub.  The location of Debtor SmileDirectClub, Inc.'s principal place of business and the Debtors' service address in these chapter 7 cases is 1530 Antioch Pike, Antioch, Tennessee 37013.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Renewed Application, the Comfort Motion, or the Final DIP Order, as defined below and as applicable.

performance of services" by the estates' retained professionals.[3]  There are—and must be—limits to the scope and duration of services rendered by estate professionals that will be tolerated **before** compliance with section 327 and Bankruptcy Rule 2014 requirements.  On these unique facts and circumstances, the Second Orrick Retention Application should be denied.

2.     Since March 2024—nearly one year from the hearing scheduled on the Second Orrick Retention Application—Orrick has functioned as an estate professional on an undisclosed basis without regard to the retention requirements under section 327 of the Bankruptcy Code, Bankruptcy Rule 2014, or Local Bankruptcy Rule 2014-1.  Although discovery is ongoing into what exactly Orrick has been doing on behalf of the chapter 7 estates for the past year, the following examples sufficiently illustrate the problem.  Upon information and belief, Orrick has:

- marketed and sourced DIP financing alternatives—the ultimate selection of which the Court determined violated the Final DIP Order;

- advised the Trustee regarding the form and substance of certain of the agreed cash collateral orders;

- negotiated and resolved a purported discovery dispute between the Securities Plaintiffs and certain of the Debtors—which remain co-defendants with the Individual Defendants in such litigation—by transferring or otherwise giving them unfettered access to unidentified "Documents", at least some of which comprise DIP Collateral;

- advised the Trustee regarding the Debtors' waiver of privilege with respect to approximately 2.2 million documents—none of which were even reviewed or meaningfully understood by the Trustee prior to the very consequential decision to waive such privilege to the detriment of the DIP Agent's ongoing efforts to monetize certain DIP Collateral;

- negotiated and entered into an undisclosed services arrangement with Consilio to host and maintain unidentified "Documents", at least some of which comprise DIP Collateral;

---

[3] *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 106 (3d Cir. 1988) (*citing Matter of Arkansas Co., Inc.*, 798 F.2d 645, 651 (3d Cir. 1986)).

- negotiated and entered into an undisclosed cost-sharing arrangement with the Securities Plaintiffs in respect of unidentified "Documents", at least some of which comprise DIP Collateral, currently hosted by Consilio;

- prepared a draft complaint against certain former directors and officers, including one or more of the Individual Defendants; and

- advised the Trustee regarding the notice of appeal of the Court's denial of the First Orrick Retention Application.

Other than with regard to the marketing and sourcing of DIP financing alternatives, ***none*** of the above services that Orrick has rendered on behalf of the estate and/or the Trustee are disclosed in the First Orrick Retention Application or the Second Orrick Retention Application.

3. Adding to the mystery of what Orrick has been up to in these chapter 7 cases, on June 13, 2024, the Trustee filed a certificate of service, indicating that Orrick also represents Microsoft Corporation, a creditor and service provider of the Debtors, in these chapter 7 cases.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on June 13, 2024, a true and correct copy of the foregoing document has been served on all parties receiving ECF notice in the above-referenced cases and by electronic mail to the party listed below:

David Litterine-Kaufman
Nicholas Poli
Mark Franke
**Orrick, Herrington & Sutcliffe LLP**
51 West 52nd Street
New York, NY 10019-6142
dlitterinekaufman@orrick.com
npoli@orrick.com
mfranke@orrick.com

*Counsel for Microsoft Corporation*

By:    /s/ Joshua W. Wolfshohl
          Joshua W. Wolfshohl

D.I. 810.  The related motion requested entry of an order granting "the Trustee and her professional retained in these chapter 7 cases access to all accounts, emails, instant messages, calendars, contacts, loose files, databases, and all other electronically stored information of the Debtors stores, maintained, or otherwise held by Microsoft or on its platforms."  *Id.* ¶ 7.  Porter Hedges' time entries corroborate that Orrick was indeed commenting on the so-called information access motion:

| 06/12/24 | MBD | Correspond with J. Wolfshohl and A. Power regarding information access motion (.1); revise information access motion (.2); correspond with Orrick team regarding same (.1); review and incorporate Orrick revisions (.2); correspond with J. Wolfshohl regarding same (.1); correspond with M. Webb regarding filing and service of information access motion (.1). | 0.80 | 500.00 |

D.I. 820.  Yet nowhere in the First or Second Orrick Retention Applications is there any disclosure with regard to Microsoft Corporation or Orrick's role in respect of the "information access motion."

4.     The Trustee offers no declaration in connection with the Second Orrick Retention Application.  But in connection with the First Orrick Retention Application, the Trustee's explanation for not disclosing Orrick's material role in the administration of these chapter 7 cases and timely filing a retention application does not meet the applicable "extraordinary circumstances" standard.

