**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON**

| | |
|---|---|
| In re:<br><br>SMILEDIRECTCLUB, INC., *et al.*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-90786 (CML)<br><br>(Jointly Administered) |
| ALLISON D. BYMAN, in her capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of SMILEDIRECTCLUB, INC.*, et al.*,<br><br>Plaintiff,<br><br>v.<br><br>DAVID KATZMAN, STEVEN KATZMAN, JORDAN KATZMAN, ALEXANDER FENKELL, SUSAN GREENSPON RAMMELT, JEFFREY SULITZER, and CAMELOT VENTURE GROUP,<br><br>Defendants. | Adv. Proc. No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Allison D. Byman, the Chapter 7 Trustee (the "Trustee" or "Plaintiff"), in her

capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of SmileDirectClub,

Inc.*, et al.*, by and through her undersigned counsel, files this Complaint against David Katzman,

Steven Katzman, Jordan Katzman, Alexander Fenkell, Susan Greenspon Rammelt, and Jeffrey

---

[1] The chapter 7 debtors whose estates the Trustee represents (collectively, the "Debtors") are SmileDirectClub, Inc., SmileDirectClub, LLC, Ortho Lab Services, LLC, Access Dental Lab, LLC, CAMF II, LLC, SDC Financial LLC, SDC Holding, LLC, SDC Plane, LLC and SmileFarm, LLC. The chapter 7 cases of the debtors are pending in the United States Bankruptcy Court for the Southern District of Texas under the jointly administered case number 23-90786.

Sulitzer (collectively, the "Insiders") and Camelot Venture Group  (together with the Insiders, the "Defendants"), and respectfully alleges as follows:

## I.   NATURE OF THE ACTION

1.     SmileDirectClub, Inc. ("SDC" or the "Company") was a direct-to-consumer business that sold clear orthodontic aligners.  Despite not being licensed dentists themselves, the Company's founders hoped they could disrupt the aligner market by using novel telehealth methods to make aligner treatment more accessible and affordable. They knew that aligner treatment entailed serious medical risk and was required—by law—to have significant oversight and care from licensed dentists, so they promised SDC would provide patients the "same level of care [as] any treating dentist or orthodontist, with the convenience that comes with online access." That promise turned out to be a lie.  It was a lie that harmed many of SDC's patients.  It was a lie that SDC's directors and officers—the Insiders—tried to conceal rather than fix.  And it was a lie that eventually caused the downfall of the Company.

2.     Aligner treatment, an area of orthodontics, is heavily regulated by state law with rules that are enforced by state dental boards and designed to protect patients from harm.  Without proper evaluation and supervision, patients undergoing aligner treatment are at risk of serious injuries, including gum disease, tooth loss, tooth decay, oral infections, jaw misalignment, and root damage.  Accordingly, state regulations require aligner treatment to be overseen by licensed dentists or orthodontists, who conduct in-person examinations, perform diagnostic tests, and continuously monitor the treatment process.

3.     Despite the dental regulations governing aligner treatment—and SDC's advertising portraying dentists as heavily involved in patient care and oversight—the Insiders implemented a treatment model that intentionally cut dentists out of the process.  Patients using SDC's aligners

had to self-administer their dental impressions; they were not seen by dentists for initial screenings or evaluation for treatment;  did not have dentists develop and design treatment plans; and necessary diagnostics, such as X-rays, were neither obtained nor reviewed by licensed medical professionals.  Moreover, patients had little to no access to dentists after they started treatment. Patients who tried to get help from dentists about worsening symptoms or unexpected complications, such as severe pain or dental damage, were unable to, and had to instead deal with SDC's retail staff and customer service representatives, who were not licensed to provide dental advice.  To make things worse, the dentists SDC did contract with to assist patients were paid only if they recommended SDC's aligner treatment.

4.      Instead of working to address these issues, the Insiders escalated national and digital advertising campaigns that promised safe, professional orthodontic care—despite knowing that SDC's treatment process lacked the clinical foundation to support such claims.  SDC falsely claimed that patients would receive the "same level of care from any treating dentist or orthodontist" and that its orthodontic program was "doctor-prescribed, doctor-directed, and doctor-managed from start to finish."

5.      By bypassing standard-of-care practices and providing unsupervised dental care, SDC caused harm and injuries to thousands of patients.  These patients filed complaints with various regulatory institutions, including the FDA and the Better Business Bureau, and detailed the harm that SDC's treatment process caused them, including tooth damage, severe pain, gum recession, pulpitis, tooth misalignment, and various other injuries.  Often, patients had to seek care from surgeons or orthodontists to fix the damage caused by SDC, who were appalled by what they saw.  One doctor reported to the FDA that a patient treated by SDC "without supervision of a dental professional . . . was done too quickly and resulted in killing the tooth" and that "this would

not have happened if the treatment . . . was overseen by a dental professional." Another doctor-submitted a FDA report stating that an SDC patient presented to the doctor "front teeth that were so sore she could not touch them nor have hot or cold food. An X-ray disclosed thickened ligaments around front tooth which indicates very high torquing forces to teeth."

6.      The Insiders have no excuse for their corporate malfeasance. They knew that the treatment model they sold to the public was doomed to cause harm, customer dissatisfaction, and damage the Company. SDC's founders were warned by nearly 100 licensed oral care practitioners who they solicited for input that having people taking impressions of their own teeth without the proper level of professional supervision was not a viable method for effective orthodontic diagnosis and treatment. Further scrutiny came from an independent review that SDC solicited from UCLA orthodontists. This review concluded that there were a "*fair number of safety concerns* raised (particularly on advanced cases) about patients developing issues down the road post-SDC treatment." In addition to other concerns, the UCLA team's assessment was that SDC had a "*[l]ack of dental expertise*," that the material SDC used for its aligners was "*a major concern*," that there was a "*[n]eed [for] standardized and consistent treatment planning*," and that from a "[l]egal aspect," SDC "*need[ed] to stay away from difficult cases*."

7.      SDC-affiliated doctors (known as "ELPs") also raised concerns. One doctor, who assessed SDC's practices and treatment process, voiced concern that SDC's patient screening and follow-up process risked failing to inform patients of serious dental conditions such as cancerous lesions. As shown below, the doctor expressed his concerns to SDC's Chief Operating Officer, Defendant Steven Katzman, stating "I am very concerned about where we are – especially given the growth you guys are predicting . . . if we don't get a handle on this stuff it will kill us."

4

To: Steve Katzman <skatzman@Camelotvg.com>
Subject: Re: 90 day review photos and policy

Holy smokes. I just realized there are a bunch of patients that identified possibly cancerous lesions on and I
wrote in the comments that they needed to see someone about it but it appears that never made it to the
patient.
Also did I misunderstand or did Sulitzer really say that we can't diagnose caries or perio disease from
photographs AND make the aao argument that "we don't have x rays"? The head of the dental side of our
company really believes this?
This stuff is all fixable but it will take actions not just talking about it. I have three months before my
practice opens and I'm willing to do what it takes in Florida or Nashville to get this lined out but I am very
concerned about where we are - especially given the growth you guys are predicting. I'm betting  PC
will come to Nashville 3 days a week if needed too. We 100 percent company guys and believe in SDC fully
but if we don't get a handle on this stuff it will kill us.

8.      Another ELP wrote to SDC's Chief Clinical Officer, Defendant Jeffrey Sulitzer,
that SDC's clinical operations ran "***without care for quality***."  The ELP informed Sulitzer of his
belief that Company leadership's decision to prioritize immediate profits over quality dental care
would cause the company to be "sued out of existence" and that the "lack of caring" regarding
SDC's lab division "will compromise the business."

To: Jeffrey Sulitzer, DMD
Subject: Re: Case Ced82817361c31 is ready for your review

Jeff,
I get the feeling that the lab runs on a numbers/day/week/month basis without care
for quality.  If they keep this up, there will be no work as the company will be sued
out of existence and we all lose.  I also feel like I might be the only Dr. paying
attention to this?  If so, I'm banging my head against the wall....  I would hate to see
this go down the drain.
I would like to request a meeting with Dan, the lab manager if possible.  Maybe
another voice would be helpful?

9.      But rather than try to remedy SDC's flawed treatment process, the Insiders covered
it up by silencing patients and deceiving the public.  The Insiders implemented a practice of forcing
patients that were harmed by SDC's treatment process to enter into broad non-disclosure
agreements before they could obtain a refund for botched SDC treatments.  These agreements
prohibited patients from talking about the harm they suffered and from filing complaints with
government agencies and industry watchdogs.  The Insiders' use of these agreements eventually
drew the attention of government regulators, and in 2022, the D.C. Attorney General commenced

an investigation and subsequent legal action that culminated in SDC having to release over 17,000 patients from their non-disclosure agreements, issue refunds to patients, and pay a substantial fine.

10.     While the Insiders' silencing tactics and deceit worked at first, over time the truth about SDC's harmful practices eventually began to come to light, triggering a litany of investigations and lawsuits that placed the Company in a perpetual state of legal scrutiny and on a path of financial decline.  In addition to the NDA investigation by the D.C. Attorney General, SDC was also investigated by the New York State Attorney General, numerous state and national dental boards, and an Australian regulatory agency.   SDC's business practices, including their unauthorized practice of dentistry, even drew the attention of Congress, when in 2020, nine members of the House of Representatives directed the FDA and FTC to open investigations into SDC.  SDC was also the subject of nearly a dozen consumer and shareholder class-action suits related to false advertising and misrepresentations.  All the legal actions forced SDC to incur millions of dollars in litigation expenses and attorneys' fees, as well as the lump-sum payments it was forced to make for settlements and adverse judgments.

11.     The Insiders' mismanagement finally came home to roost on September 29, 2023, when SDC and several of its affiliates filed for bankruptcy.   In their first-day bankruptcy filings, the Insiders conceded that "ongoing litigation" was a "key long-term challenge facing the Debtors' business" that had "resulted in substantial costs and a diversion of management's attention and resources, further necessitating the commencement of these chapter 11 cases."   What the Insiders failed to admit is that it was their ongoing perpetuation of flawed and fraudulent business practices, self-dealing, and corporate mismanagement that caused the litigation that brought the Company to its knees.

12.     The Trustee now brings this action against the Insiders and their accomplice directors, officers, and beneficial owners to recover damages on behalf of the Debtors' estates.