> [T]he Insider DIP Lenders and I were in the middle of negotiations related to the use of cash collateral and the administration of these chapter 7 cases in the months immediately following the [Orrick Engagement Letter] execution, ***and I believe that filing the Orrick Retention Application during this time would have negatively impacted those discussions***.

Byman Decl. ¶ 11 n.2 [D.I. 844-1] (emphasis added).[4]

---

[4] Local Bankruptcy Rule 2014-1(b)(2) provides that if a retention application is filed more than ***thirty days*** after the professional commences services, the applicant must explain why it did not file the application earlier and, to the best

5.      It is noteworthy that the Trustee has, on four separate occasions, timely filed retention applications for, and the Court has entered orders approving the retention of, law firms Porter Hedges LLP pursuant to section 327(e) of the Bankruptcy Code [D.I. 765 & 821], Byman & Associates, PLLC, pursuant to section 327(a) of the Bankruptcy Code [D.I. 764], and Matthew J. Borror pursuant to section 327(a) of the Bankruptcy Code [D.I. 791].  That is, the Trustee has demonstrated that she can comply with Local Bankruptcy Rule 2014-1(b)(2) and the 30-day rule promulgated thereunder.

6.      Moreover, as part of the First Orrick Retention Application, the Trustee emphatically declared that ***none*** of the potential litigation funders were willing "to provide financing on an unsecured basis or on a junior or *pari passu* basis to the Insider DIP Lenders." *Id*. at ¶ 14.  This is what section 364(d) of the Bankruptcy Code requires.  Yet now, after substantial fees and expenses incurred litigating the plain meaning of the Final DIP Order and section 364(d) relief with the First Orrick Retention Application, Orrick has agreed to do just that—be paid a 45% contingency fee and its (uncapped) expenses "after payment of all DIP Obligations" on a fully subordinated, unsecured basis.  *See* Proposed Order ¶ 4 [D.I. 957-3]; Second Orrick Retention Application ¶ 1.  The Trustee offers no disclosure of the "hurdle rates" necessary for administrative or general unsecured creditors to realize any recovery from the anticipated litigation Orrick would prosecute on these terms.[5]

7.      Finally, the DIP Agent understands that the Individual Defendants intend to object to the Second Orrick Retention Application on the basis that Orrick—as purported attorney for the

---

of its knowledge, how approval of the application may prejudice parties in interest.  Neither of those disclosures are included in the Second Orrick Retention Application.

[5] Section 327(e) of the Bankruptcy Code requires, among other things, a showing that the proposed retention would be "in the best interest of the estate."

co-defendant Debtors—has reviewed, relied upon, and improperly provided the Securities Plaintiffs with access to certain confidential "Documents" that are subject to joint and/or individual privilege(s). If that can be established, Orrick may, among other things, owe duties to the Individual Defendants. Orrick would then face an "actual conflict of interest" or hold an "interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed"—in either case, an independent, disqualifying factor for section 327 purposes.[6] The DIP Agent further understands that these issues are subject to a live dispute in the Tennessee state and federal Securities Litigations and has no objection to Court continuing the hearing on the Second Orrick Retention Application until those courts have an opportunity to rule on substantially similar questions of fact and law so that this Court has an adequate record upon which it may rule.

8. The DIP Parties expect to be paid in full in cash. Proceeds from Specified Causes of Action (as defined in the Final DIP Order), Assigned Claims and Causes of Action (as defined in the May 29, 2024 agreed order, D.I. 798), and any other estate claims and causes of action that comprise DIP Collateral will be material to achieve that objective. But the DIP Parties have growing concerns that Orrick has made that more difficult—either by prejudicing the DIP Agent's ongoing efforts to monetize DIP Collateral or increasing the quantum of DIP Obligations through ill-advised litigation. The potential for actual conflicts of interest and further disqualification proceedings only amplifies the risk profile.

---

[6] The estates might very well hold claims arising out of the facts and circumstances described herein—which may be another adverse interest. The DIP Agent may also have direct claims and causes of action for violations of the Final DIP Order and the Agreed Cash Collateral Orders, as well as DIP Liens encumbering any related estate claims and causes of action that comprise DIP Collateral. Discovery is ongoing. For the avoidance of doubt, the DIP Agent expressly reserves all rights, remedies, claims, causes of action, objections, defenses and so forth. Nothing contained in this objection shall be deemed a waiver of or prejudicial to any such right, remedy, claim, cause of action, objection, defense, and so forth by the DIP Agent, whether held directly, derivatively, or pursuant to the Final DIP Order, in any respect whatsoever.

9.      As the senior and among the largest creditors in these chapter 7 cases, the Trustee should engage the DIP Parties in constructive discussions that better align the economic interests— and recovery profiles—for secured and unsecured creditors alike.  The Second Orrick Retention Application does not do that.  There is significant room for improvement.  For the reasons set forth herein, the relief requested should be denied.