## II.      JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because it arises under Chapter 11 of the United States Code (the "Bankruptcy Code") and arises in and relates to cases pending under the Bankruptcy Code.

14.     The Court has personal jurisdiction over each Defendant pursuant to Federal Rule of Bankruptcy Procedure 7004.

15.     The Trustee demands a jury trial before an Article III judge in connection with all claims to which she is entitled to a jury trial under the Constitution and applicable law, and the Trustee does not consent to the entry of final judgment or adjudication by a bankruptcy judge as to jury-triable and non-core claims.

16.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a) because the underlying bankruptcy case is pending in this District, and this adversary proceeding arises in and relates to that case.

## III.     PARTIES

17.     Plaintiff Allison D. Byman was appointed as the Chapter 7 Trustee for the Debtors on January 26, 2024.  *In re SmileDirectclub, Inc. et al.* , Case No. 23-90786 (CML) [Dkt. No. 617].

18.     Debtor SDC was incorporated in Delaware on April 11, 2019, and its headquarters were located in Nashville, Tennessee.  SDC is a holding company whose sole material asset is its equity interest in Debtor SDC Financial LLC ("SDC Financial"), which conducted all of the Debtors' operations (through its direct and indirect subsidiaries).

19.     Debtor SDC Financial is a Delaware limited liability company.  Its headquarters were located in Nashville, Tennessee.  It was the operating company through which all SmileDirectClub activities were conducted.   SDC Financial wholly owns Debtors SmileDirectClub, LLC and Access Dental Labs.  SDC holds 31.7% of the equity and 100% of the management and voting power in SDC Financial, and has the sole authority to make decisions on behalf of SDC Financial and bind it to signed agreements.

20.     Debtor SmileDirectClub, LLC ("SmileDirectClub") is a Tennessee limited liability company.  Its headquarters were located in Antioch, Tennessee.  SmileDirectClub, LLC formerly operated as a teledentristy company that produced 3D-printed clear aligners.

21.     On information and belief, SDC, SDC Financial, and SmileDirectClub were functionally and financially inseparable, and have been since they came into existence.  Their executives, for example, served the same executive roles for each of these entities and they referred to all of these entities collectively as "SDC," including in sworn testimony, without distinguishing between them.

22.     Debtor SmileFarm, LLC (formerly known as Access Dental Labs) is a Tennessee limited liability company.  Its headquarters were located in Nashville, Tennessee.  SmileFarm LLC is a wholly owned subsidiary of SmileDirectClub, and manufactured all of SmileDirectClub's 3D-printed clear aligners.

23.     Debtor Ortho Lab Services, LLC is a Delaware limited liability company.  Ortho Lab Services LLC is a subsidiary of SmileDirectClub.

24.     Debtor CAMF II, LLC is a Delaware limited liability company.  CAMF II LLC is a subsidiary of SmileDirectClub.

25.     Debtor SDC Holding, LLC is a Delaware limited liability company.  SDC Holding LLC is a subsidiary of SmileDirectClub.

26.     Debtor SDC Plane, LLC is a Delaware limited liability company.   Upon information and belief, its sole purpose was to own and maintain the private aircraft purchased from an entity controlled by Defendant David Katzman and used for the Insiders' benefit.

27.     Defendant David Katzman was SDC's CEO and Chairman from the time of its founding in 2014.  He is also the founder and Managing Partner of Defendant Camelot Venture Group.  David Katzman is Defendant Jordan Katzman's father and Defendant Steven Katzman's brother.

28.     Defendant Steven Katzman was SDC's Chief Financial Officer from March 2018 to May 2018, and its Chief Operating Officer and a member of the board starting in May 2018. He is also a Partner and Chief of Staff of Defendant Camelot Venture Group.  Steven Katzman is Defendant David Katzman's brother and the uncle of Defendant Jordan Katzman.

29.     Defendant Jordan Katzman was a co-founder of SDC and became a director of the company in May 2014.  He is Defendant David Katzman's son and Defendant Steven Katzman's nephew.

30.     Defendant Alexander Fenkell was a co-founder of SDC and became a director of the company in May 2014.  In addition to having a longtime business relationship, including founding other direct-to-consumer businesses together, Fenkell and Defendant Jordan Katzman are childhood friends.

31.     Defendant Susan Greenspon Rammelt became SDC's Chief Legal Officer and EVP of Business Affairs on January 1, 2020.  She was previously General Counsel beginning in April 2018, Corporate Secretary since March 2019, and a member of the SDC board of directors since

August 2019.  Greenspon Rammelt has been General Counsel of Defendant Camelot Venture Group since April 2018.  Greenspon Rammelt caused SDC to retain and pay significant fees to the law firm where her husband, David Rammelt, is a partner, Benesch, Freidlander, Coplan & Aronoff LLP.

32.     Defendant Jeffrey Sulitzer served as SDC's Chief Clinical Officer beginning in January 2017.  Sulitzer is a dentist licensed in the state of California, a spokesperson for SDC and, upon information and belief, owned or leased SDC shops in California.  Sulitzer frequently made public appearances in which he propounded the benefits of SDC's dental services and the efficacy of its retainers.

33.     Defendant Camelot Venture Group ("Camelot") is a private investment group and family office owned and managed by Defendants David Katzman (as founder and Managing Partner), Steven Katzman (as Partner and Chief of Staff) and Susan Greenspon Rammelt (as General Counsel).  Its principal place of business is in West Palm Beach, Florida.  Defendants David Katzman, Steven Katzman, and Greenspon Rammelt were Camelot employees and provided management services to SDC pursuant to a management agreement between SDC and Camelot.  Camelot also compensated Jordan Katzman and Fenkell.

34.     As detailed above, Defendants David Katzman, Jordan Katzman, Steven Katzman, Alexander Fenkell, and Greenspon Rammelt served together on the SDC Board of Directors ("Insider Directors").  Defendants David Katzman, Susan Greenspon Rammelt, Jeffery Sulitzer, and Steven Katzman also served as Officers for SDC ("Insider Officers").

## IV.    FACTUAL BACKGROUND

### A.    The Insiders Founded SDC And Controlled It From Its Inception

35.     SDC was founded in 2014 by then 25-year-old childhood friends Jordan Katzman and Fenkell.

36.     From its inception, SDC was controlled by Jordan Katzman's family and their private investment firm, Camelot, which provided the initial funding for SDC.

37.     Upon information and belief, Camelot was SDC's largest shareholder and the managing member of the entity that controlled SDC before its 2019 initial public offering (the "IPO").

38.     Upon information and belief, the Katzmans installed themselves into executive and management positions at SDC through their control of Camelot.  David Katzman served concurrently as SDC's Chief Executive Officer and Chairman of the Board, as well as the founder and managing partner of Camelot.  Steven Katzman, a Camelot principal and advisor, served as SDC's Chief Operating Officer and Chief Financial Officer.  Camelot's General Counsel, Greenspon Rammelt, also served as SDC's Chief Legal Officer and Secretary, and was appointed to SDC's Board in 2019.[2]

39.     Camelot and SDC had a management agreement, dated January 1, 2014 (and as further amended from time to time, the "Management Agreement"), pursuant to which Camelot, through the Insiders and others, provided certain management services to SDC.  These services included "product development," "sales management," "company strategy," "training and development," "project management," the "design development, monitoring and supervision of SDC's advertising and marketing programs and activities," "ongoing financial consulting," and the use of certain of Camelot's shared facilities.  SDC paid Camelot $150,000 per month pursuant to the Camelot Management Agreement.

---

[2]  Rammelt's husband, David Rammelt, was hired as outside legal counsel for SDC and continues to represent the Insiders in various litigation, including SDC's bankruptcy.

40. David Katzman, Steven Katzman, and Greenspon Rammelt remained Camelot employees while simultaneously holding key officer roles and Board positions at SDC. These overlapping roles created a unity of interest and loyalty between SDC and Camelot.

41. The Katzmans maintained control of SDC throughout its existence. In 2019, certain of the Insiders entered into a voting agreement that vested David Katzman with sole voting control over nearly all of the shares held by the Katzman family, Fenkell, and their affiliated trusts and entities—collectively amounting to approximately 90% of the voting power of SDC's outstanding shares. As a result, David Katzman retained de facto and de jure control over the company's corporate affairs, director elections, and strategic decisions throughout SDC's existence as a public company.

**B.    SDC Entered A Highly Regulated Market That Entailed Serious Medical Risks For Consumers**

42. Aligner treatment is an area of orthodontics that uses a series of clear, removable plastic trays called aligners to gradually move and straighten teeth. Treatment occurs over months, and sometimes years, as it requires careful, precise and consistent long-term application of pressure to force a patient's teeth to move through the patient's bone and jaw. Given the risk involved, dentists play a critical role in determining a patient's suitability for aligner treatment and in prescribing and monitoring aligner treatment.

43. When prescribing orthodontic treatment, dentists consider various factors, including but not limited to: jaw health; prior dental treatment; mouth anatomy; whether the patient is missing teeth, has impacted teeth, or has retained baby teeth abnormally; the extent of spacing or crowding of teeth; the degree to which certain teeth have rotated within the dental arch; atypical root anatomies; history of dental trauma; potential issues arising from the surrounding bone and tissue including from oral cancer; and dental pathologies.

44.     Oversight by dentists is also necessary in monitoring treatment progress.  If teeth are moved improperly or too quickly, or if patients have undiagnosed issues (such as cavities or advanced gum disease), serious problems can result from orthodontic treatment. These problems include tooth decay, periodontal disease, decalcification (permanent markings on the patient's teeth), inflammation of the gums, gum recession, root resorption (shrinking of tooth roots), aggravation of bite problems, necrosis of tissue, and even broken or lost teeth.

45.     Given the serious risks involved, aligner treatment is heavily regulated by states to ensure patient safety and to uphold professional standards.  Regulations governing aligner treatment fall under the broader umbrella of rules governing dentistry and orthodontics, which are promulgated by state dental practice acts and enforced by state dental boards.

46.     Regulations vary by jurisdiction but generally require that any dental or orthodontic treatment, including treatment using clear aligners, be supervised by a licensed dentist or orthodontist. This includes reviewing diagnostic records (like X-rays and dental impressions) and providing a treatment plan.

47.     Some states explicitly prohibit the sale or use of aligners unless they have been prescribed and overseen by a state-licensed dentist and some require that an initial in-person clinical examination be conducted before initiating aligner treatment.  Even where remote care is allowed, dentists are generally expected to review sufficient diagnostic materials, such as X-rays and photographs, to make an informed diagnosis and treatment plan.  Many states also mandate that patients be provided with clear, written information about the risks, benefits, and alternatives to aligner treatment.