## RELEVANT BACKGROUND

10.     On September 29, 2023 (the "Petition Date"), SmileDirectClub, Inc. and the affiliated debtors (collectively, the "Debtors") in the above-captioned chapter 7 cases filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  On October 2, 2023, the Court entered an order authorizing the joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [D.I. 28].

11.     The Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code until the Court entered that certain *Order Denying Debtors' Motions and Converting Cases to Chapter 7* [D.I. 617] on January 26, 2024 (the "Conversion Date").  The Debtors ceased operating their businesses on or around December 8, 2023.  On the Conversion Date, the U.S. Trustee appointed Allison D. Byman as the Chapter 7 Trustee (the "Trustee") in these chapter 7 cases.

12.     On the Petition Date, the Debtors filed a motion [D.I. 16] (the "DIP Motion") seeking interim and final approval of, among other things, a senior secured superpriority new money delayed-draw DIP Facility in the aggregate principal amount of up to $80 million (the "DIP Facility"), pursuant to the terms of that certain Debtor-in-Possession Credit Agreement, dated as of September 29, 2023 (as subsequently modified in accordance with the terms therewith, the "DIP

Credit Agreement" and, together with that certain DIP Collateral Agreement and such other related documents, the "DIP Documents"), and related orders.

13.    On October 2, 2023, the Court approved the DIP Motion on an interim basis [D.I. 61] (the "Interim DIP Order").  Shortly thereafter, the DIP Lenders funded $20 million of Initial Draw T-1 Loans.  On October 3, 2023, the Debtors and the DIP Agent entered into that certain DIP Collateral Agreement—which agreement comprises part of the DIP Documents.

14.    On November 7, 2023, the Court approved the DIP Motion on a final basis [D.I. 296] (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"). Pursuant to paragraph 12 of the Final DIP Order, $5 million of the outstanding principal balance of the Prepetition Outstanding Revolving Loans (i.e., the Roll-Up Amount) was deemed funded pursuant to the DIP Credit Agreement on a cashless basis and constitutes DIP Obligations.

15.    On February 10, 2024, the DIP Agent and Trustee together filed the *Emergency Joint Motion of Chapter 7 Trustee and DIP Agent (I) Authorizing (A) Consensual Use of Cash Collateral and (B) the Exercise of Certain Rights and Remedies under the Final DIP Order, and (II) Granting Related Relief* [D.I. 638], whereby the parties agreed on the Trustee's use of cash collateral and the DIP Agent's ability to foreclose on certain DIP Collateral.

16.    Since February 10, 2024, the DIP Agent and the Trustee have entered into additional agreed orders governing the use of cash collateral and the Debtors' books and records that comprise DIP Collateral.  *See, e.g.*, D.I. 655, 787, 798, 800, 811, 837.  On February 15, 2024, the DIP Agent consented to the Trustee's use of cash collateral in the amount of $105,000 for the purpose of funding costs to maintain the Debtors' books and records as part of the initial agreed budget.  *See* D.I. 655, Ex 1.  On May 29, 2024, the DIP Agent agreed that, as part of foreclosing on substantially all of the remaining DIP Collateral (including the "Assigned Claims and Causes

of Action"), the Trustee could retain possession of the Debtors' books and records as necessary to fulfill her statutory duties—provided that the DIP Agent would be entitled to joint access of such books and records as necessary or appropriate to monetize the DIP Collateral.  *See* D.I. 798 ¶¶ 2-3, 6.

17.     Effective as of March 20, 2024, the Trustee and Orrick entered into an engagement letter and contingency fee arrangement to investigate and prosecute certain purported claims and causes of action against "various insiders" of the Debtors.  D'Aversa Decl, Ex. 1 [D.I. 847-2].

18.     Nearly five months later, on August 16, 2024, the Trustee filed the *Application for Entry of an Order Authorizing the Retention and Employment of Orrick, Herrington & Sutcliffe LLP as Special Litigation Counsel to the Chapter 7 Trustee* [D.I. 847] (the "First Orrick Retention Application").  Among other objectionable aspects of the proposed retention, the Trustee sought to retain Orrick, Herrington & Sutcliffe LLP ("Orrick") by granting Orrick priming liens relative to the DIP Liens and a superpriority claim senior in all respects to the DIP Obligations, in plain violation of the Final DIP Order.  That same day, the Trustee also filed a motion to approve a litigation funding agreement that would nonconsensually prime the DIP Liens and subordinate the DIP Obligations [D.I. 844] (the "Nonconsensual Priming Litigation Finance Motion").