48.     The dental aligners used in aligner treatment are themselves also regulated.   The U.S. Food and Drug Administration ("FDA") requires that aligners meet specific safety and

performance standards before they can be marketed, including the materials that make up the aligners. The FDA also mandates labeling requirements for aligners, including instructions for use, indications, contraindications, and potential risks. Aligner manufacturers are also required to adhere to post-market surveillance regulations, such as reporting adverse events and maintaining quality control systems, to monitor the ongoing safety and performance of their products.

49.     Federal and state regulations also govern how dental aligner services can be marketed. This includes prohibitions on advertising that implies or suggests that a product is safe or effective without the involvement of a licensed dentist.

## C.     The Insiders Oversaw And Promoted A Treatment Model That Intentionally Excluded Dentists

50.     At the time SDC was founded in 2014, aligner treatment had been steadily gaining popularity for over a decade. Align Technology ("Align") had introduced clear aligners to the market with its "Invisalign" system in 1999 and, by 2014, it had established itself as the dominant player in the aligner space, with over 2.4 million people having used Invisalign. Align's success was built on a dentist-centric model, whereby it marketed and sold Invisalign to dentists for them to use with their patients.

51.     SDC sought to disrupt Align's dominance by selling aligners directly to consumers and streamlining dentist involvement in the treatment process by using a telehealth model to provide consumers with dentist care and oversight. The Insiders promoted SDC as a "middleman, making virtual connections between patients and dentists." They specifically claimed that patients would receive "regular virtual check-ins with your doctor" and that a patient's "assigned doctor will be with you every step of the way." They also asserted that "every customer's aligner treatment plan is reviewed and approved by a state-licensed dentist or orthodontist."

52.     The Insiders' marketing campaign was intended to assure consumers that their dental care would involve individualized attention and oversight by qualified professionals, consistent with the standard of care expected in traditional orthodontic settings.  However, as the recent onslaught of litigations and regulatory investigations have made clear (*see* Section H, *infra*), while this allowed SDC to promote its model to consumers looking for a lower-cost option for dental correction, the Insiders concealed that SDC's treatment model ran far afoul of established orthodontic practices.

53.     Patients would begin their "Smile Journey" by purchasing SDC's aligners from either SDC's website or a chain of retail locations known as "SmileShops." Neither option provided patients with an opportunity to undergo a medical evaluation to determine whether aligner treatment was a clinically suitable option.   Instead, SDC directed them to submit impressions that they took themselves at home, or that were taken at the SmileShops by unlicensed technicians rather than dentists or orthodontists.

54.     Upon information and belief, SDC's patients did not meet with a dentist for an initial evaluation of their dental history and SDC did not obtain or review necessary diagnostic records such as X-rays.  Nor did SDC have a dental professional independently verify a patient's self-reporting of their medical or dental history.  The medical records of SDC's patients were reviewed remotely by an affiliated provider whose identity, credentials, and role were seldom disclosed to the patient.

55.     The lack of dentist involvement and oversight continued through the treatment process for SDC's patients. SDC's patients were unable to speak directly with a dentist about worsening symptoms or unexpected complications, including severe pain, bite changes, or dental damage.  Patient complaints were met with scripted replies or delayed responses from SDC's retail

staff and customer service representatives, who were not licensed to provide dental advice, but were nonetheless left to communicate treatment expectations and respond to medical concerns from patients.

56.     Even when SDC's patients were able to meet with dentists or other affiliated providers that SDC contracted with, the level of care was suboptimal at best.  SDC's affiliated providers were overstretched and unable to provide the necessary level of care.  Upon information and belief, dentists under contract with SDC routinely reviewed 75 to 100 cases per day, spending only seconds on each file.  In one instance, an ELP approved 103,360 treatment plans in a year— an average of 280 per day, *i.e.*, one every 80 seconds.

57.     The financial structure SDC implemented to compensate dentists further exacerbated problems with its treatment model, as it incentivized approvals over caution and volume over safety.  Upon information and belief, SDC paid dentists only if they approved treatment and they were not compensated for disqualifying patients, requesting X-rays, or providing post-treatment care.  According to public reports, SDC paid its affiliated dentists $50 per evaluated case, which is far less compensation than any competent dentist or orthodontist receives for completing a comprehensive examination, and much less for monitoring patient treatment.

58.     The medical protocols underlying SDC's treatment process were also unsound. Upon information and belief, critical aspects of the company's clinical model—such as the pace of tooth movement—were dictated by Steven Katzman, who had no medical training.  Steven Katzman acknowledged that prevailing assumptions within SDC about safe tooth movement "made no sense," were "illogical," and lacked any clinical basis.  Nevertheless, he pressured the Company to push more aggressive movement plans to meet customer expectations and reduce

treatment times, despite known risks of tooth damage.  For example, when a potential SDC patient was rejected for treatment by an ELP, such as for gum disease or a serious cavity, the case would be shifted to a second ELP, and if necessary, a third ELP, until someone approved the patient for treatment.  The second or third ELPs were not advised that a previous doctor had rejected the patients' case or the reasons for the rejection and the patient likewise was never informed of this practice.  Upon information and belief, more than 100,000 customers received second or third opinions pursuant to this highly unsound and unsafe business practice.

> **D.    The Insiders Knowingly Lied To Consumers About The Level Of Dentist Involvement In SDC's Treatment Model**

59.    In national marketing campaigns, public-facing materials, and website content, the Insiders promised SDC's patients they would receive the "same level of care from any treating dentist or orthodontist," and that its orthodontic program was "doctor-prescribed, doctor-directed, and doctor-managed from start to finish."  This was a program that consumers wanted——one that promised medical professional care and oversight to patients undergoing a dangerous procedure—but it was not the model the Insiders implemented and sold to the public, as was later revealed in multiple government investigations.

60.    Founder Jordan Katzman played a central role in directing SDC's deceptive growth strategy.  As one of SDC's co-founders and a key architect of the Company's public image, Katzman helped oversee marketing that included hundreds of millions of dollars of advertisements—many of which turned out to be demonstrably false.  These materials were disseminated via social media, national TV, direct mail, and digital search platforms and systematically misrepresented the level of dental involvement and the safety of SDC's treatment.

61.    Jordan Katzman knowingly approved SDC's false advertising and participated in public appearances where he repeated these misrepresentations despite being fully aware that SDC

lacked the infrastructure, clinical oversight, and regulatory compliance to back up the claims. For example, he falsely stated during a CNBC interview that SDC's dentists were "seeing their patients one-to-one." In reality, SDC's customers were never examined by dentists in person and often never communicated with a dentist at all. This statement, made during one of the company's most critical public-facing events, was designed to reassure consumers and to deflect attention from systemic deficiencies in care.

62.     Co-founder Alex Fenkell was also deeply involved in the company's marketing and public messaging. Fenkell oversaw SDC's mass mailer and promotional campaigns and appeared in national media interviews. Fenkell falsely claimed in another CNBC interview that an FDA investigation into SDC had been "shut down," when in fact it remained open. This falsehood was part of a broader strategy to paint SDC as both clinically sound and regulatorily compliant—when neither was true.

63.     Sulitzer, SDC's Chief Clinical Officer, was also directly complicit. He falsely represented to the public that SDC's "network of state-licensed dentists and orthodontists are with you the entire way," including specifically stating that (i) a U.S. doctor checks in on each customer every 90 days, (ii) that a U.S. doctor prescribes all SDC aligners, and (iii) that SDC customers receive the same quality of care as patients using traditional orthodontists. None of these statements was true.

64.     The Insiders also oversaw and approved the contents of SDC's website, which falsely claimed that each customer would receive "regular virtual check-ins," have their treatment "overseen by a licensed dentist or orthodontist," and be "monitored every step of the way." These statements were critical to the company's image and valuation and were made repeatedly with the Insiders' knowledge and approval. For example, on January 14, 2020, an SDC employee emailed

Sulitzer for his input on changing an answer to a frequently asked question on the website: "Hi Dr. S…We've had some questions about 'bad bites' in SmilePlans and the current approved answer says that our dentists 'would never approve a plan that [would] leave customers with a damaged bite', which isn't always true.  We have seen plenty of plans approved by doctors that leave customers with open bites, which are often shared on Reddit or in the closed Facebook group."  The employee asked for what the new answer should be in order to "respond honestly."  Upon information and belief, the Insiders never corrected or retracted the statements on the website.

65.     David Katzman also consistently asserted—falsely—that SDC had "more than 250 doctors" involved in customer treatment "from start to finish."  Katzman knew that these doctors were not actively engaged in the majority of cases, and that many patients never spoke to or were contacted by any licensed provider.

66.     In a May 2020 investor call, Chief Legal Officer Greenspon Rammelt falsely reassured analysts that new California legislation requiring dentists to review X-rays would have no impact on SDC's model—claiming that SDC doctors already had the option to request X-rays. This was deliberately misleading.  In practice, SDC encouraged minimal diagnostic review and discouraged doctors from requesting X-rays, since they were compensated only for approving treatment and not for disqualifying patients.

### E.     SDC's Business Practices Caused Severe Harm To Thousands Of Patients

67.     The Insiders' decision to excise dentist involvement in the aligner treatment process led to patient dissatisfaction and injury, ultimately harming the Company's ability to obtain new customers and thus its bottom line.

68.     Upon information and belief, thousands of SDC patients suffered adverse outcomes, including gum recession, severe pain, open bites, and misaligned teeth, requiring corrective care from traditional orthodontists or oral surgeons.  Often, this was a result of patients

with active dental disease, severe malocclusion, or other contraindications to orthodontic treatment being inappropriately approved for aligner therapy by SDC.

69.     Despite SDC's efforts to silence its harmed patients with non-disclosure agreements (as discussed in more detail below), thousands of patients filed public grievances, including more than 3,000 complaints with the Better Business Bureau.

70.     Public reports indicate that patients suffered pain, damage, and considerable costs in remedying problems caused by SDC's aligners.  For example, one patient reported that SDC's aligners caused pericoronitis when his teeth shifted, requiring painful surgery and teeth extraction. Another patient reported that SDC's aligners made her teeth worse than before she began SDC's treatment and that she needed dental work that cost $18,000 to correct the issues, after already spending $2,000 on SDC's aligners.  Another patient reported that he only had minor cosmetic issues before using SDC aligners, but ended up with an irregular and painful bite and other dental problems after using SDC's product.