19.     Orrick was actively involved in the strategy behind the Trustee filing the Nonconsensual Priming Litigation Finance Motion, including performing outreach to find lenders willing to provide the litigation funding and negotiating the terms of any such funding with such lenders.  First Orrick Retention Application ¶ 6 ("[T]he Trustee engaged Orrick to represent her in connection with . . . the sourcing of litigation financing to pursue [the claims against certain of the Debtors' insiders."); D.I. 844-1, ¶ 13 ("[Orrick], under my direction, contacted fourteen institutions regarding the opportunity to fund the prosecution of the Insider Claims."), ¶ 14

("[Orrick] engaged in several rounds of meetings and follow-up communications with the parties subject to confidentiality agreements regarding the funding opportunity. . . For any meetings where I did not personally participate, [Orrick] updated me promptly following each meeting"), ¶ 16 ("Upon receipt of Omni's initial term sheet, [Orrick], at my direction, engaged in extensive negotiations and exchanged numerous draft proposals with Omni.  I also participated in several meetings with [Orrick] and Omni to discuss the structure and economics of the proposed financing"); D.I. 858-1, 94:24-95:8 ("Q:  When did you first consider that you might have to prime the DIP lenders' lien in order to pursue the insider claims?  A:  First consider it was when I first met with Orrick.  It was discussed as a possibility.  So that would have been – Q:  At the end of February?  A:  The end of February/early March.  Q:  Of 2024?  A:  Yes.").

20.     The DIP Agent filed two objections to the First Orrick Retention Application and Nonconsensual Priming Litigation Finance Motion—*see, e.g.*, D.I. 859, 885—and otherwise participated in the contested evidentiary hearings pursuant to which the Court considered such relief requested.

21.     On October 18, 2024, the Court denied the First Orrick Retention Application without prejudice.  D.I. 908.  It also denied the relief requested in the Nonconsensual Priming Litigation Finance Motion.  D.I. 907.

22.     On November 1, 2024, the Trustee filed a *Notice of Appeal* in respect of the Court's orders denying the relief requested in the First Orrick Retention Application and the Nonconsensual Priming Litigation Finance Motion.  D.I. 921.  On November 15, 2024, the Trustee filed that certain *Appellant's Statement of Issues to Be Presented on Appeal and Designation of Items to Be Included in the Record on Appeal*.  D.I. 929.  On November 27, 2024, the DIP Agent

filed that certain *DIP Agent's Counter-Designation of Items to Be Included in the Record on Appeal*.  D.I. 941.

23.    Also on November 1, 2024, the Securities Plaintiffs' filed the <u>*Emergency* Motion *for Order Confirming Chapter 7 Trustee is Authorized and Empowered to Waive the Debtors' Attorney/Client Privileges*</u> [D.I. 920] (the "<u>Comfort Motion</u>"), which disclosed for the first time to the DIP Agent and other parties in interest that the Trustee had transferred or otherwise granted access to "certain documents maintained by the Debtors relevant to the Securities Litigations" (the "<u>Debtors' Documents</u>") to the Securities Plaintiffs on or around June 2024.   The Debtors' Documents appear to comprise, at least in part, DIP Collateral.  In fact, the Trustee admits that the Debtors' Documents are DIP Collateral.  D.I. 953-1 ("<u>Byman Comfort Motion Dep. Tr.</u>"), 38:18-22.[7]

24.    Deposition testimony in connection with the Comfort Motion further revealed that, prior to transferring or otherwise giving access to the Debtors' Documents to the Securities Plaintiffs, also on or around June 2024, the Trustee authorized Orrick to take responsibility for managing the litigation database with Consilio that hosts the Debtors' Documents and resolving purported discovery disputes between the estates and the Securities Plaintiffs.  For example, the Trustee apparently authorized Orrick to enter into an undisclosed service agreement with Consilio to host, maintain, and provide Orrick with access to the Debtors' Documents, inclusive of DIP Collateral.  *Id*. 18:8-17.   Orrick and the Securities Plaintiffs apparently have an undisclosed arrangement to jointly fund and otherwise share costs of maintaining access to the Debtors'

---

[7] ("Q.  And, Ms. Byman, do you agree with me that the debtors' records are part of the DIP agent's collateral in connection with the DIP loan? MR. POWER:  Objection; form.  THE WITNESS:  Yes.")

Documents, inclusive of DIP Collateral, via Consilio.[8]  *Id*. 34:10-15.  And Orrick apparently transferred or otherwise provided the Securities Plaintiffs with unfettered access to the Debtors' Documents, inclusive of DIP Collateral, on behalf of the Trustee as a purported resolution of a purported discovery dispute.  *Id*. 20:25-21:5. 27:1-10.  All of this happened without notice to or consent by the DIP Agent.  Nor has the Trustee herself ever reviewed any of the Debtors' Documents—nor does she have any meaningful understanding of what the Debtors' Documents entail.  *Id*. 21:19-25:5.  That is because Orrick was "running point" on all of this.  At that time, however, Orrick's role remained undisclosed to the DIP Agent and the Trustee had not yet filed an application to retain Orrick.