71.     Dissatisfied SDC patients also filed complaints directly with the Food and Drug Administration ("FDA").  Indeed, the Company received over 1,000 reports filed with the FDA's Manufacturer and User Facility Device Experience database (MAUDE), demonstrating repeated patterns of harmful effects from consumer use of the SDC aligners.  In 2021, the Company received over 500 reports of the continued negative results from using the aligners, and in 2022, it received more than 400 reports.  The MAUDE reports identified a concerning trend, indicating that myriad consumers suffered from a wide variety of dental issues including "nerve damage on tooth number 9," "bone loss on front top and bottom teeth," "infection in the lateral tooth number 7," and "allergic reaction in the form of numbness & swelling of the gums & tongue."

72.     Upon information and belief, many SDC patients sought care from licensed orthodontists or surgeons to undo the damage caused by improperly administered aligner therapy, including "root canals," "implants," and "gum graft[s]."  Treating professionals were appalled by what they found and confirmed that these patients would never have been approved for aligners had they received proper diagnostic assessments.

73.     Some of these dentists reported their patients' problems to the FDA.  For example, one orthodontist—who was consulted by an SDC patient—reported to the FDA the following:

> It is my assessment as an orthodontic professional that a medical device is being prescribed to straighten [a patient's] teeth without being under the supervision of a trained dentist/orthodontist. She was charged $2000 [by SDC] for a service that *left her teeth crooked*, the heights of her front teeth are *completely uneven*, the back teeth do not come together properly and *several of those teeth are interfering with each other*, and the supposed 'doctor' diagnosing and assisting with this case *left 2 unerupted permanent teeth under the gumlines* and existing baby teeth . . . .[3]

74.     Another FDA report indicated that a patient treated by SDC "without supervision of a dental professional . . . was done too quickly and resulted in killing the tooth.  This would not have happened if the treatment . . . was overseen by a dental professional.  The issue with [SDC] is evident from this case and many others."

75.     Another FDA report stated that an SDC patient presented to a doctor "front teeth that were *so sore she could not touch them nor have hot or cold food*.  An X-ray disclosed thickened ligaments around front tooth which indicates very high torquing forces to teeth."

76.     Another doctor reported to the FDA that a patient who had used SDC's aligners had contracted "*irreversible pulpitis*," a condition that causes painful inflammation of the innermost part of the tooth and is caused by bacteria that invades the tooth causing it to swell.

---

[3] Ex. 2, MAUDE Adverse Event Report, No. MW5090525 (Oct. 18, 2019) (emphasis added). Maude adverse event reports are publicly available on the FDA's website. *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm.

### F.   The Insiders Ignored The Dangers And Risks Of Their Treatment Model

77.     The Insiders were warned by various sources—internal and external, consumer and medical professional—that SDC's treatment process was flawed, injurious, and illegal.  They knew they had built a company that could not withstand consumer growth without adjustments to their business practices, but they ignored and buried the warnings.

78.     The treatment model the Insiders pushed raised eyebrows among dental professionals.  Jordan Katzman and Fenkell sought input from over 100 licensed oral care practitioners.   Almost unanimously, these experts warned that self-administered dental impressions were inadequate for effective orthodontic treatment.  Despite these warnings, the Insiders pressed forward, convinced of their disruptive potential.

79.     Over time, the warning signs grew louder.  One doctor voiced concern that SDC's patient screenings and subsequent communications failed to inform some patients of serious dental conditions, including cancerous lesions.  Another cautioned Steve Katzman, stating: "I am *very concerned* about where we are – especially given the growth you guys are predicting...*if we don't get a handle on this stuff it will kill us*."

80.     As just one example, an ELP participant warned Sulitzer about the company's focus on immediate profits over quality dental care.  He had the feeling that the "[SDC] lab runs on a numbers/day/week/month basis *without care for quality*."  He warned that "if they keep this up, there will be no work as *the company will be sued out of existence*."  This same team member felt that he was "banging [his] head against the wall," later explaining that he was "*frustrated with the lack of caring . . . in the lab division*."   The ELP participant described that division as "*unresponsive*" to issues that would "*compromise the business*."  Nevertheless, the pursuit of expansion overshadowed these internal warnings.

81.    ELPs also complained that SDC's model prevented them from communicating directly with their patients.  For example, one ELP complained that SmileDirectClub's model prevented the ELP from communicating directly with patients, observing:

> Again, I and I as well as other ELPS have a hard time not being able to communicate with the clients when there is a special circumstance that needs to be qualified.  I would think the "Doctor assisted tele- dentistry" model would that "doctor-assisted".

82.    When SDC conducted a survey asking patients if their aligners improved their smiles, it heard back that in 30 cases, the aligners failed to deliver the promised results.  And instant messaging transcripts between patients and SDC's team highlighted concerns from patients that they were not able to connect with either dentists or orthodontists.  Patients were specifically told by SDC employees that they would not be able to speak with dentists and orthodontists, though they were promised medical professionals would oversee their cases.

83.    In one case, a customer who complained of extreme pain, cut gums, and damage to her teeth and gums begged for help from SDC's team.  In addition to describing how she had "***never been more upset in her life***," the customer cited conversations with her personal dentist where she was "informed that [SDC] aren't dentists or orthodontists" and that her SDC retainer had made "***bone loss in [her] gums***" "***considerably worse***."  She exclaimed in frustration, "you guys are a dental team of no orthodontists."

84.    Further scrutiny came from an independent review that SDC solicited from UCLA orthodontists Dr. Kang Ting and Dr. Jin Hee Kwak.  This review concluded that there were a "***fair number of safety concerns*** raised (particularly on advanced cases) about patients developing issues down the road post-SDC treatment."  In addition to other concerns, the UCLA team's assessment was that SDC had a "***[l]ack of dental expertise***," that the material SDC used for its aligners was "***a major concern***," that there was a "[n]eed [for] standardized and consistent

treatment planning," and that from a "*[l]egal aspect*," SDC "*need[ed] to stay away from difficult cases*."

85.     None of these warnings—nor from multiple government investigations and a plethora of legal actions brought against the Company described herein—deterred the Insiders from pushing forward ever harder with their dangerous business practices.

### G.     SDC Tried To Silence Injured Patients With NDAs

86.     The Insiders realized that the lack of dentist involvement in SDC's treatment model would eventually be exposed as the number of harmed and dissatisfied patients grew.  But rather than address the issues directly, they sought to conceal them from the public.  They did so, in part, through a strategy using broad non-disclosure agreements ("NDAs").

87.     SDC wielded the NDAs to silence dissatisfied—and in some case severely injured—patients by refusing to provide refunds unless the patient executed an NDA.  Patients could receive a cash refund only after signing an NDA, which prohibited them from speaking publicly about their experience, posting reviews of SDC, or filing complaints with government regulators.  In some cases, SDC demanded that customers delete negative social media posts, online reviews, or complaints before they could receive a refund.  The Company even prohibited patients from disclosing the very existence of the NDAs.

88.     The NDAs were forced on patients notwithstanding SDC's much-publicized "Smile Guarantee," pursuant to which patients were promised a refund if SDC's treatment did not meet their expectations.   However, SDC limited the "Smile Guarantee" to patients that sought a refund within 30 days after receiving their aligners.  After the 30 days expired, patients had to sign an NDA to receive a refund.

89.     SDC expended substantial legal and corporate resources to draft, enforce, and litigate the NDAs—including by attacking patients who violated them.  Despite its awareness of

these tactics, the Insiders continued to falsely market the company as committed to transparency, consumer satisfaction, and safe outcomes.

90.     In 2020, the *New York Times* published an investigate report exposing SDC's practice of using NDAs to silence patients.  The article described how SDC systematically required dissatisfied patients to sign NDAs as a condition of receiving refunds.  As a result, the article explained, patients were prohibited from publicly discussing their negative experiences— including concerns related to pain, improper treatment outcomes, and the lack of dentist involvement—effectively preventing the public from learning about the risks associated with SDC's treatment model.  SDC's then-chief legal officer, Greenspon Rammelt, attempted to downplay the significance of SDC's misconduct by misleadingly describing the NDAs as "negotiable" and characterizing criticism of SDC's practices as a "misinformation campaign."

91.     The *New York Times* report also revealed that SDC aggressively pursued legal action against critics and regulators in an apparent effort to suppress the dangers posed to patients. This included suing a media outlet for publishing consumer warnings and initiating litigation against state dental boards that questioned the Company's clinical practices.

92.     Eventually, mounting public pressure and regulatory scrutiny forced SDC to cease its use of NDAs to gag patients.  In December 2022, the Office of the Attorney General for the District of Columbia ("OAG") filed suit against SDC, alleging that its use of NDAs to silence injured customers violated local consumer protection laws.  The complaint stated that SDC used NDAs to block consumers from posting reviews or filing complaints, thereby concealing critical safety information and misleading the public.  According to the OAG, consumers who suffered more serious injuries were even prohibited from notifying law enforcement or filing regulatory complaints unless they forfeited their refund.

93.     To resolve the OAG's complaint, SDC had to release over 17,000 consumers from their NDAs, change its refund practices, and pay a fine of $500,000.  These costs to the Company—both reputational and financial—were borne as a result of the Insiders' actions.  SDC also incurred substantial legal fees defending against the OAG investigation and other regulatory actions, all of which could have been avoided had the company honored its own refund guarantees and complied with consumer protection laws.

94.     Moreover, without the ability to gag patients, the Insiders were no longer able to keep the full truth about SDC's harmful and illegal treatment model hidden from the public.  Over the ensuing months, SDC's business declined dramatically as would-be patients learned that SDC's promises of oversight by dental professionals had become, at best, severely exaggerated.

### H.     The Insiders' Actions Exposed SDC To Perpetual Litigation

95.     Aside from the scandal and damage caused by the Insiders' use of the NDAs, the Insiders' perpetuation of SDC's injurious treatment program led to a barrage of lawsuits, investigation, and regulatory and administrative proceedings in the United States and abroad.  These legal actions were brought from various stakeholders and government bodies, including consumers, regulatory agencies, state dental boards, dentist associations, shareholders, and SDC's competitors.

96.     The legal actions required SDC to incur millions of dollars in litigation expenses and to pay various fines and settlements.  They also took an enormous reputational toll on the Company, impacting consumers' opinions of the Company and damaging its operating and financial performance.