25.     Despite the lack of retention, Orrick continued to perform services with respect to the DIP Collateral and the Securities Plaintiffs, including entering into an undisclosed service agreement with Consilio to host, maintain, and provide access to such DIP Collateral (*Id*. 18:8-17), and entering into an undisclosed arrangement with the Securities Plaintiffs to fund the costs of maintaining access to such DIP Collateral—the Trustee is not party to that funding agreement (*Id*. 34:10-15).

26.     The DIP Agent had no notice or knowledge of the transfer of, or otherwise granting access to, the Debtors' Documents until the Comfort Motion was filed, despite the explicit requirements of the Final DIP Order that no such transfer occur without the DIP Agent's consent.  Final DIP Order ¶ 21.  The Trustee admits that she did not obtain the DIP Agent's consent before providing such third parties access to the Documents.  Byman Comfort Motion Dep. Tr. 38:24-39:3.

---

[8] The DIP Agent understands the Individual Defendants intend to show that Orrick's access and review of the Consilio database has created an adverse interest or actual conflict of interest that would be grounds for disqualification of Orrick's retention.

27.     At least a subset of the Debtors' Documents appear to consist of privileged materials of the Individual Defendants, who are the very same defendants that the Trustee intends to bring claims against through Orrick.  D.I. 951, ¶¶ 13, 53,  55, Ex. 9 (6/15/24 E-mail from D. Rammelt regarding "many layers of privilege"), Ex. 10 (7/12/24 E-mail from A. Power confirming Trustee would not waive privileges belonging to third parties).  Given that the Trustee handed the Debtors' Documents over to Orrick, delegated to Orrick authority to resolve any open discovery issues with the estates' adversary (the Securities Plaintiffs), which resolution involved Orrick waiving the estates' privilege and handing over the Debtors' Documents to the Securities Plaintiffs, there is a reasonable inference that Orrick must have reviewed the documents that are privileged—either jointly or individually—as to the Individual Defendants.  Discovery is ongoing. The DIP Agent understands that Orrick has refused to comply with discovery requests from the Individual Defendants.

28.     On December 9, 2024, the DIP Agent filed its objection to the Comfort Motion. D.I. 952.

29.     On December 20, 2024, the Court denied the relief requested in the Comfort Motion, choosing to defer several substantive issues to the courts presiding over the Tennessee state and federal Securities Litigations and related discovery disputes.

30.     On January 6, 2025, the Trustee's appeal of the Court's denials of the First Orrick Retention Application and the Nonconsensual Priming Litigation Finance Motion was dismissed in its entirety with prejudice by agreement with the DIP Agent.  D.I. 969.

## OBJECTION

**A. The Intentional Delay in Disclosing Orrick's Role and Seeking Court-Approved Retention Violates Section 327 of the Bankruptcy Code—Orrick Has Played a Material and Largely Undisclosed Role in the Administration of the Chapter 7 Cases for Nearly a Year.**

31.     The Fifth Circuit has held that the procedural rules for professional retention mandate "strict compliance" therewith, and such compliance "is even more crucial in a Chapter 7 setting." *In re Lyons*, 439 B.R. 401, 407 (Bankr. S.D. Tex. 2010) (denying retention application where the chapter 7 trustee waited several months to obtain approval of retention of special counsel on contingency fee basis); *In re Keren Ltd. Pshp.*, 225 B.R. 303, 307 (S.D.N.Y. 1998) (denying retention application where debtor waited approximately eight months to obtain approval of retention of a real estate broker on a commission fee basis).  "Retroactive applications to employ professionals should not be routinely granted." *In re Shady Green Inc.*, No. 04-97890, 2007 WL 7143417, at *1 (Bankr. N.D. Ga. Sept. 24, 2007) (citing *In re Crook,* 79 B.R. 475, 477 (9th Cir. BAP 1987)).

32.     While there is no formal deadline under the Bankruptcy Code or the Bankruptcy Rules, bankruptcy courts have discretion to deny employment applications filed months or years after work has begun.  *Id*.; *see also In re Benitez*, No. 19-70230, 2020 Bankr. LEXIS 661, at *16 (Bankr. E.D.N.Y. 2020) (denying chapter 7 trustee's attorney retention application that was filed eleven months after work began); *In re Mallamaci*, 152 B.R. 41, 43 (Bankr. M.D. Pa. 1993) (denying retention application entirely that was filed eleven months after work began); *In re Martin*, 102 B.R. 653, 656 (Bankr. W.D. Tenn. 1989) (denying retention application entirely that was filed two years after work was commenced); *In re Arkansas Co., Inc.*, 798 F.2d 645, 650-51

14

(3d Cir. 1986) (denying retention application by creditors' committee where retention application filed thirteen months after work began).