97.     As with the numerous warnings and concerns raised by dentists and consumers, the perpetual legal actions and investigations in which the Insiders entangled SDC should have alerted them to the danger of the business practices they had implemented and promoted.  But as with the

other warnings raised by doctors and patients, the Insiders failed to implement changes that would put SDC's business back on course.

### I.  Regulatory Actions and Government Investigations

98.    SDC was subject to at least 40 claims brought by state dental boards and other dental practice organizations alleging that it illegally operated as a dentist without proper licensing or regulatory compliance.  These included claims filed by the Dental Board of California, the New Jersey Dental Board, the Board of Dental Examiners of Alabama, the Georgia Board of Dentistry, and state affiliates of the American Dental Association and the American Association of Orthodontists.

99.    For example, the American Dental Association ("ADA") filed a citizen's petition with the U.S. Food & Drug Administration ("FDA") complaining that SDC's practices did not comply with the FDA's prescription requirement for plastic teeth aligners and posed other potential dangers to public health and safety.  The FDA notified the ADA it does not initiate enforcement actions on behalf of petitioners, but promised to "evaluate this matter to determine what follow-up action is appropriate."

100.    The ADA later sent a complaint letter to the Federal Trade Commission ("FTC") concerning SDC's unfair and deceptive practices.  Among other things, the ADA complaint referenced SDC representations to consumers that they would have recourse against SDC via arbitration—while also requiring customers to waive any and all rights against SDC.  The ADA also criticized SDC representations to customers that SDC aligners would correct their overbite, underbite, and crossbite conditions or "extreme" malocclusion—in contrast to other SDC representations that SDC aligners could not treat bite conditions at all and could only treat mild to moderate teeth misalignment, not "extreme" misalignment.  The complaint further detailed SDC's

misleading claims that customers received the same level of dental care as actual dental patients, when in fact SDC and its "affiliated dentists" provided virtually no care.

101.     Subsequently, nine members of the U.S. House of Representatives called on the FDA and FTC to investigate SDC "to ensure that it is not misleading consumers or causing patient harm."[4]

102.     Although the FDA and FTC never officially announced an investigation into SDC, regulatory pressure and investigations continued via state AGs and numerous state dental board proceedings.

103.     In Alabama, the Board of Dental Examiners sent SDC a cease-and-desist letter, stating that SDC engaged in the unlawful practice of dentistry by taking digital images of patients' teeth without a supervising dentist present.

104.     In Georgia, the Board of Dentistry enacted Subparagraph (aa) to Rule 150-9-.02, restricting who can perform digital scans for orthodontic appliances, requiring that digital scans be performed under the "direct supervision" of a licensed dentist or orthodontist, effectively limiting the practice to expanded-duty dental assistants or licensed professionals.  The Georgia board then investigated SDC for its non-compliance due to a lack of dental oversight.

105.     In California, the Dental Board of California began investigating SDC for inadequate dental oversight and attempts to bypass state dentistry regulations, particularly as it related to X-ray oversight.  This investigation included raids on SDC properties.  Instead of complying with the California rules, SDC launched an ill-advised counteroffensive, spending heavily on lobbying and public relations.

---

[4] *See* https://www.classaction.org/media/smiledirectclub-fda-ftc-letter.pdf

106.     As discussed above, the D.C. Attorney General filed suit against SDC in December 2022 for its use of NDAs to silence dissatisfied patients.  To resolve the suit, SDC was required to stop using the NDAs, release more than 17,000 customers from their existing obligations under the NDAs, change its refund policy to provide refunds without forcing customers into NDAs, and pay a $500,000 fine.

107.     SDC was also investigated by the Australian Competition and Consumer Commission ("ACCC").   On July 12, 2021, the ACCC commenced an action against SmileDirectClub, LLC and its Australian affiliate, SmileDirectClub Aus Pty Ltd, for making false claims about insurance coverage for their aligners and violating Australian Consumer Law.  The Australian court ruled against SDC, ordering it to pay $3.5 million in penalties, and compensate affected customers, issue corrective notices, implement a multi-year compliance program, and pay the ACCC legal costs.

108.     Soon after SDC filed for bankruptcy, in December 2023, the New York Attorney General issued a formal cease-and-desist letter to SDC for charging patients for undeliverable services in violation of New York State's unfair and deceptive practices and false advertising acts. SDC paid $4.8 million to more than 28,000 affected consumers worldwide to settle the action.

**J.      Consumer and Shareholder Class-Actions**

109.     SDC also faced a number of consumer and shareholder class-action lawsuits alleging that SDC was engaged in the unauthorized practice of dentistry.  For example, on December 3, 2021, a class action suit (*Navarro v. SmileDirectClub, Inc.*, No. 21-cv-003537 (Alameda Cnty., Cal.)) was filed against SDC, SmileDirectClub, LLC, and Sulitzer in California claiming that they engaged in the unauthorized practice of dentistry by providing dental services without a licensed dentist's care, supervision, and oversight.  Arbitration in this matter was stayed pending the completion of SDC's bankruptcy case.

29

110.    The Insiders' false advertising practices also led to lawsuits.  For example, in September 2019, a group of dentists filed a class-action suit against SDC asserting consumer protection and Lanham Act claims.  *See Ciccio, et al. v. SmileDirectClub, LLC*, No. 3:19-cv-00845 (M.D. Tenn. Sept. 24, 2019).  The dentists alleged that SDC misrepresented the extent of dentist involvement in the teledentistry model and also misrepresented the efficacy of SDC's aligner treatment.  The case was never decided on the merits, and although a class was never certified, SDC incurred millions of dollars in legal fees defending the action.

111.    SDC and SmileDirectClub, LLC have also faced three class-action lawsuits alleging violations of the Telephone Consumer Protection Act ("TCPA") and other state telemarketing laws resulting from the aggressive sales practices the Insiders caused or allowed SDC to pursue, even to patients for whom they were not well-suited.  For example, in Illinois, a putative class action was filed on December 14, 2020, against SDC seeking injunctive relief, statutory damages, and attorneys' fees for TCPA violations.  *See Benbow et al. v. SmileDirectClub, Inc. et al.*, No. 2020 CH 07269 (Ill. 2020).  SDC paid approximately $4 million to settle the action. In Florida, SDC paid $2.95 million in November 2022 to resolve class action allegations that it violated Florida telemarketing laws with unsolicited text messages.  *See Borges, et al. v. SmileDirectClub, LLC*, No. 162151576 (Fla. Sup. Ct., Orange Cty.).

### K.    The Insiders' Actions Harmed SDC And Led To Steadily Declining Revenues

112.    The Insiders exposed the Debtors to significant liabilities based on, among other things, the violations of consumer and medical regulations they imposed on SDC.  This dangerous mismanagement, as well as the Insiders' ultimately failed and destructive efforts to hide it from anyone not in on the scheme, resulted in a precipitous drop-off in customer demand for the Company's products and hundreds of millions of dollars in litigation claims and millions of dollars in legal and lobbyist fees, insolvency, and eventually the Debtors' bankruptcy petitions.

113.    Notwithstanding the massive increase in the use of telemedicine during the COVID-19 pandemic, [5] SDC's revenues steadily declined.    Between 2019 and 2022, the Company's net revenues fell every single year from approximately $706 million in 2019 to $436 million in 2022.  In 2022 alone, revenues decreased 26%, driven by decreased aligner shipments— the Company's core business.

114.    As the Insiders knew, the Company was on track for insolvency.  SDC's cash flow deteriorated throughout its life as a publicly-traded company, falling from approximately $750 million in 2019 to approximately $471 million by 2022.  In that same time, liabilities consistently increased; by the end of 2022 SDC's long-term debt had ballooned from $173 million in 2019 to more than $849 million in 2022.  In the four-year timespan between its IPO and filing for bankruptcy, SDC had only one quarter where it achieved positive year-to-date adjusted EBITDA. SDC's stock price similarly plummeted during this time period, falling 97% from its IPO offer price of $23 per share to around $0.42 when it filed for bankruptcy.

115.    By May 2023, it had become clear to outside observers that the liquidity crisis caused by the Insiders' dangerous mismanagement had put the company on the brink of collapse. One analyst wrote: "[w]e expect the company will run out of cash sometime in 2024 if it does not achieve a consistent level of free cash flow."

116.    Seeing the writing on the wall, the Insiders took action to protect themselves at the expense of the Company and its creditors.  On June 1, 2023, controlling stockholder, CEO, and Board Chair David Katzman caused SDC to amend its certificate of incorporation to exculpate

---

[5] *See, e.g.*, Julia Shaver, M.D., "The State of Telehealth Before and After the COVID-19 Pandemic," *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC9035352/ ("Telemedicine, or receiving one's medical care remotely via synchronous, asynchronous, or store-and-forward technology, had been on a steady increase for the last decade, but the overall growth had remained slow until March 6, 2020.  In response to the SARS-CoV-2 pandemic crisis, the US Congress toppled a multitude of telemedicine regulations, and telemedicine expanded rapidly.").

officers from breaches of their duty of care. The amendment conferred no value to the Debtors, as its sole purpose and effect was to insulate the Insiders from liability. That amendment was effective as of July 1, 2023, before which date officers remained personally liable for breaches of their duty of care.

### L.   The Insiders Attempted To Escape Liability In Bankruptcy

117.   On September 29, 2023 (the "Petition Date"), SDC and several of its affiliated entities each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "Chapter 11 Cases"). The Debtors reported approximately $890.6 million in funded debt as of the Petition Date and total liabilities that exceeded $1 billion.

118.   In the declaration filed by SDC's CFO, Troy Crawford, in support of the Debtors' petitions (the "First Day Declaration"), the Debtors acknowledged that SDC's performance had been in sharp decline for several years and that the Company's "losses were driven in large part by the Company's steadily declining revenue following the pandemic." In particular, the Debtors stated that the Insiders' litigation campaign had "resulted in substantial costs and a diversion of management's attention and resources," necessitating the bankruptcy petitions. They also noted that "SmileDirect is subject to various shareholder class actions related to its IPO, other non-shareholder class actions, false advertising litigation, and securities litigation" all of which created "long-term challenges" with managing the company's liabilities.