33.     For example, *nunc pro tunc* approval of professional retention applications are "the rare exception—reserved for extraordinary circumstances—not the rule." *In re Off. Prods. of Am., Inc.*, 136 B.R. 675, 682 (Bankr. W.D. Tex. 1992) (citations omitted); *see also In re French*, 111 B.R. 391, 394 (Bankr. N.D.N.Y. 1989) (denying fee request from counsel who failed to apply for 327(e) retention).  Section 327 of the Bankruptcy Code works "most efficiently and effectively when the court reviews and approves the application for employment ***before any services are performed***." *Off. Prods. of Am.* 136 B.R. at 682 (citations omitted) (emphasis added); *see also In re Hydro Servs., Inc.,* 277 B.R. 309, 310–11 (Bankr. E.D. Tex. 2001) (*nunc pro tunc* approval "should not be granted without regard to the circumstances, facts and equities in the case or with such carte blanche as to render the procedural requirements of the Bankruptcy Code and Bankruptcy Rules meaningless formalities").  "*[N]unc pro tunc* approval should be limited to cases where extraordinary circumstances are present." *Arkansas*, 798 F.2d at 649.

34.     Another bankruptcy court within the Fifth Circuit recently opined on the purposes of section 327 of the Bankruptcy Code:

> The purpose of [section] 327 is to provide notice to all creditors and other interested parties that the trustee … is hiring a professional and proposing to pay the professional from estate funds. Section 327 allows courts to perform a 'screening process, verify the necessity of employment, ensure the neutrality of the person employed, and control and limit estate expenses, thereby promoting efficient administration of the bankruptcy estate'.
>
> …
>
> While [section] 327 contemplates employment beginning before approval, when professionals delay in seeking court approved employment, the oversight function of § 327 is diminished, which requires increased scrutiny when examining employment applications.

*In re Coleman*, 655 B.R. 441, 448, 457 (Bankr. N.D. Miss. 2023) (denying attorney retention application filed eighteen months after work began) (internal citations omitted).

35.     Local Rule 2014-1(b)(2) of the Local Rules of the Bankruptcy Court for the Southern District of Texas further provides that if a retention application is filed more than thirty days after the professional commences services, the applicant must explain why it did not file the application earlier and related prejudice to parties in interest insofar as it seeks *nunc pro tunc* relief.[9]

36.     The Trustee did not disclose her engagement with Orrick until August 16, 2024, the date of the First Orrick Retention Application, and did not file the Second Orrick Retention Application until December 10, 2024, almost two months after the First Orrick Retention Application was denied without prejudice.  That is, the retention application before the Court was not filed until ***ten months*** after Orrick began work for the Trustee—and it will not be heard by the Court until ***nearly one year*** since Orrick commenced (in secret) its material role in administering these chapter 7 cases.  D'Aversa Declaration, Ex. 1.

37.     The importance and duration of Orrick's undisclosed role in these chapter 7 cases are problematic.  It marketed and sourced alternative DIP financing—which was determined to violate the Final DIP Order.  Orrick has entered into multiple commercial agreements for the maintenance and preservation of the Debtors' Documents, including an undisclosed services arrangement with Consilio and an undisclosed funding arrangement with the Securities Plaintiffs. It represented the Debtors in resolving purported discovery disputes with the Securities Plaintiffs in the Securities Litigations—where the Debtors remain co-defendants alongside the Individual

---

[9] To the extent the Second Orrick Retention Application seeks Court approval for Orrick's employment effective as of, or any acts or omissions undertaken by Orrick prior to, some date ***prior*** to the entry of any order authorizing such retention, such relief requested constitutes *nunc pro tunc* relief that should be denied for the reasons set forth herein. *See also Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 140 S. Ct. 696 (2020).

Defendants.  Upon information and belief, it gave advice to the Trustee as part of her questionable decision to waive the estates' privilege with respect to the Debtors' Documents—and without regard to the interests of the DIP Agent or the Individual Defendants.  Orrick commented on and apparently represented Microsoft as part of the so-called "information access motion."  And Orrick continues to cast a shadow over every other contested matter in these chapter 7 cases, including the Comfort Motion and now dismissed appeal.  It bears repeating:  almost none of these responsibilities are even mentioned in the First Orrick Retention Application or Second Orrick Retention Application.

38.     The Trustee admits that she intentionally delayed filing the First Orrick Retention Application for nearly five months for tactical reasons in relation to her near-term cash collateral agenda—i.e., the Trustee feared disclosure of Orrick's role might "negatively impact" her ability to use the DIP Parties' cash collateral on a consensual basis to fund these chapter 7 cases, including payment of retained professionals.  *See* D.I. 844-1, ¶ 11 n. 2.  This is not a case of excusable neglect, a mere oversight, or time constraints.  The Trustee made a choice.  Such tactical maneuvers have consequences and come nowhere close to the "extraordinary circumstances" required to justify a nearly one-year delay in seeking the proposed retention of Orrick.