119.   The Insiders' attempts to cover up and avoid responsibility for their actions continued in bankruptcy. On October 30, 2023, the Debtors filed their proposed plan of reorganization. That plan gave the Debtors' DIP lenders—all of whom are, are controlled by, or operate for the benefit of the Insiders—a right to approve any proposed bid. In other words, even in the bankruptcy proceedings to which they subjected the Debtors, the Insiders continued to rule with an iron grip and to prioritize their own interests.

120.     The Insiders further attempted to ensure their own protection in the proposed plan of reorganization, by including an exculpation provision protecting them from liability (as officers and directors of the Debtors and as DIP agent and lenders).

121.     On November 2, 2023, the official committee of unsecured creditors and Align filed objections to the proposed final DIP order, which they rightfully pointed out was designed to impede investigation into the Insiders' wrongdoing.  Align specifically noted that the facility was an attempt to escape potentially hundreds of millions of dollars of liability for just $20 million of guaranteed new money.

122.     The Debtors ceased operations on December 8, 2023.

123.     Throughout the chapter 11 process, the Insiders attempted to portray themselves as white knights, the only willing lenders "of last resort."   In fact, their purported attempts to save the company were a Trojan horse through which the Insiders sought to turn the Chapter 11 Cases to their sole advantage.  After the Debtors' "marketing process" failed to generate any third-party bidders for the Debtors' equity, on December 20, 2023, the Debtors proposed to allow the Chapter 11 DIP Lenders to purchase the company using their Chapter 11 DIP Loan as a credit bid and to release the Insiders from any personal liability to the estates, while leaving the estates unable to pay administrative expense claims in full.  The bid would have allowed the Insiders to repurchase the company for themselves for a total of just $32.65 million to $35.65 million (and just a few million dollars in new money after rolling over the existing $28 million in DIP obligations)—free of liability for their myriad breaches of duty and other wrongdoing that caused hundreds of millions of dollars of damages to the Debtors.  And while the bid purported to provide for a creditor trust, that trustee would be limited to pursuing only certain claims against just a few individual Insiders—and only up to the limits of existing insurance (a maximum of $24 million).  In other

words, no Insider would face *any* personal liability for running the company into the ground while obtaining hundreds of millions of dollars of benefits for themselves.

124.    On January 10, 2024, the U.S. Trustee filed an objection to the proposal, asserting that it would "result in a secured creditor being permitted to use the bankruptcy process for its benefit without any benefit to creditors and without ensuring that all the legitimate costs associated with the bankruptcy process are paid."

125.    Multiple creditors also objected to the proposal, contending that the sole result of the proposed settlement and credit bid would be to shield the Debtors' insiders from liability in spite of the fact that pursuing estate claims would likely provide a more significant recovery to creditors.

126.    The Court agreed, and on January 26, 2024, the Debtors' chapter 11 cases were converted to chapter 7 cases.

127.    In its decision to convert the case, the Court described the chapter 11 proposal as going "too far," finding that "the releases and exculpations provided [to former directors, officers, and related parties] are too broad."

128.    The Trustee was appointed on January 26, 2024, to oversee the Debtors' bankruptcy after it was converted to Chapter 7.  This was the first time someone other than the Insiders had control or visibility into SDC's business, and the first point at which the scope and degree of the Insiders' breach of fiduciary duties and misrepresentations, as well as the coordination of the Insiders' efforts to wring the company dry through self-dealing transactions, could be discovered.

129.     Following conversion, the Trustee and her counsel investigated potential claims and causes of action against the Insiders, ultimately leading to the filing of this Complaint.[6]

130.     Surprisingly, despite SDC's bankruptcy, the Trustee has learned as part of her investigation that the Insiders have started a new business venture involving orthodontic aligners called Smileset.

### M.     The Insiders Systematically Looted SDC's Assets And Managed The Company For Their Own Personal Benefit

131.     In addition to destroying the Company's business through fraudulent and dangerous business practices, the Insiders also exploited SDC for their personal benefit.  The Insiders had received approximately $513 million in cash proceeds from SDC's IPO in 2019, but unsatisfied, they engineered and approved a number of self-interested, fraudulent, and conflicted transactions in the four years that followed until the Company's bankruptcy.

#### 1.     The Insiders Caused SDC To Enter Conflicted Transactions With Camelot For Their Personal Benefit

132.     The Insiders used their overlapping roles at SDC and Camelot to enter into personally lucrative related-party transactions that provided no benefit to SDC.

133.     David Katzman served concurrently as SDC's Chief Executive Officer and Chairman of the Board, as well as the founder and managing partner of Camelot.  Steven Katzman, a Camelot principal and advisor, also served as SDC's Chief Operating Officer and Chief Financial Officer.  Camelot's General Counsel, Greenspon Rammelt, also served as SDC's Chief Legal Officer and Secretary, and was appointed to SDC's Board in 2019.

---

[6]  Prior to filing this Complaint, the Trustee and the Defendants entered into a tolling agreement on September 26, 2025 (the "Tolling Agreement"), to toll the statutes of limitations applicable to the Trustee's claims for seven days.  On October 3 and October 8, 2025, the parties entered a supplemental tolling agreement and second supplemental tolling agreement, respectively, to extend the effectiveness of the Tolling Agreement through October 10, 2025.

134.    David Katzman, Steven Katzman, and Greenspon Rammelt remained Camelot employees while simultaneously holding key officer roles and Board positions at SDC and providing managerial services to SDC under the Camelot Management Agreement.   These overlapping roles created a unity of interest and loyalty between SDC and Camelot, which David Katzman and his family also controlled.

135.    Upon information and belief, SDC paid Camelot millions of dollars under the Camelot Management Agreement for managerial services provided by David Katzman, Steven Katzman, Greenspon Rammelt, and others.

136.    Upon information and belief, SDC also reimbursed Camelot for 401(k) contributions made to Insiders' retirement accounts.

137.    For several years the Insiders caused SDC to lease a private plane (for the Insiders' use) from Camelot SI Leasing, LLC, a subsidiary of Camelot wholly controlled by David Katzman. In 2018 alone, SDC paid approximately $1 million for that lease.  In February 2020, the Insiders caused SDC to purchase the plane from Camelot SI Leasing, LLC for $3.4 million.   David Katzman stood on both sides of that transaction and was SDC's controlling stockholder, but did not take proper measures to ensure the fairness of the transaction, which inured directly to his benefit (nor did any other Insider).

### 2.    *The Insiders Wasted SDC Assets To Pay Themselves Lavish Bonuses and Fringe Benefits*

138.    Despite SDC's worsening financial condition, the Insiders consistently awarded themselves massive bonuses, stock awards, and various perks and fringe benefits.  David Katzman alone received over $20.9 million between 2018 and 2022, including the personal use of a corporate aircraft, transportation and living expenses for commuting to SDC's Nashville headquarters, tax gross-ups, and millions in equity awards.  Steven Katzman received more than

$23.7 million over the same period.  Other Insiders, including Greenspon Rammelt and Fenkell, also received millions in total compensation and fringe benefits.

139.    The compensation packages the Insiders received were unmoored from performance and imposed without any good-faith process, as the Insiders failed to establish a fully independent committee to review or approve executive compensation.

140.    The fraudulent payouts the Insiders received for nowhere near reasonably equivalent value occurred even as the company was continuing to incur mounting losses, laying off staff, and bleeding value.  Indeed, as it became increasingly apparent that the Insiders' actions had rendered SDC insolvent and beyond recovery, the Insiders moved to transfer SDC's remaining capital to themselves or other companies they controlled.

141.    In 2021, SDC transferred to David Katzman the sum of $4,999,993 in stock awards and $444,624 in other compensation, including housing, corporate plane usage, consulting fees, and tax gross-ups in connection with these fringe benefits.  In 2022, SDC transferred to David Katzman the sum of $4,999,999 in stock awards and $205,113 in other compensation, including housing, corporate plane usage, consulting fees, and tax gross-ups.

142.    In 2021, SDC transferred to Defendant Steven Katzman the sum of $5,240,963 in stock awards and $132,255 in other compensation, including housing, corporate plane usage, consulting fees, and tax gross-ups.  In 2022, SDC transferred to Steven Katzman the sum of $5,999,998 in stock awards, $121,200 in non-equity incentive plan compensation, and $393,431 in other compensation, including housing, corporate plane usage, consulting fees, and tax gross-ups.

143.    In 2021, SDC transferred to Greenspon Rammelt the sum of $2,499,997 in stock awards and $132,907 in other compensation, including housing, corporate plane usage, consulting

fees, and tax gross-ups. In 2022, SDC transferred to Greenspon Rammelt the sum of $4,999,998 in stock awards, $139,020 in non-equity incentive plan compensation, and $350,000 in other compensation, including housing, corporate plane usage, consulting fees, and tax gross-ups.

144.    In 2022, SDC transferred to Jordan Katzman the sum of $1,000,000 in stock awards.

145.    In 2022, SDC transferred to Fenkell the sum of $1,000,000 in stock awards.

<h3 style="text-align:center">CLAIMS FOR RELIEF</h3>

<h3 style="text-align:center">COUNT ONE<br>Breach Of Fiduciary Duty<br>(Against The Insider Directors)</h3>

146.    The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

147.    As Directors of SDC, the Insider Directors owed the Debtors fiduciary duties of loyalty and due care, including oversight and good faith.  These duties extended, upon insolvency, to SDC's creditors as residual owners of the company.

148.    These duties required the Insider Directors to act in the best interests of the Debtors, to refrain from knowingly causing the Debtors to violate law or adopt unsafe business practices, and to respond in good faith to warning signs.

149.    The Debtors' mission-critical function was the safe and lawful delivery and marketing of orthodontic aligner treatment—a heavily regulated medical service that, by law and standard of care, requires evaluation, diagnostics, and ongoing oversight by licensed dentists and orthodontists.

150.    The Insider Directors knew that over time SDC came to intentionally excise dentist involvement and diagnostics: patients self-administered impressions; no in-person screenings

occurred; X-rays and other diagnostics were not obtained or reviewed; affiliated dentists were paid only if they approved treatment; and patients had little to no post-initiation access to a dentist.