39.     Accordingly, the Second Orrick Retention Application should be subject to higher scrutiny because it is untimely and denied in its entirety given the unique facts and circumstances of these chapter 7 cases.  *See, e.g., In re Triangle Chems., Inc.*, 697 F.2d 1280, 1289 (5th Cir. 1983) (denying *nunc pro tunc* retention where debtor's counsel performed substantial services for seven months after chapter 11 petition date without obtaining court approval); *see also Benitez*, 2020 Bankr. LEXIS 661, at *15 ("The longer an estate professional waits to seek court approval of its retention, the more the 'particular facts and circumstances surrounding [the] case' develop,

which means the Court may broaden its analysis to include hindsight consideration of the services already rendered and the professionals who rendered those services.").

**B.  The Failure to Disclose Orrick's Various Roles and Connections in These Chapter 7 Cases Violates Bankruptcy Rule 2014.**

40.     As set forth herein, the Second Orrick Retention Application contains a host of material omissions in terms of disclosure.  The DIP Agent does not intend to repeat them all here; they are, for the avoidance of doubt, incorporated by reference into this section.  Furthermore, discovery is ongoing, thus the DIP Agent reserves the right to supplement this section in connection with the hearing on the Second Orrick Retention Application.

41.     Bankruptcy Rule 2014 requires the applicant and person to be employed to provide a verified statement setting forth, among other things, such "person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Failure to comply with Bankruptcy Rule 2014 is grounds for denying—or revoking—retention.  *See, e.g.*, *In re Filene's Basement, Inc.,* 239 B.R. 845, 850 (Bankr. D. Mass. 1999) (granting motion for reconsideration of application to retain financial advisor to chapter 11 debtors, and denying retention, where professional failed to disclose representation of another client in two matters brought against the debtors); *In re Kings River Resorts, Inc.,* 342 B.R. 76, 86–87 (Bankr. E.D. Cal. 2006) (revoking retention of real estate broker hired by chapter 7 trustee to sell certain estate property where broker failed to disclose prepetition relationship with debtor).

42.     Based on the myriad disclosure infirmities described herein, the Court should deny the Second Orrick Retention Application.

C. **The Second Orrick Retention Application Violates the Final DIP Order and Other Court Orders—It Should Be Denied to the Extent Orrick Seeks Authority to Pursue Claims That Are Owned by the DIP Parties or Otherwise Comprise DIP Collateral.**

43.     The Trustee has requested that Orrick be retained for the limited purpose of representing the Trustee in connection with "(A) the investigation and prosecution of certain claims and causes of action (the "Claims") against various current and former insiders of the Debtors *and their affiliates, and any persons or entities against whom Claims may lie as a result of the conduct of insiders* . . . and (B)  the negotiation of settlements of the Claims."  Second Orrick Retention Application ¶ 12 (emphasis added).  The bold-italicized language quoted above *was added* to the proposed amended and restated contingency fee arrangement as part of the Second Orrick Retention Application.  *See* D.I. 957-2.

44.     But the DIP Agent previously foreclosed on every estate claim and cause of action—other than the Specified Causes of Action, which are limited to Avoidance Actions, Recovery Actions, and claims and causes of actions held by the Debtors against one or more current or former insiders.  *See* Final DIP Order ¶ 8; Agreed Order Date May 29, 2024 [D.I. 798].  As set forth in the Final DIP Order, the DIP Liens encumber "all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of each of the Debtors"—except that with respect to Specified Causes of Action, DIP Liens encumber Specified Causes of Action Proceeds, but not the Specified Causes of Action themselves.  *See* Final DIP Order ¶ 8.

45.     The DIP Agent does not consent to, and the Court cannot approve the relief requested for, Orrick's investigation and prosecution of any claims or causes of action that have already been foreclosed upon by the DIP Agent and/or otherwise comprise DIP Collateral.  The Second Orrick Retention Application violates the Final DIP Order and May 29, 2024 Agreed Order in that respect.  To the extent the Trustee seeks to engage Orrick to investigate prosecute claims

and/or parties outside the parameters of "Specified Causes of Action" under the Final DIP Order, the relief requested must be denied.

**D. Orrick Has Represented the Trustee in Conducting these Chapter 7 Cases—Such Representation Cannot Be Authorized under Section 327(e) of the Bankruptcy Code.**

46.     A trustee may retain counsel under section 327(e) of the Bankruptcy Code "for a specified special purpose, ***other than to represent the trustee in conducting the case***." (emphasis added).  Section 327(e) of the Bankruptcy Code "does not authorize the employment of the debtor's attorney to represent the estate generally or represent the trustee in the conduct of the bankruptcy case." H.R. Rep. No. 95-595, 1st Sess. at 328 (1977); S. Rep. No. 95-989, 2nd Sess. at 38–39 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5824–5825, 6284–6285.