151.   The Insider Directors were repeatedly confronted with specific, credible warning signs demonstrating that SDC's model was clinically unsafe and unlawfully marketed, including, without limitation:

- Near-unanimous warnings from approximately 100 licensed oral-care practitioners that self-impressions without proper professional supervision were not a viable or safe orthodontic pathway;

- An independent UCLA orthodontic review the Insiders solicited, identifying a "[l]ack of dental expertise," "major" material concerns with SDC's aligners, a "[n]eed [for] standardized and consistent treatment planning," and safety risks "particularly on advanced cases";

- Internal ELP complaints that (i) SDC's screening/follow-up risked missing serious conditions (including cancerous lesions); (ii) the lab "runs on a numbers/day/week/month basis without care for quality"; (iii) prioritizing immediate profits over care would get SDC "sued out of existence"; and (iv) the model prevented doctor–patient communication;

- Thousands of consumer complaints (including over 3,000 BBB complaints) and over 1,000 MAUDE adverse event reports to the FDA describing tooth loss, root/bone damage, pulpitis, infections, severe pain, and misaligned bites requiring surgeries, implants, grafts, and other corrective treatment;

- Regulatory investigations, dental board actions, and government enforcement actions (including but not limited to the D.C. OAG's action that forced SDC to

release over 17,000 consumers from gag NDAs and pay penalties; investigations, raids and rulemaking by dental boards; and inquiries spurred by members of Congress); and

- Internal risk and compliance objections—flagging violations of law, code-of-ethics issues, and deficient controls that senior management signed off on.

152.     Each of the Insider Directors —David Katzman, Steven Katzman, Jordan Katzman, Alexander Fenkell, and Susan Greenspon Rammelt—had actual knowledge of the foregoing warning signs and risks by virtue of their roles, receipt of board and management materials, participation in meetings where such issues were discussed, direct warnings from internal clinicians and ELPs, external expert assessments (including the UCLA review), consumer and FDA adverse-event data, and ongoing regulatory and litigation developments; yet each consciously failed to take remedial action and instead approved, implemented, or perpetuated the challenged conduct.

153.     The Insider Directors sustained inaction in the face of their known duty to act constitutes bad-faith conduct, a breach of the duty of care, a breach of the duty of loyalty, and a breach of the duty of oversight.

154.     The Insider Directors' actions were the direct and proximate cause of damages to the Debtors and their estates, including the destruction of their enterprise value, the deepening of their insolvency, regulatory penalties, defense and investigation costs, settlements and judgments, reputational damage, the loss of customers and revenue and, ultimately, bankruptcy.

**COUNT TWO**
**Breach Of Fiduciary Duty**
**(Against The Insider Officers)**

40

155.    The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth here.

156.    As Officers of SDC, the Insider Officers were entrusted by the Board of Directors with overseeing SDC's operations, financial health, and team of executives.  As such, the Insider Officers owed the Debtors fiduciary duties of loyalty and due care, including oversight and good faith.  These duties extended, upon insolvency, to SDC's creditors as residual owners of the company.

157.    Those duties required the Insider Officers to act in the best interests of the Debtors, to refrain from knowingly causing the Debtors to violate law or adopt unsafe business practices, and to respond in good faith to warning signs.

158.    The Debtors' mission-critical function was the safe and lawful delivery and marketing of orthodontic aligner treatment—a heavily regulated medical service that, by law and standard of care, requires evaluation, diagnostics, and ongoing oversight by licensed dentists and orthodontists.

159.    The Insider Officers knew that over time SDC came to intentionally excise dentist involvement and diagnostics: patients self-administered impressions; no in-person screenings occurred; X-rays and other diagnostics were not obtained or reviewed; affiliated dentists were paid only if they approved treatment; and patients had little to no post-initiation access to a dentist.

160.    The Insider Officers were repeatedly confronted with specific, credible warning signs demonstrating that SDC's model was clinically unsafe and unlawfully marketed, including, without limitation:

- Near-unanimous warnings from approximately 100 licensed oral-care practitioners that self-impressions without proper professional supervision were not a viable or safe orthodontic pathway;

- An independent UCLA orthodontic review the Insiders solicited, identifying a "[l]ack of dental expertise," "major" material concerns with SDC's aligners, a "[n]eed [for] standardized and consistent treatment planning," and safety risks "particularly on advanced cases";

- Internal ELP complaints that (i) SDC's screening/follow-up risked missing serious conditions (including cancerous lesions); (ii) the lab "runs on a numbers/day/week/month basis without care for quality"; (iii) prioritizing immediate profits over care would get SDC "sued out of existence"; and (iv) the model prevented doctor–patient communication;

- Thousands of consumer complaints (including over 3,000 BBB complaints) and over 1,000 MAUDE adverse event reports to FDA describing tooth loss, root/bone damage, pulpitis, infections, severe pain, and misaligned bites requiring surgeries, implants, grafts, and other corrective treatment;

- Regulatory investigations, dental board actions, and government enforcement actions (including but not limited to the D.C. OAG's action that forced SDC to release over 17,000 consumers from gag NDAs and pay penalties; investigations, raids and rulemaking by dental boards; and inquiries spurred by members of Congress); and

- Internal risk and compliance objections—flagging violations of law, code-of-ethics issues, and deficient controls that senior management signed off on.

161.    Each of the Insider Officers — David Katzman, Steven Katzman, Jeffery Sulitzer, and Susan Greenspon Rammelt— had actual knowledge of the foregoing warning signs and risks by virtue of their roles, receipt of management materials, participation in meetings where such issues were discussed, direct warnings from internal clinicians and ELPs, external expert assessments (including the UCLA review), consumer and FDA adverse-event data, and ongoing regulatory and litigation developments; yet each consciously failed to take remedial action and instead approved, implemented, or perpetuated the challenged conduct.

162.    The Insider Officers' sustained inaction in the face of the known duty to act constitutes bad-faith conduct, a breach of the duty of care, a breach of the duty of loyalty, and a breach of the duty of oversight.

163.    The Insider Officers' actions were the direct and proximate cause of damages to the Debtors and their estates, including the destruction of their enterprise value, the deepening of their insolvency, regulatory penalties, defense and investigation costs, settlements and judgments, reputational damage, the loss of customers and revenue and, ultimately, bankruptcy.

## COUNT THREE
### Aiding And Abetting Breaches Of Fiduciary Duties
### (Against Camelot)

164.    The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

165.    At all relevant times, Camelot was owned and managed by Insiders David Katzman (founder and Managing Partner), Steven Katzman (Partner and Chief of Staff), and Susan Greenspon Rammelt (General Counsel).

166.    Through its ownership of SDC, its Management Agreement with SDC, and the overlapping roles of its principals as SDC directors and officers, Camelot was intimately involved

in the design, oversight, and execution of SDC's treatment model, marketing campaigns, and corporate governance.

167.    As alleged above, the Insiders breached their fiduciary duties of loyalty, good faith, and oversight.

168.    Camelot knowingly participated in, facilitated, and substantially assisted these breaches.  In particular:

- Camelot negotiated and operated under a lucrative "Management Agreement" pursuant to which it directed product development, strategy, sales management, and, critically, "the design development, monitoring, and supervision of SDC's advertising and marketing programs and activities"—the very advertising that misrepresented the role of dentists and concealed risk indicators;

- Camelot installed and maintained its own principals and management (David Katzman, Steven Katzman, and Greenspon Rammelt) in senior executive and board positions, ensuring alignment between Camelot's financial interests and the fiduciary misconduct alleged;

- Camelot directly benefitted from related-party transactions and insider compensation schemes, including millions of dollars in monthly management fees, reimbursement of retirement contributions, and insider use and eventual sale to SDC of a private aircraft;

- Camelot employees continued to function in dual roles at SDC, blurring the line between fiduciary duty to SDC and Camelot's own pecuniary interests, thereby reinforcing and supporting the Insiders' breaches.

44

169.    Camelot knew of the warning signs confronting SDC because its principals and employees were the very individuals who received the warnings, reviewed board and management materials, directed advertising content, and handled regulatory inquiries.  But Camelot nonetheless took steps to reinforce and perpetuate the Insiders' misconduct for Camelot's own financial benefit.

170.    Camelot's substantial assistance was a but-for cause of the Insiders' breaches, as Camelot's management role, control of advertising, and provision of personnel enabled and amplified the fiduciary misconduct.

171.    As a direct and proximate result of Camelot's aiding and abetting of the Insiders' breaches, the Debtors suffered massive harm, including regulatory penalties, litigation costs, settlements, reputational damage, revenue decline, and ultimate bankruptcy.

### COUNT FOUR
**Avoidance Of Preferential Transfers To Insiders Under 11 U.S.C. § 547**
**(Against The Insiders)**

172.    The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

173.    The Insiders and Camelot were insiders of the Debtors under the Bankruptcy Code.

174.    Within one year of the Petition Date, the Debtors made the following payments to the Insiders (the "Preferential Transfers"):[7]

---

[7]  The Trustee obtained information about the types and amounts of the Preferential Transfers set forth herein from SDC's public SEC filings, which were signed by David Katzman, Steven Katzman, Jordan Katzman, Alexander Fenkell, and Susan Greenspon Rammelt, among others. *See* https://www.sec.gov/Archives/edgar/data/1775625/000104746919004785/a2239489zs-1.htm

The public filings do not indicate any additional information regarding the Preferential Transfers, including the dates of the transfers or the account numbers of the transfer recipients.  The Trustee investigated SDC's books and records for additional information, but the bank statements that these transfers were likely included in were notably missing from SDC's books and records.

| Recipient | Transaction Type | Title of Recipient | Amount | Year |
|---|---|---|---|---|
| Alexander Fenkell | Stock awards | Director | $1,000,000 | 2022 |
| David Katzman | Stock awards | Chief Executive Officer | $5,000,000 | 2022 |
| David Katzman | Non-salary compensation for personal use of the SmileDirectClub corporate-owned aircraft or other non-commercial aircraft accessed through a lease or time-share arrangement | Chief Executive Officer | $205,113 | 2022 |
| Jordan Katzman | Stock awards | Director | $1,000,000 | 2022 |
| Steven Katzman | Non-equity Incentive Plan compensation | Chief Operating Officer | $121,200 | 2022 |
| Steven Katzman | Living costs for corporate housing near SmileDirectClub's principal executive office in Nashville | Chief Operating Officer | $28,644 | 2022 |
| Steven Katzman | Tax reimbursement for living costs for corporate housing near SmileDirectClub's principal executive office in Nashville | Chief Operating Officer | $44,131 | 2022 |
| Steven Katzman | Payments under SmileDirectClub's 2022 retention program | Chief Operating Officer | $300,000 | 2022 |
| Steven Katzman | Stock Awards | Chief Operating Officer | $5,999,998 | 2022 |
| Susan Greenspon Rammelt | Payments under SmileDirectClub's 2022 retention program | Chief Legal Officer, EVP Business Affairs and Secretary | $350,000 | 2022 |

| Recipient | Transaction Type | Title of Recipient | Amount | Year |
|-----------|------------------|--------------------|--------|------|
| Susan Greenspon Rammelt | Non-Equity Incentive Plan Compensation | Chief Legal Officer, EVP Business Affairs and Secretary | $139,020 | 2022 |
| Susan Greenspon Rammelt | Stock Awards | Chief Legal Officer, EVP Business Affairs and Secretary | $4,999,998 | 2022 |

175.    These transfers were made on account of antecedent debt.

176.    The Debtors were insolvent when each transfer was made.

177.    Each transfer enabled the recipient thereof to receive more than he, she, or it would have received if the transfers had not been made and if the recipient received payment for a respective debt to the extent provided by the Bankruptcy Code.