47.     Courts have refused to employ special counsel whose services would overlap with those that customarily overlapped with general bankruptcy counsel under section 327(a) of the Bankruptcy Code.  *See, e.g., In re Mohiuddin,* 627 B.R. 875, 883 (Bankr. S.D. Tex. 2021) (denying expansion of special counsel's scope of services because the trustee already had general counsel retained for the purpose of liquidating property of the estate); *In re Roper & Twardowsky, LLC*, 566 B.R. 734, 750-51 (Bankr. D.N.J. 2017) (collecting cases and declining special counsel retention where trustee sought to retain counsel for nearly every litigation that touched upon the administration of the debtor's estate, and its role in "[o]bjecting to the allowance of claims goes to the heart of what a Chapter 7 Trustee does."); *Century Indem. Co. v. Congoleum Corp.* (*In re Congoleum Corp.*), 426 F.3d 675, 691-92 (3d Cir. 2005) (reversing the retention of special counsel under 327(e) because the scope of the retention was better suited for 327(a), where special counsel was retained to advise the debtor on matters relating to insurance-related issues but also participated actively in formulating and revising the plan); *In re Neuman*, 138 B.R. 683, 685-87 (S.D.N.Y. 1992) (denying special counsel's retention under 327(e) where special counsel's

proposed retention overstepped the duties of the trustee to investigate and determine the allowable amount of a claim).

48.     As noted herein, Orrick has performed services for the Trustee well beyond the limited purpose of investigating, prosecuting, and settling claims against insiders.  The DIP Agent does not intend to repeat them all here; they are, for the avoidance of doubt, incorporated by reference into this section.

49.     Negotiating legal and commercial resolutions with estate creditors and service providers is beyond the scope of a 327(e) retention.  Such services could and should have been performed by Byman & Associates, as general counsel, or perhaps one of her other special purpose law firms that are already retained in these chapter 7 cases—e.g., Porter Hedges.  Insofar as Orrick's role goes beyond the permissible limits of section 327(e)—discovery is ongoing—the Second Orrick Retention Application should be denied.

**E.  Orrick May Be Disqualified Because of an Adverse Interest or Actual Conflict of Interest.**

50.     Section 327(e) of the Bankruptcy Code provides that professionals employed as special counsel must "not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed."  Section 327(c) of the Bankruptcy Code further provides that an "actual conflict of interest" is a disqualifying factor for retention purposes.

51.     The DIP Agent understands that the Individual Defendants intend to show that Orrick has either an adverse interest or an actual conflict of interest based upon, among other things, its handling of confidential, jointly privileged, and/or separately privileged materials in at least the Tennessee state and federal Securities Litigation context where certain of the Debtors

21

remain co-defendants with the Individual Defendants.  The consequence of which is that Orrick may owe duties to the Individual Defendants.

52.     There is an alternative theory of "adverse interest" and/or "actual conflict of interest" that stems from Orrick's decision to partner with the Securities Plaintiffs by, among other things, sharing confidential, privileged materials and entering into commercial arrangements with the Securities Plaintiffs.  That is, Orrick may be deemed to be co-counsel or have an impermissible economic arrangement with the Securities Plaintiffs—who continue to sue certain of the Debtors along with the Individual Defendants in the Tennessee state and federal Securities Litigations.

53.     As set forth herein, the DIP Agent has concerns that any such conflicts or adverse interests would continue to prejudice the likelihood of, and timing for, payment in full in cash of the DIP Obligations.

[*Remainder of Page Intentionally Left Blank*]

## **CONCLUSION**

WHEREFORE, the DIP Agent respectfully requests that the Court enter an order (a) denying the Second Orrick Retention Application with prejudice; and (b) granting any other relief it deems necessary or proper.

Dated: January 10, 2025

Respectfully submitted,

*/s/ James P. Meunker*
James P. Muenker (Texas Bar No. 24002659)
**DLA PIPER LLP (US)**
845 Texas Avenue, Suite 3800
Houston, Texas 77002
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
Email: james.muenker@us.dlapiper.com

-and-

Brett Ingerman (admitted *pro hac vice*)
Dale K. Cathell (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
650 South Exeter Street, Suite 1100
Baltimore, Maryland 21202
Telephone: (410) 580-4177
Facsimile: (410) 580-3177
Email: brett.ingerman@us.dlapiper.com
        dale.cathell@us.dlapiper.com

-and-

W. Benjamin Winger (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: benjamin.winger@us.dlapiper.com

*Counsel for the DIP Agent and the DIP Lenders*

## CERTIFICATE OF SERVICE

I, James Muenker, hereby certify that on this 10th day of January 2025, I caused a true and correct copy of the foregoing *DIP Agent's Objection to the Renewed Application for Entry of an Order Authorizing the Retention and Employment of Orrick, Herrington & Sutcliffe LLP as Special Litigation Counsel to the Chapter 7 Trustee* to be to be served this day on parties requesting transmission of Notices of Electronic Filing generated by CM/ECF.

 */s/ James P. Muenker*
James P. Muenker (Texas Bar No. 24002659)
**DLA PIPER LLP (US)**
845 Texas Avenue, Suite 3800
Houston, Texas 77002
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
Email: james.muenker@us.dlapiper.com