178.    Each transfer constitutes an avoidable preference pursuant to section 547(b) of the Bankruptcy Code.

179.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 547 that each of the transfers is avoided and the transferred property preserved for the benefit of the Debtors' estates.

## COUNT FIVE
### Avoidance Of Actual Fraudulent Transfers
### Under 11 U.S.C. § 548(a)(1)(A) And 11 U.S.C. § 544
### (Against All Defendants)

180.    The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

181.    Within two years of the Petition Date, the Debtors made numerous transfers of property to or for the benefit of the Insider Defendants and Camelot, including but not limited to:

- Excessive bonuses, equity awards, stock options, and cash compensation;

- Reimbursement of personal expenses, including personal aircraft use, housing, and transportation costs;

- Tax gross-up payments and consulting fees;

- Payments under the Camelot Management Agreement for purported consulting and marketing services; and

- Payments to Camelot SI Leasing, LLC for the lease and eventual purchase of a private aircraft (collectively, the "Fraudulent Transfers").

182.   These transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtors, including by stripping value from the Debtors at a time when they were insolvent or nearly insolvent; diverting assets to the Insiders and Camelot while the Debtors were burdened with mounting liabilities from litigation, regulatory investigations, and customer claims; and using the Debtors as a vehicle to enrich the Insiders and Camelot while concealing the true condition of the Company.

183.   Pursuant to 11 U.S.C. § 548(a)(1)(A), the Fraudulent Transfers are avoidable as actually fraudulent transfers.

## COUNT SIX
### Avoidance Of Constructive Fraudulent Transfers
### Under 11 U.S.C. § 548(a)(1)(B) And 11 U.S.C. § 544
### (Against All Defendants)

184.   The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

185.   Within two years of the Petition Date, the Debtors made the Fraudulent Transfers to or for the benefit of the Insider Defendants and Camelot, including but not limited to:

- Excessive bonuses, equity awards, stock options, and cash compensation;

48

- Reimbursement of personal expenses, including personal aircraft use, housing, and transportation costs;

- Tax gross-up payments and consulting fees;

- Payments under the Camelot Management Agreement for purported consulting and marketing services; and

- Payments to Camelot SI Leasing, LLC for the lease and eventual purchase of a private aircraft.

186.    The Debtors received less than reasonably equivalent value in exchange for the Fraudulent Transfers, in that:

- The Debtors paid millions under the Camelot Management Agreement without receiving legitimate or market-based value;

- Compensation, bonuses, and stock awards to the Insiders were grossly disproportionate to the Debtors' declining revenues and deteriorating financial condition;

- Fringe benefits, tax gross-ups, and personal reimbursements provided no value to the Debtors; and

- The aircraft lease and purchase from a Camelot affiliate conferred no benefit on the Debtors and were self-dealing transactions.

187.    At the time of each transfer, the Debtors (i) were insolvent or became insolvent as a result of the transfers; (ii) were engaged in business for which they had unreasonably small capital; or (iii) intended to incur, or believed they would incur, debts beyond their ability to pay as they matured.

188.     Pursuant to 11 U.S.C. § 548(a)(1)(B), these transfers are avoidable as constructively fraudulent transfers.

**COUNT SEVEN**
**Avoidance Of Actual Fraudulent Transfers**
**Under 11 U.S.C. § 544(b) And Tenn. Code Ann. § 66-3-305(a)(1)**
**(Against All Defendants)**

189.     The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

190.     Within four years of the Petition Date, the Debtors made transfers of property to or for the benefit of the Insiders and Camelot, including but not limited to: (i) cash bonuses, equity awards, and stock grants totaling tens of millions of dollars; (ii) tax "gross-up" payments, consulting fees, and personal reimbursements; (iii) payments for personal use of aircraft, housing, and transportation; (iv) payments under the Camelot "Management Agreement" for purported consulting and marketing services; and (v) millions of dollars in lease and purchase payments for a private aircraft from Camelot SI Leasing, LLC (collectively, the "Tennessee Fraudulent Transfers").

191.     The Tennessee Fraudulent Transfers were made at a time when the Debtors faced escalating litigation, regulatory investigations, declining revenue, and mounting liabilities that placed them on the brink of insolvency.

192.     The Debtors made the Tennessee Fraudulent Transfers with actual intent to hinder, delay, or defraud creditors, as evidenced by badges of fraud, including:

- Transfers to insiders and affiliates under common control;

- Concealment of the nature and purpose of certain transfers, including NDAs used to silence harmed consumers;

- Transfers made while the Debtors were insolvent or became insolvent as a result;

- Transfers made after creditors had threatened litigation or while the Debtors were already subject to lawsuits, regulatory actions, and adverse judgments; and

- Transfers that stripped value from the Debtors while providing no legitimate corporate benefit.

193.    Pursuant to Tenn. Code Ann. § 66-3-305(a)(1), as incorporated by 11 U.S.C. § 544(b), the Tennessee Fraudulent Transfers are voidable.

## COUNT EIGHT
### Avoidance of Constructive Fraudulent Transfers
### Under 11 U.S.C. § 544(b) And Tenn. Code Ann. § 66-3-305(a)(1)
### (Against All Defendants)

194.    The Trustee repeats and realleges all preceding paragraphs.

195.    Within four years of the Petition Date, the Debtors made the Tennessee Fraudulent Transfers described above to or for the benefit of the Insiders and Camelot.

196.    The Debtors did not receive reasonably equivalent value in exchange for the Tennessee Fraudulent Transfers, as (i) the bonuses, equity awards, and compensation were grossly disproportionate to the Debtors' collapsing financial performance; (ii) fringe benefits such as aircraft usage, housing reimbursements, and tax gross-ups provided no value to the Debtors' business; (iii) the Camelot Management Agreement extracted millions of dollars annually for conflicted services that were duplicative, unnecessary, and not performed at arm's length; and (iv) the aircraft lease and purchase from Camelot SI Leasing, LLC were self-dealing transactions that inured directly to the Insiders' benefit.

197.    At the time of the Tennessee Fraudulent Transfers, the Debtors: were insolvent or became insolvent as a result of the transfers; were engaged in business for which their remaining assets were unreasonably small; and/or intended to incur, believed or reasonably should have believed they would incur, debts beyond their ability to pay as they came due.

198.     Pursuant to Tenn. Code Ann. § 66-3-306(a), as incorporated by 11 U.S.C. § 544(b), the Tennessee Fraudulent Transfers are voidable as constructively fraudulent transfers.

## COUNT NINE
### Recovery Of Avoided Transfers Pursuant To 11 U.S.C. § 550
### (Against All Defendants)

199.     The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

200.     To the extent the transfers and obligations described above are avoided as preferences or fraudulent transfers under sections 547 or 548 of the Bankruptcy Code, the Trustee is entitled to recover the property transferred or the value of the property transferred from each Defendant or any immediate or mediate transferee of the Defendant under section 550 of the Bankruptcy Code.  The assets recovered will become the property of the Debtors' estates.

## COUNT TEN
### Disallowance Of Claims Pursuant To 11 U.S.C. § 502(d)
### (Against All Defendants)

201.     The Trustee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

202.     Defendants are persons or entities from which property is recoverable under section 550 of the Bankruptcy Code.

203.     Defendants have not paid the amount or turned over any property transferred for which Defendants are liable under section 550 of the Bankruptcy Code.

204.     Pursuant to section 502(d) of the Bankruptcy Code, any filed or scheduled claims held by Defendants must be disallowed until Defendants repay in full an amount equal to the aggregate amount of the avoidable transfers, plus interest thereon and costs.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment against the

Defendants as follows:

a. An award of monetary damages in the amount of the losses suffered by Debtors, in amounts to be determined at trial;

b. An award of fees, costs, and expenses incurred by the Trustee in connection with investigating and prosecuting the claims and causes of action alleged herein;

c. Avoiding preferential transfers and fraudulent transfers pursuant to 11 U.S.C. §§ 544, 547, and 548, and applicable state fraudulent transfer law;

d. Awarding monetary damages or restitution, including the proceeds realized from the sale or disposition of any stock transferred, in amounts to be determined at trial, pursuant to 11 U.S.C. § 550;

e. Preserving avoided transfers for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551;

f. Disallowing any claims of Defendants against the Debtors' estates pursuant to 11 U.S.C. § 502(d) unless and until repayment is made;

g. Pre-judgment and post-judgment interest; and

h. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Trustee hereby demands a trial by jury of all issues so triable pursuant to Federal Rule

of Civil Procedure 38 and Federal Rules of Bankruptcy Procedure 9015.

Dated:  October 10, 2025

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:   */s/ Ryan C. Wooten*
     Ryan C. Wooten, Texas Bar No. 24075308
     609 Main Street, 40th Floor
     Houston, TX 77002-3106
     Telephone: (713) 658-6400
     Facsimile: (713) 658-6401
     Email:    rwooten@orrick.com

     David Litterine-Kaufman (*pro hac vice* application forthcoming)
     Nicholas Poli (*pro hac vice* application forthcoming)
     Mark Franke (*pro hac vice* application forthcoming)
     Ariel Roytenberg (*pro hac vice* application forthcoming)
     51 West 52nd Street
     New York, New York 10019-6142
     Telephone: (212) 506-5000
     Facsimile:  (212) 506-5151
     Email:    dlitterinekaufman@orrick.com
            npoli@orrick.com
            mfranke@orrick.com
            aroytenberg@orrick.com

*Special Litigation Counsel to Allison D. Byman, The Chapter 7 Trustee for Debtors SmileDirectClub, Inc., et al.*